EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

* * * * * * * * *

MARIA ANDRADE, on behalf of
herself and those similarly
situated, and SHAUN CAULKINS,
on behalf of himself and those
similarly situated,                    NO. 3:18-cv-06743-SK

        Plaintiffs,

   vs.

AMERICAN FIRST FINANCE, INC.,
a corporation; AHMAD FAYEZ AL
RAWASHDEH, an individual and
dba ELEGANT FURNITURE; TERESA
LOREDO, an individual and dba
BELLA'S FURNITURE,

        Defendants.
_____/

DEPOSITION OF MARIA ANDRADE

September 10, 2019

TAKEN BEFORE CANDI LEON
CERTIFIED SHORTHAND REPORTER
STATE OF CALIFORNIA
CSR LICENSE NO. 6364

Pizzorni & Jarnagin
925-416-1800

```
 1                         MARIA ANDRADE

 2                  After being placed under oath

 3                by the Certified Shorthand Reporter,

 4                      testified as follows:

 5

 6                  EXAMINATION BY MR. BALOGH

 7

 8    BY MR. BALOGH:

 9        Q.   Can you please state your name?

10        A.   Maria R. Andrade.

11        Q.   Were you once known as Maria Rivera?

12        A.   Andrade.

13             Oh, yeah, Maria Rivera.

14        Q.   And is that a maiden name or a former married

15    name, or where does that name come from?

16        A.   That's my maiden name.

17        Q.   How long have you been Maria Andrade?

18        A.   Three years.

19        Q.   And is that a married name?

20        A.   Yes.

21        Q.   Have you been married before --

22        A.   Yes.

23        Q.   -- you were married three years ago?

24             Let me -- have you ever given a deposition

25    before?
```

Maria Andrade & Shaun Caulkins vs. American First Finance, Inc. et al                    Maria Andrade

7

Pizzoni & Jarnagin
925-416-1800

| | | |
|---|---|---|
| 1 | **Q.** | Yes. |
| 2 | **A.** | R-a-y-m-u-n-d-o. |
| 3 | **Q.** | And what does Mr. Andrade do for a living? |
| 4 | **A.** | Construction. |
| 5 | **Q.** | Does he work in Concord, California? |
| 6 | **A.** | Yes. |
| 7 | **Q.** | What is your current email address? |
| 8 | **A.** | I have two. |
| 9 | **Q.** | Can you tell me what those are? |
| 10 | **A.** | The first one is mariariveraandrade62@gmail.com. |
| 11 | **Q.** | Okay.  And what is the other one? |
| 12 | **A.** | It is m, as in "Maria," n, as in "Nancy," |

13    rivera62@yahoo.com.

| | | |
|---|---|---|
| 14 | **Q.** | Have you ever had other email addresses? |
| 15 | **A.** | No. |
| 16 | **Q.** | Do you know whose email address is |

17    1miketru@gmail.com?

| | | |
|---|---|---|
| 18 | **A.** | No. |
| 19 | **Q.** | Have you ever heard that -- of that email address |

20    before?

| | | |
|---|---|---|
| 21 | **A.** | No. |
| 22 | **Q.** | And it's the number 1miketru@gmail.com. |
| 23 | **A.** | No. |
| 24 | **Q.** | Have you ever seen that email address before? |
| 25 | **A.** | No. |

Maria Andrade & Shaun Caulkins vs. American First Finance, Inc. et al                    Maria Andrade

13

Pizzorni & Jarnagin
925-416-1800

1    Q.   You don't have any degrees or certifications?

2    A.   For college you're talking about?

3    Q.   Or just professionally.  You know, as part of

4    your employment history, I know that you haven't been to

5    college, but have you had any other type of vocational

6    training or certifications?

7    A.   I have training in elderly care.

8    Q.   Elderly care?

9    A.   Yes.

10   Q.   And is that what you do for a living?

11   A.   Yes.

12   Q.   You still work for Sunrise Assisted Living?

13   A.   Yes.

14   Q.   How long have you worked at Sunrise?

15   A.   Fifteen years.

16   Q.   What do you do for Sunrise?

17   A.   I am a supervisor, lead care manager.

18   Q.   So what does that mean you do on a day-to-day

19   basis?

20   A.   I make sure that I give out the assignments that

21   we're going to do for the elderly for that day, showers,

22   laundry.  Anyone that's on Hospice, I'm the first one to

23   make sure everything's okay with them, no bed sores, no

24   complications.  I go around to make sure that we have

25   enough supplies for the elderly, make sure the meals are

```
 1   getting prepared.  And I take care of my own six

 2   residents, shower them, get them up, dressed.

 3        Q.   Okay.  How many residents are in that facility?

 4        A.   Right now we only have 14.

 5        Q.   Okay.  So you have responsibility for six of

 6   them, and then it sounds like you're also supervising the

 7   staff that's taking care of the rest of them.

 8        A.   Yes.

 9        Q.   Who is your boss?

10        A.   My boss is Rona Vargas (phonetic).

11        Q.   And were you off today or how --

12        A.   I took the day off.

13        Q.   You took the day off?

14        A.   Um-hum.

15        Q.   Do you work a defined schedule?

16        A.   I work Monday through Friday 6:00 until whenever

17   I go off.

18        Q.   And when is that normally?

19        A.   It's really 6:00 to 2:00.

20        Q.   Um-hum.

21        A.   But it just depends day by day.  It depends on

22   what's going on at that -- at that moment.

23        Q.   What other positions have you held other than at

24   Sunrise Elderly Care?

25        A.   That's it at Sunrise.
```

Pizzorni & Jarnagin
925-416-1800

```
 1        Q.  Were you told anything about 90 days same as
 2    cash?
 3        A.  Yes.
 4        Q.  90 days no interest?
 5        A.  He just said, "If you want to pay it off, you
 6    have 90 days."
 7        Q.  And what did you understand that to mean?
 8        A.  I had 90 days to pay the whole thing off.  If
 9    not, he said I can make payments.  And that's when we
10    agreed on $100 a month.
11        Q.  And did you have an understanding that, if you
12    decided to make payments, that you were going to also be
13    responsible for interest on those payments?
14        A.  We didn't talk about interest at all, so I didn't
15    think about it.
16        Q.  Well, did you ask about interest?
17        A.  No, I did not.
18        Q.  Did you have an understanding of how long the
19    repayment obligation would be?
20        A.  No.  He just told me until it's paid off.
21        Q.  Did you have an understanding that it would be
22    more than a year?
23        A.  No.
24        Q.  Did you have an understanding that it would be
25    closer to 18 months?
```

1    location undertaking this transaction, did you ask about

2    interest?

3          **A.**   No.

4          **Q.**   Did you come to realize that you would, in fact,

5    be paying interest on this financing?

6          **A.**   Did I realize?

7          **Q.**   Yes.

8          **A.**   After I talked to First American, yes.

9          **Q.**   And when was that?

10         **A.**   When I asked them, I'm thinking about 2016.

11         **Q.**   What part of 2016?

12         **A.**   September, maybe, October, when I got the

13   contract from them.

14         **Q.**   Where is the furniture now?

15         **A.**   It's at home.

16         **Q.**   Do you still use it?

17         **A.**   No.

18         **Q.**   So where do you keep it?

19         **A.**   I keep it in Fresno at my mom's house.

20         **Q.**   Does your mom use it?

21         **A.**   No.

22         **Q.**   So is it in a storage unit or a garage or

23   somewhere?

24         **A.**   It's in the second bedroom.  I wanted it for when

25   the kids come down, they had a place to sleep.

1     **Q.**  Yes, that's correct?

2     **A.**  Yes.

3     **Q.**  So where did -- did you sit down with Mr. Tru --

4   I guess I don't know if he goes by Mr. Tru, but we'll call

5   him Tru.

6     **A.**  Um-hum.

7     **Q.**  Did you sit down with Tru and go over the terms

8   of the transaction with him?

9     **A.**  Yes.

10    **Q.**  And you said you didn't ask him anything about

11   interest?

12    **A.**  No.

13    **Q.**  What else, if anything, did he say to you about

14   the transaction?

15    **A.**  Just like what I just said.  He asked me about

16   the bed.  I liked it, talked about what I can afford.  And

17   we just -- I was hoping for a thousand dollars, but we

18   went 200 over.  And I said okay.  And we agreed on a

19   hundred dollars.

20    **Q.**  And when you say you agreed, that's what you

21   understood to be an oral agreement between you and Tru?

22    **A.**  Yes.

23    **Q.**  Did you ask any questions about whether there

24   would be a written agreement?

25    **A.**  Just the receipt, the contract, that he gave me.

Pizzuti & Jernagin
925-416-1800

1        Q.   Well, did you ask if that was the written

2   agreement between Elegant Furniture and you?

3        A.   Yeah, the -- this is -- I'd asked him, "This is

4   it?"

5             And he said, "Yes."

6        Q.   Did you ever receive at the time you were sitting

7   there a contract from Elegant Furniture?

8             MR. LeBEL:   Objection, form.

9   BY MR. BALOGH:

10       Q.   You may answer.

11       A.   The contract that I signed, yes.

12       Q.   Did you ever receive the security agreement

13  contract that had the terms to it while you were there?

14       A.   The contract that I signed, yes, just what I

15  have.

16       Q.   Let me show you what I'm going to mark -- and

17  we're going to continue, by agreement, the exhibit

18  numbers.  So I'm going to show you what's going to be

19  marked as your first exhibit, but it's going to be marked

20  as Exhibit 12.

21             (Defendants' Exhibit 12 was marked for

22              identification.)

23  BY MR. BALOGH:

24       Q.   Is this the contract that you're referring to?

25       A.   Yes.

Pizzutti & Jernagin
925-416-1800

1      **Q.**  Was that your recollection?

2      **A.**  Yes.

3      **Q.**  Do you see up in the middle where it says,

4  "90 days same as cash"?

5      **A.**  Yes.

6      **Q.**  Did I read that correctly?

7      **A.**  Um-hum.

8      **Q.**  You have to answer.

9          Did I read that correctly?

10      **A.**  Yes.

11      **Q.**  And was it your understanding on that day that,

12  if you made all the payments that totaled $1,201.62 within

13  90 days, that you would be charged no interest?

14      **A.**  No.

15      **Q.**  What did you understand "90 days same as cash" to

16  mean?

17      **A.**  He told me I have 90 days to pay it off; if not,

18  I can make payments.

19      **Q.**  And when you were told that, if you don't pay it

20  off in 90 days and you've made payments thereafter, did

21  you understand that you would be charged interest?

22      **A.**  No.

23      **Q.**  So did you believe that you weren't going to be

24  charged interest?

25      **A.**  I didn't think about it.

```
 1    American First Finance in the paragraph that begins at the
 2    bottom, "By signing below, I hereby"?  Do you see the
 3    references to American First Finance?
 4         A.   Where are we talking about?  Right here
 5    (indicating)?
 6         Q.   Yes, ma'am.
 7         A.   Um-hum.
 8         Q.   You do see the references to American First
 9    Finance in that paragraph?
10         A.   I see First American Finance [sic] here, yes.
11         Q.   All right.  You can put that to the side.
12              When you were sitting with Tru at the furniture
13    company, did Tru receive anything electronically that you
14    were aware of related to your particular transaction?
15         A.   No.
16              MR. LeBEL:  Objection, form.
17              THE WITNESS:  Oh.
18              Yeah.  No.
19    BY MR. BALOGH:
20         Q.   You have to let Dan object if he wants to.
21         A.   Oh.  Sorry.
22         Q.   So just -- so let me ask the question again.
23              While you were sitting with Tru, did he mention
24    to you or did he show to you any documents that he may
25    have received electronically related to your transaction?
```

1      **A.**  Not that I recall.

2      **Q.**  Could it have been that he did and you just don't

3  recall that he did?

4      **A.**  No, not that I recall.  He did not.

5      **Q.**  So there's a difference between not recalling and

6  no.  I'm just trying to make sure that I understand.

7          When you say, "not that I recall," does that mean

8  that you don't have any recollection of him receiving

9  those types of documents?

10     **A.**  No, he did not.

11     **Q.**  So you're saying definitively that, while you

12  were sitting with Mr. Tru, that Mr. Tru did not receive

13  any electronic documents pertaining to your transaction?

14         MR. LeBEL:  Object to the form of the question.

15         THE WITNESS:  No.

16  BY MR. BALOGH:

17     **Q.**  No, that's correct?

18     **A.**  No, that's correct.

19     **Q.**  Thank you.

20         Did you receive a repayment schedule?

21     **A.**  No.

22     **Q.**  Were you shown a repayment schedule?

23     **A.**  When I asked First American to send me the

24  contract, I don't recall if they sent it to me or not.

25     **Q.**  I want to show you what I've marked as

Pizzuti & Jernagin
925-416-1800

```
 1   Exhibit 15.

 2              (Defendants' Exhibit 15 was marked for

 3               identification.)

 4              MR. LeBEL:   Thank you.

 5              MR. BALOGH:   You're welcome.

 6              THE WITNESS:   Oh.

 7              I recall getting this from First American.

 8   BY MR. BALOGH:

 9        Q.   You mean American First?

10        A.   American First.

11        Q.   I do that all the time, by the way.

12        A.   Yeah, constantly.

13        Q.   So this Exhibit 15, is this what you say you

14   received from American First?

15        A.   Yes.

16        Q.   And when would you have received this document?

17        A.   Hmm.

18              I don't recall when I received it.  I don't

19   recall when I received it.

20        Q.   Do you -- would it have been after the -- it

21   would have been after December the 9th, 2015?

22        A.   No.

23        Q.   Let me ask the question again because you may not

24   have heard me.

25              Would you have received Exhibit 15 after December
```

1   the 9th, 2015?

2      **A.**  Yes.

3      **Q.**  Okay.  How far after December the 9th, 2015, did

4   you receive Exhibit 15?

5      **A.**  I received it -- I don't recall the month or the

6   date, but it was after September, after talking with

7   Anthony.

8      **Q.**  So that would be September of 2016?

9      **A.**  Um-hum.

10       Yes.

11      **Q.**  And do you see up at the top where it says,

12   "DocuSign Envelope ID," and it's got a big long number

13   after it?

14      **A.**  Yes.

15      **Q.**  Do you know what that is?

16      **A.**  No.

17      **Q.**  Do you see at the bottom where it says, "AFF010"?

18      **A.**  Yes.

19      **Q.**  Do you know what that is?

20      **A.**  No.

21      **Q.**  Do you contest that you agreed to your electronic

22   signature on this first page of the document?

23      **A.**  Yes.

24      **Q.**  And, if you turn to the next few pages, do you

25   see that that's a Security Agreement?

1          MR. LeBEL:  Objection, form of the question.

2          THE WITNESS:  The next page?

3   BY MR. BALOGH:

4      **Q.**  Yes, ma'am.  But it's a collection of -- it says

5   it's several pages, six.

6          Do you see where it says, "Security Agreement"?

7      **A.**  Um-hum.

8          Yes.

9      **Q.**  Okay.  Is this a security agreement that you

10  would have received in September of 2016 at your request

11  from American First Finance?

12     **A.**  Yes.

13     **Q.**  And if you will turn several pages in, you see

14  this page (indicating)?

15         Do you see on what's marked as page 6 of 6, it's

16  got an electronic signature of -- of the buyer right

17  there?

18     **A.**  Yes.

19     **Q.**  Do you see that?

20     **A.**  Yes.

21     **Q.**  Do you contest that that's your electronic

22  signature?

23         MR. LeBEL:  Objection, the form of the question.

24         THE WITNESS:  Yes.

25  ///

1    BY MR. BALOGH:

2        **Q.**  Do you contest that you ever gave approval for

3    that electronic signature?

4        **A.**  No.

5        **Q.**  You don't contest that?

6            MR. LeBEL:  I'll object to the form of the

7    question.

8    BY MR. BALOGH:

9        **Q.**  You may answer.

10       **A.**  Rephrase that again.

11       **Q.**  Do you contest that you ever gave permission for

12    an electronic signature?

13       **A.**  Yes.

14       **Q.**  Okay.

15            You see where there's a -- pardon me.

16            MR. LeBEL:  Gesundheit.

17            MR. BALOGH:  Thank you.

18       **Q.**  Do you see where there's another electronic

19    signature about the middle of that page?

20       **A.**  Yes.

21       **Q.**  Is that an electronic signature that you gave

22    approval for?

23       **A.**  No.

24       **Q.**  Have you ever used electronic signatures?

25       **A.**  Never.

Pizzutti & Farnagin
925-416-1800

1    **Q.**  Do you use them as part of intake materials at

2    the assisted living memory care facility?

3    **A.**  No.  I sign for everything.

4    **Q.**  Well, do others use electronic signatures?

5    **A.**  I have no idea if they do.

6    **Q.**  How about patients when they're admitted?  Do you

7    all use electronic signatures at the memory care facility?

8    **A.**  No.

9    **Q.**  So, when you were sitting with Tru, did Tru say

10   anything to you about, "Well, do you agree to the" -- "to

11   the terms of financing the furniture?"  Did he ever ask

12   you if you agreed to it?

13   **A.**  To the finance furnishing?  No.

14   **Q.**  Did Tru ever asked you if you agreed to anything

15   regarding the purchase of the furniture?

16        MR. LeBEL:  Objection, the form of the question.

17        THE WITNESS:  We agreed on the payment.

18   BY MR. BALOGH:

19   **Q.**  And how was that agreement expressed?

20   **A.**  He asked me how much am I -- am I willing -- I

21   mean -- how did he put it?

22        He asked me how much I can afford a month.  And I

23   told him about a hundred dollars a month.  And he said

24   okay.

25   **Q.**  Did he --

1     **A.**  And he asked me for my name, my phone number, my

2     address.

3     **Q.**  Did he say anything else?

4     **A.**  No.

5     **Q.**  Did you ask him any more questions?

6     **A.**  No.

7     **Q.**  All right.  Put that to the side, please.  I want

8     to move to another exhibit.

9           After you entered into the purchase agreement,

10    did you receive electronically a copy of the security

11    agreement?

12    **A.**  No.

13    **Q.**  Other than the one that you received in September

14    of 2016?

15    **A.**  No.  From Elegant Furniture, just my contract

16    that I have with him.

17    **Q.**  How about from American First?  Did you receive a

18    copy of the security agreement electronically from

19    American First other than when they sent it to you as you

20    requested in September of 2016?

21    **A.**  No.

22    **Q.**  Do you have any recollection of that, or do you

23    definitively say that you did not receive anything?

24    **A.**  Just the contract that they sent me.

25    **Q.**  So what I'm asking is, do you definitively

Pizzuti & Jernagin
925-416-1800

1    testify that, other than when American First sent the

2    security agreement to you, as you said, in September of

3    2016, had you ever received the security agreement before

4    that time?

5         **A.**   No.

6         **Q.**   Have you -- do you still have your email?

7         **A.**   I still have it.

8         **Q.**   Do you delete email as you get them?

9         **A.**   No.  It stayed with the old phone.  This is the

10   new phone.  It stayed with the old phone, and it's put

11   away.  And I just barely added the email.

12            I don't check my emails.

13        **Q.**   As a matter of practice you don't normally check

14   your emails?

15        **A.**   No.

16        **Q.**   Have you checked your emails to determine whether

17   you received a copy of the security agreement on December

18   9, 2015?

19        **A.**   Not that I recall.

20        **Q.**   Can you rule out that perhaps you did receive a

21   copy of the security agreement on that day?

22        **A.**   On which day?

23        **Q.**   December 9, 2015.

24        **A.**   No.

25        **Q.**   So you can't rule that out?

Pizzuti & Jernagin
925-416-1800

1    payment is reduced to $129.08?

2        **A.**  Yes.

3        **Q.**  And you don't see any reference to any payments

4    beyond that date, correct?

5        **A.**  No.

6        **Q.**  And you -- is it your testimony that you did not

7    have an understanding of exactly how long your repayment

8    obligations would be?

9        **A.**  No.

10       **Q.**  No, that's correct?

11       **A.**  That's correct.

12       **Q.**  Are you aware that, when you quit paying that,

13   there was still a balance owed --

14       **A.**  Yes.

15       **Q.**  -- on the account?

16       **A.**  Yes.

17       **Q.**  And have you done anything to address that

18   deficiency?

19           MR. LeBEL:  Objection, form of the question,

20   argumentative.

21   BY MR. BALOGH:

22       **Q.**  You may answer.

23       **A.**  Repeat the question.

24       **Q.**  Have you done anything to address that deficiency

25   in the amount that you owe?

1          Do you see that?

2     **A.**   Yes.

3     **Q.**   Is that addressed to Elegant Furniture?

4     **A.**   I don't recall.

5     **Q.**   Well, did Elegant Furniture or American First

6    sell you the furniture on December the 9th?

7     **A.**   Elegant Furniture.

8     **Q.**   So you wrote, "You sold me furniture on

9    December 9, 2015 but never told me that I would be paying

10   120% interest on the sale."

11         Do you see that?

12    **A.**   Yes.

13    **Q.**   So we talked about earlier, you did not ask any

14   questions about the interest that would be charged on the

15   transaction, correct?

16    **A.**   Correct.

17    **Q.**   And you also testified that you were never told

18   the interest that would be charged, correct?

19    **A.**   Correct.

20    **Q.**   So is it your testimony that that was an issue

21   that just wasn't addressed at the time that you purchased

22   the furniture in December of 2015?

23    **A.**   Correct.

24    **Q.**   Have you ever financed anything before?

25    **A.**   Yes.

Pizzuti & Brenagin
925-416-1800

1    charged interest?

2            MR. LeBEL:  Object, form of the question.

3    BY MR. BALOGH:

4        Q.  You may answer.

5        A.  When I buy my vehicles, I have the salesman and

6    the finance company on the phone explaining everything

7    that I'm going to be signing.

8        Q.  And when was the last time you did that?

9        A.  2000 -- I'm thinking 2016.

10       Q.  And who has that been?

11       A.  Paul Blanco.

12       Q.  Who is Paul Blanco?

13       A.  It's a car dealership in Fresno, California.

14       Q.  And what did you finance?

15       A.  A Nissan Altima 2013.

16       Q.  Did you have a written contract?

17       A.  Yes.

18       Q.  You then -- turning your attention back to the

19   Exhibit 18, you then state, "You never said anything about

20   the financing terms except that payment in 90 days was the

21   same as cash."

22           Is that a true statement?

23       A.  Yes.

24       Q.  I thought earlier you said something to the

25   effect that Tru had told you that your payment would be

1   around a hundred dollars.

2        **A.**   He said it was going to be a hundred dollars.

3        **Q.**   Did he say it was going to be a hundred dollars

4   or around a hundred dollars?

5        **A.**   A hundred dollars, that's what we agreed on.

6        **Q.**   And did you say that -- did he say that, or did

7   you say that that was the amount that you would be able to

8   pay?

9        **A.**   That's the amount that I'm able to pay.

10       **Q.**   Okay.  So did Tru say anything to you about

11  agreeing that your payment would be a hundred dollars a

12  month?

13       **A.**   Yes.

14       **Q.**   And what exactly do you say that he said to you?

15       **A.**   He asked me --

16       MR. LeBEL:  Objection, form of the question.

17  BY MR. BALOGH:

18       **Q.**   You may answer.

19       **A.**   He asked me how much I can afford a month, and I

20  told him a hundred dollars a month.  And he said, "Okay,"

21  and he set up my contract.

22       **Q.**   You then say, "I left thinking that I would be

23  receiving a monthly invoice from Elegant Furniture, but I

24  never received a coupon book or statements."

25            Did I read that correctly?

1      **A.**   Yes.

2      **Q.**   Did you ever ask for a coupon book or statements?

3      **A.**   No.

4      **Q.**   And you paid for, what, about a year and a half,

5   almost a year and a half?

6      **A.**   Yes.

7      **Q.**   And you never once asked for a coupon book or

8   statements?

9      **A.**   No.

10          MR. LeBEL:  Objection, argumentative.

11   BY MR. BALOGH:

12      **Q.**   No, that's correct?

13      **A.**   That's correct.

14      **Q.**   Thank you.

15          You then say, "Only after calling you because I

16   thought I had paid off the loan did you tell me that the

17   lender was American First...."

18          Is that a true statement?

19      **A.**   Yes.

20      **Q.**   And you knew that American First was drawing and

21   drafting from your account, correct?

22      **A.**   No.

23          MR. LeBEL:  Objection.

24          Thank you.

25          THE WITNESS:  Sorry.

1    report to you, right?

2        **A.**   Yes.

3        **Q.**   When you say, "Only after calling you because I

4    thought I had paid off the loan...," what do you mean by

5    "paid off the loan"?

6        **A.**   I kept the booklet beside me when I make a

7    payment, and I wrote down the date.  I always assumed it

8    was on the -- on the 9th because that's the day I bought

9    the furniture.  So every time the 9th comes around, I

10   would write it down.

11       **Q.**   So you knew that there was a loan, right?

12       **A.**   With Elegant Furniture, yes.

13       **Q.**   And the nature of the loan, of course, is to

14   charge interest, correct?

15            MR. LeBEL:  Objection.

16            THE WITNESS:  No.

17   BY MR. BALOGH:

18       **Q.**   Okay.  Why do you say no?

19       **A.**   Because Elegant -- I made a contract with Elegant

20   Furniture.  They're the ones that's selling me.  I'm

21   paying them.  They didn't tell me they're selling my

22   contract to American First.  I thought that's who they

23   were, Elegant Furniture, me and Elegant.  That's it.

24       **Q.**   Okay.  My question was geared more toward -- I

25   mean, you understood that you would be charged interest on

Pizzuto & Jernagin
925-416-1800

1    the loan that you're referencing as having paid off,

2    correct?

3              MR. LeBEL:  Objection, form of the question.

4              THE WITNESS:  We didn't talk about interest.  I

5    just know that I was paying 143 and change, and that's

6    what I was going off of.

7    BY MR. BALOGH:

8        Q.  And I appreciate your answer.  You've said you

9    didn't ask about and you didn't discuss the interest rate

10   at the time that you purchased the furniture.  But my

11   question is geared more toward at this point,

12   January 20th, 2017, you understood that that loan that you

13   had taken out was interest bearing, correct?

14       A.  No.

15       Q.  So did you think that you were paying an

16   interest-free loan?

17       A.  I can't answer that question because my -- like

18   I'm going to say again, my dealings, my contract was with

19   Elegant Furniture.  This is the amount they gave me.  This

20   is the amount that I abide by.  They told me the 9th;

21   that's the 9th it started; every month it's the 9th.

22             So interest, loans, we did not talk about that.

23   We talked about payments with Elegant Furniture.  Me and

24   Elegant Furniture talked about the payment.  The payment

25   was a hundred.  There was no talk about loans, and there

1   was no talk about interest.

2       **Q.**  Now, when you -- after you purchased the

3   furniture, it had to be delivered to your house, correct?

4       **A.**  Yes.

5       **Q.**  And did Elegant Furniture deliver the furniture

6   to your house?

7       **A.**  Yes, they did.

8       **Q.**  And who was it from Elegant Furniture?  Do you

9   recall?

10      **A.**  I was not there.

11      **Q.**  Did they try to contact you before?

12      **A.**  No.  I contacted them because they were late with

13  my furniture.

14      **Q.**  Okay.  Did you have an understanding that you had

15  to acknowledge the agreement, the loan agreement, before

16  the furniture could be delivered by Elegant Furniture?

17      **A.**  In what way do you mean?

18      **Q.**  Well, did anybody talk to you from Elegant

19  Furniture or otherwise that you had to sign and agree to

20  the loan terms before the property could be delivered to

21  your house?

22      **A.**  I --

23          MR. LeBEL:  Objection, form.

24  BY MR. BALOGH:

25      **Q.**  You may answer.

Pizzuti & Jernagin
925-416-1800

1      **A.**   Yes.

2      **Q.**   And there was problems with the -- or there were

3   problems with getting it delivered to the home, correct?

4      **A.**   Yes.

5      **Q.**   Were some of those problems related to making

6   sure that the finance terms were acknowledged?

7      **A.**   No.

8      **Q.**   I believe I heard you say -- correct me if I'm

9   wrong -- that there was some problem and you had to go

10  back and talk about it.  Did I mishear that?

11     **A.**   Yes.

12     **Q.**   Okay.  Let me ask this.  During the -- how many

13  times have you been to Elegant Furniture?

14     **A.**   Twice.

15     **Q.**   The --

16     **A.**   No -- I'm sorry -- three times.

17     **Q.**   Three times?

18     **A.**   Yes.

19     **Q.**   So the first time was December 9, 2015, the day

20  of the purchase, correct?

21     **A.**   Yes.

22     **Q.**   How long did you stay there?

23     **A.**   About -- I can't recall.  It wasn't long, about

24  30 minutes.

25     **Q.**   Thirty minutes?

1    **A.**   Forty minutes.

2    **Q.**   And you went with your brother-in-law, correct?

3    **A.**   Yes.

4    **Q.**   And you say he wasn't involved in the

5    discussions, correct?

6    **A.**   Yes.

7    **Q.**   That's correct?

8    **A.**   Yes, correct.

9    **Q.**   And that lasted 30 minutes, and you left?

10   **A.**   Yes.

11   **Q.**   And where did things stand at that point?

12   **A.**   That they were going to deliver my furniture.

13   **Q.**   And when were they going to deliver it?

14   **A.**   I don't recall.

15   **Q.**   What's the next occasion you went to Elegant

16   Furniture?

17   **A.**   I went back to Elegant Furniture about maybe two

18   weeks because the furniture hasn't been delivered.

19   **Q.**   Okay.  And just so I'm clear, before we get to

20   that second visit, you've told us all that you can

21   remember about that first visit, correct?

22   **A.**   Um-hum.  Yes.

23   **Q.**   And then the second visit was about two weeks

24   later, and you went back because the furniture hadn't been

25   delivered to you?

1      Q.  And so, if we do some math with $143 a month

2   times nine months, it's about $1,200, correct?

3      A.  Yes.

4      Q.  So your thinking was that you had no interest on

5   it, that you just could pay it off in nine months without

6   any interest?

7      A.  Yes.

8      Q.  And were you told at that point that that wasn't

9   how things work with loans?

10      A.  Nobody --

11         MR. LeBEL:  Objection, argumentative.

12   BY MR. BALOGH:

13      Q.  You may answer.

14         I think you talked over him as he was making his

15   objection.  You go ahead.

16      A.  Okay.  Nobody talked to me about the loan or

17   interest.  No conversation about that ever came up.

18      Q.  Okay.  Now, I want to go back to the first visit

19   at Elegant Furniture and your interactions with Tru.

20         I've read a couple places in your declaration and

21   in your interrogatory answers of some reference to

22   clicking things with a mouse.  Do you recall testifying in

23   that regard?

24      A.  I clicked one time on the mouse.

25      Q.  And tell me everything you can recall about that.

1    **A.**  He asked me for my name, where I worked at, how

2    long I'd been there, my phone number, my account number.

3    That way they can take out the money.  And he was just

4    asking me -- he was looking at the computer asking me,

5    "This is correct?  This is correct?"

6           And I go, "Yes.  Yes."

7           And he goes, "Okay."

8           He pushed the mouse to me, and he goes, "Just

9    click to say, yes, that everything is correct."

10          And I said, "Okay," and I clicked it.  And I

11    pushed it back.  And that was it.

12    **Q.**  So where were you in relation to where he was

13    sitting?

14    **A.**  He was sitting on that side, computer facing him,

15    and I was on this side (indicating).

16    **Q.**  So, in other words, he was sitting at his desk

17    with the computer facing him?

18    **A.**  Yes.

19    **Q.**  And you were sitting on the other side of the

20    desk?

21    **A.**  Yes.

22    **Q.**  So you say he pushed the mouse to you and said to

23    click, right?

24    **A.**  Yes.

25    **Q.**  Is that just one of those regular type of mouse

1   that people use with computers?

2        **A.**   Yes.

3        **Q.**   And do you -- was it wireless, or was it corded?

4        **A.**   I don't recall.

5        **Q.**   And your testimony is he said, "Just click"?

6        **A.**   "Just click if this is" -- he said, "So this is

7   all correct, the information that you're giving me?"

8   Because he's reading it out.

9             And I said, "Yeah, it's correct.  It's correct."

10            He goes, "Just click here to say it's correct."

11            I go, "Okay."  I clicked it because it was

12   correct.

13       **Q.**   Well, did you look at it to make sure it was

14   correct?

15       **A.**   No, he did not show me the computer.

16       **Q.**   But you're saying that when he pushed the mouse

17   to you -- you know, the mouse will move with movement.

18       **A.**   Um-hum.

19       **Q.**   You've worked a mouse on a computer, right?

20       **A.**   Yes.

21       **Q.**   And you understand that, when you move a mouse,

22   it moves the cursor all around the computer screen, right?

23       **A.**   Yes.

24       **Q.**   And you say he just pushed the mouse to you and

25   said, "Click here," right?

1    **A.**   No.

2    **Q.**   Did you ask him what you were clicking on?

3    **A.**   That everything was true that I told him.

4    **Q.**   And what do you think it was that you clicked on?

5         MR. LeBEL:  Objection, form of the question.

6         THE WITNESS:  The information that I gave him was

7    true.

8    BY MR. BALOGH:

9    **Q.**   So you were -- by clicking that, you were giving

10   your approval of the information that had been provided

11   for the -- for the purchase?

12   **A.**   Yes.

13   **Q.**   And you knew that and did it voluntarily?

14   **A.**   He asked me if everything was correct, and that's

15   what I did.  I clicked it.

16   **Q.**   Did you ask for a printout of the information?

17   **A.**   No.

18   **Q.**   Did you ask any questions about how the

19   information was being used?

20   **A.**   No.

21   **Q.**   Do you believe, by clicking that mouse, you were

22   giving your E-signature approval to the terms of a

23   contract?

24   **A.**   No.

25   **Q.**   And why do you say that?

1        A.   Because he asked me for my phone number, where I
2   worked, my personal information, where I work at, my phone
3   number in case they need to contact me.  People miss
4   payments.  People won't pay.  So that way he can contact
5   me.  I gave him my work phone number, where I worked, and
6   everything.  And I told him that was correct, and I
7   clicked it.

8        Q.   After he pushed the mouse to you?

9        A.   Yes.

10        Q.   And, to your recollection, you don't recall Tru
11   receiving any electronic documents during the course of
12   this discussion with you?

13        A.   No.

14        Q.   And it's your testimony that you never received
15   an electronic copy of the security agreement contract?

16        A.   No.

17        Q.   You said earlier that you're familiar with loan
18   agreements at least in the context of purchasing vehicles?

19             MR. LeBEL:  Objection to the form of the
20   question.

21   BY MR. BALOGH:

22        Q.   Is that right?

23        A.   With the assistance of my brother-in-law, yes.

24        Q.   And you've actually entered into loan agreements
25   with car dealers?

```
 1              THE WITNESS:  Repeat that again.
 2    BY MR. BALOGH:
 3        Q.  Did anybody ever talk to you about the need for
 4    you to acknowledge the financing terms before the property
 5    could be given to you?
 6        A.  No.
 7        Q.  When you say, "No," do you have a recollection of
 8    that, or are you saying that never happened?
 9        A.  That never happened.
10        Q.  When you purchased your car, the Nissan you were
11    talking about earlier, did you have to acknowledge the
12    financing terms of that loan before they gave you the car?
13        A.  Yes.
14        Q.  And did you do that?
15        A.  Yes.
16        Q.  Does that seem like a normal business practice?
17        A.  Yes.  When I bought my other car --
18        Q.  Was that --
19        A.  -- everything discussed, everything signed.
20        Q.  Does that seem like a reasonable business
21    practice, that somebody would have to acknowledge the
22    terms of the loan before actually taking possession of the
23    property?
24        A.  Yes.
25        Q.  Did there come a time where you received some
```

Due date  11/1/2019 Hinton Law

DEPONENT'S CORRECTION SHEET

To add testimony, indicate "Add" and print the exact words you wish to add.
To delete testimony, indicate "Delete" and print the exact words you wish to delete.

DEPOSITION OF: _Maria Andrade_____

Date: _9-10-19_____

I, _Maria Andrade_, have the following changes to my deposition transcript:

PAGE    LINE    CHANGE (Add/Delete)

_No changing_

_Maria Andrade_

_____        _____
Witness Name              Date