# EXHIBIT 7

# EXPERT REPORT
# OF PROFESSOR ADAM J. LEVITIN

*Andrade v. American First Finance, Inc.*
No. 18-cv-6743-SK (N.D. Cal.)

INTRODUCTION ..................................................................................................................... 2

PROFESSIONAL BACKGROUND AND QUALIFICATIONS ........................................................... 3

SUMMARY OF OPINIONS OFFERED ........................................................................................ 5

I. AFF'S FINANCINGS BEAR INDICIA OF BEING A LOAN ......................................................... 8

    A.   CALIFORNIA REGULATORY LANDSCAPE FOR CONSUMER LOANS AND RISCS ......................... 8
    B.   AFF AND THE AFF TRANSACTIONS ........................................................................ 10
    C.   AFF'S INVOLVEMENT WITH THE FINANCING EXCEEDS WHAT IS NECESSARY TO EFFECTUATE ASSIGNMENT OF A RISC .. 17

II. AFF'S FINANCINGS BEAR INDICIA OF UNCONSCIONABILITY ............................................ 21

    A.   CALIFORNIA STANDARD FOR UNCONSCIONABILITY .................................................... 21
    B.   SUBSTANTIVE UNCONSCIONABILITY ....................................................................... 22
    C.   PROCEDURAL UNCONSCIONABILITY ....................................................................... 24

III. THE RATES ON AFF'S RISCS EXCEED THE MAXIMUM PERMITTED LOAN CHARGES FOR LOANS MADE BY CALIFORNIA FINANCE LENDERS ............................................................... 26

CONCLUSIONS .................................................................................................................... 29

APPENDIX A. CURRICULUM VITAE OF ADAM J. LEVITIN ....................................................... 30

APPENDIX B. DOCUMENTS RELIED UPON IN FORMULATING THE REPORT ........................... 56

APPENDIX C. LIST OF EXPERT TESTIMONY GIVEN AT DEPOSITION OR TRIAL DURING THE PREVIOUS FOUR YEARS ...................................................................................................... 60

## INTRODUCTION

1. My name is Adam Jeremiah Levitin. I was retained by the Sturdevant Law Firm ("**Counsel**"), on behalf of the executive committee representing the plaintiff class (the "**Plaintiff Class**") in *Andrade v. American First Finance, Inc.*, No. 18-cv-6743-SK (N.D. Cal.) to provide expert testimony regarding the consumer finance industry in relation to:

    (1) the question of whether the financing provided defendant American First Finance Co. ("**AFF**" or "**Defendant**"), between November 7, 2014 and the date of class certification (the "**Class Period**") was a loan or the purchase of a retail installment sales contract ("**RISC**");

    (2) the question of the unconscionability of the financing; and

    (3) the maximum rate that a licensed California finance lender may charge on consumer loans and how this compares with the rates on the financing provided by AFF.

2. I express no opinion here on the ultimate questions of law in any issue. Instead, I confine myself to the questions of whether AFF's involvement with retailers went beyond what was necessary to effectuate the purchase of RISCs or was typical for RISC financing, whether a reasonable finder of fact could find that the terms of the financing satisfied California's standard for procedural unconscionability, and whether the rates charged

on the AFF financing exceeded those that a licensed California finance lender is permitted to charge.

3. I have read the Second Amended Complaint (the "**Complaint**") in this litigation and am so acquainted with the allegations in this case regarding the conduct of the Defendants and the proposed definition of the Plaintiff Class as individuals who were customers of AFF's retailer associates who unknowingly became customers of AFF during the four years preceding the filing of the initial Complaint up to present. It is also my understanding that the RICO claims in this litigation have been dismissed.

### PROFESSIONAL BACKGROUND AND QUALIFICATIONS

4. I am the Anne Fleming Research Professor and Professor of Law at the Georgetown University Law Center in Washington, D.C., where I have taught as a full-time faculty member since 2007. I have held tenure at Georgetown University Law Center since 2011 and have held a research professorship since 2018.

5. At Georgetown University Law Center, I teach courses in consumer finance, regulation of financial institutions, bankruptcy, contracts, payment systems, sales, secured lending, and structured finance. As part of my course in consumer finance, I regularly teach about retail installment sales, secondary market financing of consumer credit, and the distinction between the regulatory regimes for lenders and assignees of RISCs.

6. I have previously served as the Bruce W. Nichols Visiting Professor of Law at Harvard Law School; as the Robert Zinman Scholar in Residence at the American Bankruptcy Institute; as a faculty member for the Practicing Law Institute's Consumer Financial Services program; and as the faculty instructor for the Federal Trade Commission's training program for its Division of Financial Practices attorneys.

7. From 2012-2015, I served as a member of the statutory Consumer Advisory Board for the Consumer Financial Protection Bureau ("**CFPB**").

8. Since 2008, I have testified thirty-two times before Congress on financial regulatory issues, including at sixteen hearings dealing specifically with non-mortgage consumer finance. I have also testified regarding consumer finance before the Financial Crisis Inquiry Commission and twice before the Government Accountability Office.

9. I have presented on consumer finance topics at the CFPB, Federal Reserve, FDIC, FTC, and industry conferences sponsored by AmeriCatalyst, the Mortgage Bankers Association, and the National Association of Homebuilders. I have also presented on consumer lending issues on a compensated basis to institutional clients of Citigroup and FBR Capital Markets, and I serve as a for-fee consultant for various investment funds. I have also previously been retained as a consultant on consumer finance issues for the American Association of Retired Persons ("**AARP**") and a paid reviewer for the Pew Charitable Trusts for its studies on consumer finance.

10. I regularly consult informally with members of Congress, the CFPB, the Federal Reserve, the Federal Deposit Insurance Corporation, the Federal Trade Commission, the Departments of Commerce, Housing and Urban Development, and Treasury, the International Monetary Fund, the World Bank, state attorneys general offices, and non-profit policy groups on financial regulation.

11. The consumer finance industry is a major focus of my academic research. I have authored over fifty academic articles and book chapters and encyclopedia entries, the majority of which deal with aspects of consumer finance. Among my publications is the first law school textbook devoted to consumer finance and its regulation, CONSUMER FINANCE: MARKETS AND REGULATION. The book addresses the calculation of usury caps among other topics. I have also written a feature length article on the auto finance industry, *The Fast and the Usurious: Putting the Brakes of Auto Lending Abuses*, 108 GEO. L.J. 1257 (2020) that deals with motor vehicle RISCs and their assignment. A complete list of my academic publications from the last ten years may be found along with my curriculum vitae in Appendix A to this report.

12. My work has been published in leading law, economics, and finance journals and has been awarded prizes from the American College of Consumer Financial Services Lawyers (twice), the *American Bankruptcy Law Journal*, the George Washington University Center for Law, Economics and Finance, and the *Yale Journal on Regulation*. My scholarship has also been cited in numerous judicial opinions, including by state supreme courts in California, Maine, New Jersey, New Mexico, New York, and Rhode Island, and by several federal circuit courts of appeals.

13. I am elected Fellow of the American College of Consumer Financial Services Lawyers, an elected Fellow of the American College of Bankruptcy, and an elected member of the American Law Institute. In 2013, I received the American Law Institute's Young Scholar's Medal, which is awarded every two years to "one or two outstanding early-career law professors whose work is relevant to the real world and has the potential to influence improvements in the law."

14. I serve as a peer reviewer for several scholarly journals. I also serve on the Academic Research Council of the Urban Institute. I previously wrote an occasional column for the *Wall Street Journal* on bankruptcy-related issues.

15. I hold a J.D. *cum laude* from Harvard Law School. I also hold a Bachelor of Arts (A.B.) degree *magna cum laude* with highest honors in field from Harvard College, a Master of Arts (A.M.) degree and a Master of Philosophy (M.Phil.) degree from Columbia University.

16. I have served as law clerk to the Honorable Jane R. Roth on the United States Court of Appeals for the Third Circuit and am admitted to practice before the bars of the State of New York, the Supreme Court of the United States, the United States Court of Appeals for the Third Circuit, the United States District Court for the Southern District of New York, and the United States District Court for the Eastern District of New York.

17. I have submitted *amicus curiae* briefs as the main or sole author in several consumer finance-related litigations before the United States Supreme Court and state supreme courts.

18. I have served as an expert witness in numerous consumer finance-related litigations, including for the Consumer Financial Protection Bureau and state attorneys general. In the course of these engagements, I have previously testified at trial regarding California's usury caps on finance lenders.

19. I regularly provide for-fee consultations to investment firms that seek to invest in the consumer finance industry, including in firms that purchase retail installment contracts.

20. Based on the foregoing experiences, as well as my research following my engagement in this case, I am familiar with the economics, regulation, and custom and practices of the consumer finance industry and possess specialized knowledge about the financing of the purchase of consumer goods and services, including through RISCs and the assignment thereof such that I believe would be helpful to the trier of fact in understanding the evidence and determining issues of fact. In particular, I believe my expertise would be helpful to the trier of fact in determining whether the financing AFF provided to California consumers was a loan or the purchase of a RISC.

21. My compensation for preparing this report, for preparing for giving testimony, and for any testimony given in this Litigation is at the rate of $750/hour plus reimbursement of approved expenses. My non-working travel time involved in this engagement is compensated at half that rate.

22. My compensation is not dependent either on the opinions I express or the outcome of this litigation.

23. This report is the product solely of my own work. No other individuals assisted me in the writing of the report.

24. The sources I considered upon in preparing this report are listed in Appendix B to this report.

25. My other testimonies as an expert at trial or by deposition in the past four years are listed in Appendix C to this report.

## SUMMARY OF OPINIONS OFFERED

26. Counsel has requested that I prepare this report to address:

    (1) whether the financing provided by AFF to the Plaintiff Class bears the indicia of a loan or an assignment of a RISC;

    (2) whether a reasonable trier of fact could conclude the financing was unconscionable; and

(3) whether the interest rates on the AFF RISCs exceeded the maximum rate a licensed California finance lender is permitted to charge.

I have not been asked to opine on the ultimate questions of whether the financing provided by AFF to the Plaintiff Class was in fact a loan under California law or whether it was in fact unconscionable under California law or on whether AFF violated California's usury laws, and I express no opinion on those ultimate questions, which are the province of the court.

### *Nature of the Financing*

27. California requires that direct consumer lenders operate pursuant to a license from the state. In contrast, California does not require the assignees of RISCs to be specially licensed by the state. It is further my understanding that California law looks to substance over form when determining if a transaction is a direct loan or an assignment of a RISC.[1]

28. Based on my review of the discovery record in this case and my existing knowledge about the custom and practices of the consumer finance industry, it is my opinion that AFF's provision of financing bears the indicia of being a direct loan to consumers rather than the assignment of a RISC. Throughout the entirety of the Class Period, AFF's involvement in the financing went beyond what was necessary to effectuate a mere assignment of the Plaintiff Class's RISCs. This is because:

   a. AFF had a pre-existing relationship with the retailers, with contracts in place even before the consumer contemplated a purchase.

   b. AFF advertised its financing services directly to consumers.

   c. Consumers' credit applications were sent to AFF. Either consumers submitted the credit information directly to AFF or the retailer handled the data entry; the retailer had no involvement in the credit application process other than collecting information from the consumer and inputting it into AFF's platform.

   d. AFF alone underwrote the consumer's credit in the transaction. The retailer never undertook its own evaluation of the consumer's credit.

   e. AFF alone determined and controlled all of the material terms and documentation of the financing. The retailer played no role in determining the terms offered to the consumer.

   f. The RISC was prepopulated with AFF's contact information, indicating that AFF was the real party in interest *ab initio*.

   g. The RISC was purportedly pre-assigned to AFF even before it was executed.

---

[1] *In the Matter of the Commissioner of Business Oversight v. Sezzle, Inc.*, 2019 WL 8194406 (Cal. Dept. Corp. Dec. 30, 2019); Cal. Dept. of Bus. Oversight, Opinion Letter re: Deferred Payment Products, File No. OP 7667 (Dec. 20, 2019).

     h.   AFF dictated and controlled the process by which the consumer had access to, executed, and received a copy of the RISC.

     i.   AFF paid the retailer for the amount due on the RISC promptly upon delivery of the goods to the consumer, such that the retailer never bore any of the consumer's credit risk on the RISC.

29. Additionally, the drafting and structure of the RISC suggest that AFF is actually the direct lender:

     a.   The contractual language in the RISC repeatedly refers to AFF as if it were the original lender.

     b.   The RISCs were never actually assigned to AFF by the retailer.

30. These facts are indicative to me based on my experience and knowledge that the AFF transactions are direct loans, not assignments of RISCs.

### *Unconscionability*

31. It is my understanding that California law requires a showing of both substantive and procedural unconscionability in order for a contract to be deemed unconscionable, but a stronger showing of one element necessitates a lesser showing of the other element of unconscionability.[2] It is also my understanding that California law holds that a high price term alone can render a financing unconscionable, even if there is no applicable usury cap,[3] and that procedural unconscionability can be shown by oppression, meaning lack of negotiation or meaningful choice, or by surprise regarding contract terms.[4]

32. Based on my experience and knowledge, it is my opinion that the AFF financings bear indicia of substantive and procedural unconscionability. Specifically:

     a.   The AFF financings have shockingly high interest rates, particularly given the size and maturity of the financings and their secured status.

     b.   The AFF financings have arbitration clauses.

     c.   The arbitration clauses in the AFF financings give unequal procedural benefits to AFF by exempting self-help remedies and creating an extra level of arbitral review for awards of over $50,000, which would only be against AFF, not against the consumer.

     d.   The AFF financings were non-negotiated take-or-leave-it offers.

     e.   The AFF financings were for borrowers with poor credit who would be unlikely to shop for alternative financing terms and therefore would lack meaningful choice.

---

[2] *Pinnacle Museum Tower Ass'n v. Pinnacle Market Development (US), LLC*, 55 Cal. 4th 223, 247 (Cal. 2012).
[3] *De La Torre v. CashCall, Inc.*, 5 Cal. 5th 966, 973 (Cal. 2018).
[4] *Pinnacle*, 55 Cal. 4th at 247.

f.   The AFF financing process, particularly the workings of the DocuSign system materially interfered with consumers' ability to learn the terms of the financing, obscuring the pages of the contract that included the price of the financing and presence of the arbitration clause, prior to the consumer committing to the financing transaction.

### Maximum Permitted Loan Charges

33. California law restricts what a licensed finance lender may charge on a loan. The California rate cap is complex and has changed during the Class Period.  Prior to January 1, 2020, there was no rate cap for loans of $2,500 or greater. Since January 1, 2020, California has imposed a flat 36% annual rate cap on finance lenders for all loans with a principal amount of $2,500 or greater than, but less than $10,000.[5]  For the entire Class Period, however, loans of less than $2,500 have been subject to a rate cap.  Under that cap, lender may charge either a flat rate equal to 19.2% annually or a graduated rate based on loan size, ranging between 12% and 30% annually. Additionally, California finance lenders are permitted to charge an administrative fee that varies by loan size.

34. All of the RISCs at issue in this litigation bear annual percentage rates of 120% or greater and have maturities of approximately 18 months.[6] Accordingly, all of the RISCs at issue in this litigation that were made on January 1, 2020 or later bear interest rates that vastly exceed those permitted by California law for loans made by licensed finance lenders. All of the RISCs at issue in this litigation that were made prior to January 1, 2020 for less than $2,500 also bear interest rates that vastly exceed those permitted by California law for loans made by licensed finance lenders.

### I. AFF's FINANCINGS BEAR INDICIA OF BEING A LOAN

#### A.   California Regulatory Landscape for Consumer Loans and RISCs

35. Consumer loans in California are governed by the California Financing Law.[7] The California Financing Law requires any person that engages in the business of a finance lender obtain a license from the Department of Financial Protection and Innovation (previously the Department of Business Oversight).[8] A finance lender includes any person in the business of making consumer loans.[9] A "consumer loan" means a loan, the proceeds of which are intended by the borrower for use primarily for personal,

---

[5] CAL. FIN. CODE § 22304.5(a).

[6] See, e.g., Britt 2021 Depo. Tr. at 110:15-20 (standard rates), 112:13-113:8 (rates of 120% or greater); FAC-0037 (term); AFF-Andrade 000799 (term).

[7] CAL. FIN. CODE §§ 22200-22407.

[8] CAL. FIN. CODE § 22100(a).

[9] CAL. FIN. CODE § 22009.

family, or household purposes.[10] Moreover, a consumer loan is subject to a usury cap in California,[11] as well as other consumer protections.[12]

36. In contrast, reflecting the time-price doctrine, a retail installment sales contract (also known as a credit sale), in which a retailer provides a consumer goods or services against future payments, are not regulated as loans in California, and a retailer offering bona fide installment credit for the purchase of its own goods or services is not subject to the licensing requirements of the California Financing Law.[13]

37. Because of a concern that parties might attempt to evade California's regulation of loans by disguising loans as retail installment sales, California law exempts *bona fide* RISCs from the California Financing Law.[14]

38. In order to be a *bona fide* RISC, the contract must be between the consumer and the retailer. If the financing is provided to the consumer by a third-party, the transaction is inherently a loan. In contrast, if a retailer sells or otherwise assigns a *bona fide* RISC, the sale of the contract does not result in the contract being subject to the California Financing Law.

39. The Unruh Act governs retail installment sales of consumer goods in California.[15] Whereas consumer loans in California are subject to a usury cap, no such cap exists under the Unruh Act for RISCs. Thus, the distinction between whether a financing is a loan or a RISC can have substantial consequences for the permitted terms.

40. The Unruh Act provides that it is "not intended to abrogate the judicial principle that the substance of a transaction rather than its form is determinative of its characterization as a loan or credit sale".[16] The Unruh Act does not apply to:

> any transaction in the form of a loan made by a supervised financial organization to a buyer of goods or services where all or a portion of the loan proceeds are used to purchase such goods or services, whether or not the seller of such goods or services arranges the loan or participates in the preparation of the loan documents, unless the supervised financial organization and the seller:
>
>> (1) Are related by common ownership and control and the relationship was a material factor in the loan transaction; or

---

[10] CAL. FIN. CODE § 22203.

[11] CAL. FIN. CODE §§ 22303-22304.5.

[12] *See, e.g.*, CAL. FIN. CODE § 22307.5 (prohibiting prepayment penalties).

[13] CAL. FIN. CODE § 22054.

[14] *Boerner v. Colwell Co.*, 21 Cal. 3d 37 (Cal. 1978); Cal. Fin. Code § 22054 ("This division does not apply to bona fide conditional contracts of sale involving the disposition of personal property when these forms of sale agreements are not used for the purpose of evading this division.").

[15] CAL. CIV. CODE §§ 1801-1812.20. There are certain exceptions that are not applicable to AFF-associated merchants. CAL. CIV. CODE § 1801.4.

[16] CAL. CIV. CODE § 1801.6(a).

> (2) Share in the profits and losses of either or both the sale and the loan.[17]

41. Determining whether a financing is a loan or a *bona fide* RISC requires an analysis of the substance of the transaction, rather than its formal designation.[18]

42. The involvement of a third-party financing institution in what purports to be a RISC may result in the transaction being deemed a loan if (1) the third-party's involvement goes beyond what is necessary to effectuate the purchase of the contract; (2) the role of the third-party and the terms of the transaction are not fully disclosed to the consumer; or (3) if the third party does not bear the full risk of the consumer's performance under the contract.[19]

### B. AFF and the AFF Transactions

43. AFF is a Kansas corporation.[20] Prior to February 6, 2018, AFF was not licensed to transact any sort of business in California.[21]

44. At no time during the Class Period has AFF been licensed as a California finance lender.[22]

45. AFF works with various retailers to provide purchase money financing to consumers for household goods such as furniture and services such as auto repair. While AFF offers financing through different legal structures in different states, in the arrangement used in California throughout the Class Period, the consumer goes to a retailer and selects goods or services to purchase. The retailer then asks the consumer if the consumer would like to finance the purchase. If so, AFF is offered as a financing option, which nominally purchases a RISC from the retailer. As discussed below, however, the substance of the transaction bears many indicia of being a loan, rather than an assignment of a RISC. Most critically, AFF's involvement with the financing goes well beyond what is necessary to effectuate an assignment of a RISC.

46. The cornerstone of AFF's arrangement is a contract between AFF and retailers entitled "Retail Installment Sales Contract Program Agreement" (the "**RISC Program Agreement**").[23] The RISC Program Agreement for any particular retailer is created using templates created by AFF.[24] The relevant provisions of the RISC Program Agreement used by AFF throughout the Class Period were standardized, with only the

---

[17] CAL. CIV. CODE. § 1801.6(b).
[18] *W. Pico Furniture Co. v. Pac. Fin. Loans*, 2 Cal. 3d 594, 603 (1970); *Boerner v. Colwell Co.*, 21 Cal. 3d 37, 44 (Cal. 1978).
[19] *Sezzle, supra* note 1, at *4.
[20] Kansas Secretary of State, Business Entity Search, results for "American First Finance Inc." (listing incorporation as 04/15/2013) (search engine at https://www.kansas.gov/bess/flow/main?execution=e2s3).
[21] Britt 2019 Depo. Tr. at 34:8-35:19; American First Finance Inc. Statement of Designation by Foreign Corporation filed 02/06/2018 with the California Secretary of State.
[22] Britt 2021 Depo. Tr. at 90:9-12.
[23] *E.g.*, AFF-Andrade 001236-36; AFF-Andrade 007216-28; AFF-Andrade 013762-69.
[24] Christen Depo. Tr. at 68:16-24.

name and address and state of organization of the retailer and the contract signature date filled in.[25]

47. The RISC Program Agreement was drafted by AFF.[26] Patrick Christen, who managed AFF's retailer relationships,[27] testified that he had never seen a RISC Program Agreement that did not use the form prepared by AFF.[28] Mr. Christen also testified that he was unaware of any retailers that sought to edit the pre-printed RISC Program Agreement provided by AFF.[29] Mr. Christen was also unaware of any non-standard RISC Program Agreements.[30]

48. The key provisions of the RISC Program Agreement have remained materially identical and unchanged throughout the class period for all California retailers with whom AFF dealt. In particular, section 1.2 of the RISC Program Agreement, which sets forth AFF's right to determine the terms on which it will purchase sale contracts from retailers, establish the form and provisions, including the credit terms, of those contracts, and determine the creditworthiness of the consumer, is identical in thirty-two RISC Program Agreements I reviewed.[31] These thirty-two RISC Program Agreements span a date range between November 12, 2014, five days after the start of the Class Period, and August 16, 2021.

49. The RISC Program Agreement provides that the retailer "offers to sell" to AFF "certain credit sale contracts," and that AFF "will purchase any contract that is presented" to it and that it "approves, in its discretion, subject to all supporting documents being provided."[32]

50. The RISC Program Agreement further provides that the credit sale contracts being offered include:

> without limitation, all of Seller's right, title, and interest in all instruments, guarantees, security agreements, representations and warranties, financing statements, certificates of title, and other documents related to such contracts and Seller's interest in the Products; installments and other payments due and to become due under such contracts

---

[25] Christen Depo. Tr. at 68:3-9; Christen Depo. Tr. PLTF Exh. 015. There was variation among RISC Program Agreements regarding what percentage discount AFF agreed to pay the merchant for the RISCs. Cf. AFF-Andrade 007229-7237 (2% discount) and AFF-Andrade 007238-7246 (0% discount).

[26] Murad Alrawashdeh Response to Plaintiff's Request for Admission, Number 9; Ahmad Alrawashdeh Response to Plaintiff's Request for Admission, Number 9.

[27] Christen Depo. Tr. at 58:7-19.

[28] Christen Depo. Tr. at 59:9-11.

[29] Christen Depo. Tr. at 59:12-15.

[30] Christen Depo. Tr. at 69:7-14.

[31] AFF-Andrade 001236; AFF-Andrade 001245; AFF-Andrade 001337; AFF-Andrade 002284; AFF-Andrade 002085; AFF-Andrade 008692; AFF-Andrade 007229; AFF-Andrade 001889; AFF-Andrade 006955; AFF-Andrade 002029; AFF-Andrade 002293; AFF-Andrade 007216; AFF-Andrade 001189; AFF-Andrade 005790; AFF-Andrade 011101; AFF-Andrade 005808; AFF-Andrade 001346; AFF-Andrade 006964; AFF-Andrade 007238; AFF-Andrade 002076; AFF-Andrade 005116; AFF-Andrade 005170; AFF-Andrade 005198; AFF-Andrade 001317; AFF-Andrade 005772; AFF-Andrade 000964; AFF-Andrade 011090; AFF-Andrade 012410; AFF-Andrade 003557; AFF-Andrade 003566; AFF-Andrade 001917; AFF-Andrade 013762.

[32] E.g., AFF-Andrade 001236 (§§ 1.1 and 1.2).

(collectively, the "Contracts"). Once a Contract is purchased and assigned to Purchaser, Seller will cease for all purposes to have any security rights and interest in the Contract and in the Product.[33]

51. The RISC Program Agreement also provides that "Each Contract (as defined below) will initially constitute a direct payment obligation of the Customer to and in favor of Seller, which upon purchase will be assigned to [AFF]."[34]

52. Section 1.2 of the RISC Program Agreement also provides that AFF:

> will have the right at all times and in its sole discretion: (a) to determine the extent to which, and the terms and conditions under which, [AFF] will purchase Contracts from Seller; (b) to establish and approve the form and provisions of Contracts; (c) to determine the types of Products that may be the subject of a Contract purchased by [AFF] ; (d) to determine the credit terms of Contracts purchased by Purchaser; and (e) to determine the creditworthiness of each Customer.[35]

53. In the RISC Program Agreement, the retailer represents and warrants to AFF that "The credit sale of the Product was bona fide and in the ordinary course of Seller's business." [36] The retailer also represents and warrants to AFF that "None of the preprinted provisions of the Contracts have been altered, modified, or stricken by the Customer or by Seller".[37]

54. The RISC Program Agreement is in place for each retailer before AFF will provide any financing to the retailer's customers.[38] Once the RISC Program Agreement has been executed by the retailer and AFF, the retailer would then offer consumers the option of financing their purchases through AFF, including by displaying marketing materials provided by AFF—brochures, web banners, email campaigns, posters, and social media—in the retailer's store and on its website.[39] AFF provides links on its own website directly to each of its retailer partners' websites,[40] and participates in joint marketing efforts with retailers.[41]

55. AFF has licensed a software solution called KwikLoans to offer its financing products.[42] A feature of the KwikLoans software is a web-based online portal ("Dealer Portal") for

---

[33] E.g., AFF-Andrade 013762 (§ 1.1).
[34] E.g., AFF-Andrade 001236 (§ 1).
[35] E.g., AFF-Andrade 001236.
[36] E.g., AFF-Andrade 001239. (§ 5.4).
[37] E.g., AFF-Andrade 001239. (§ 5.5(a)).
[38] Christen Depo. Tr. at 67:3-16.
[39] Murad Alrawashdeh Response to Plaintiff's Request for Admission, Number 14; Ahmad Alrawashdeh Response to Plaintiff's Request for Admission, Number 14; Christen Depo. Tr. at 39:18-40:16; AFF-Andrade 010404; Bella's-Andrade 000034.
[40] Christen Depo. Tr. at 71:2-73:24.
[41] Christen Depo. Tr. PLTF Exhb. 029 ¶8 (Steps for Success).
[42] Britt 2019 Depo. Tr. at 23:6-22; 24:14-20.

merchants to input customer information and AFF to provide information to merchants about the financing status of each customer's application for AFF financing.[43]

56. AFF provides training to merchants on how to use AFF's Dealer Portal.[44]

57. AFF also made videos explaining to merchants how to view their customers' financing status and approval by AFF within AFF's dealer portal, including AFF's approval amount, payment schedule, and APR prior to the RISC being signed.[45]

58. Consumers generally apply for financing only at the end of their shopping experience at a retailer; the consumer has already picked out the goods that he or she wants, and now has to figure out how to pay for them. At this point in the transaction, the consumer is often worn out from the shopping process and wants to close the transaction as rapidly as possible.

59. If the consumer chooses to finance a purchase through AFF, the retailer collects the consumer's information to populate a credit application created and supplied by AFF.[46] Sometimes the retailer enters the consumer's information into the online Dealer Portal, and sometimes the data is input by the consumer directly, either on the consumer's own device or on the retailer's computer or other electronic device.[47]

60. The retailer would submit this information to the Dealer Portal owned and controlled by AFF.[48] Additionally, the consumer can apply directly for financing from AFF through the retailer's website,[49] or through text message.[50] AFF required retailers to submit the consumer's credit application to AFF for approval using AFF's Dealer Portal in order to participate in its financing program.[51] In order to apply for credit, the consumers are expected to provide an email address to AFF.[52]

61. When retailers used the Dealer Portal, they used only the Credit Application Forms provided by AFF,[53] or would input the information required by AFF directly into the Dealer Portal.[54] AFF also allows consumers to apply directly for financing, either through the merchant's website or later in the Class Period also through a link provided

---

[43] Christen Depo. Tr. PLTF Exhb. 030.
[44] Britt 2019 Depo Tr. at 96:7-9.
[45] Christen Depo. Tr. at 114:20-116:14.
[46] Walter Depo. Tr. at 47:24-48:7; Walter Depo. Tr. at 46:24-47:3.
[47] Walter Depo. Tr. at 45:19-46:23, 49:3-11; Christen Depo. Tr. at 75:17-76:4, 76:16-77:4.
[48] Murad Alrawashdeh Response to Plaintiff's Request for Admission, Number 6; Ahmad Alrawashdeh Response to Plaintiff's Request for Admission, Number 6.
[49] Christen Depo. Tr. at 39:5-40:1; Bella's-Andrade 000034.
[50] Walter Depo. Tr. at 52:7-13.
[51] Murad Alrawashdeh Response to Plaintiff's Request for Admission, Number 12; Ahmad Alrawashdeh Response to Plaintiff's Request for Admission, Number 12; Walter Depo. Tr. at 47:24-48:7.
[52] Christen Depo. Tr. PLTF Exhb. 029 ¶7 (Steps for Success).
[53] Murad Alrawashdeh Response to Plaintiff's Request for Admission, Number 10; Ahmad Alrawashdeh Response to Plaintiff's Request for Admission, Number 10.
[54] Walter Depo. Tr. at 46:24-49:11.

to the consumer in response to a text message.[55] Regardless of application channel , AFF alone created and controlled the terms of the credit application.

62. After the consumer's information was input to the Dealer Portal, AFF, rather than the retailer, would then pull a credit report on the consumer.[56] At no point would the retailer investigate—or have knowledge of—the consumer's creditworthiness.

63. Using this credit report information as well as the information from the application, AFF alone would underwrite the borrower.[57] No input is requested from the retailer in the underwriting decision.[58] While AFF's underwriting is automated, there can be human overrides if AFF requires more information;[59] AFF would sometimes contact the retailer to request more info on the consumer, which the retailer would then relay to AFF.[60]

64. AFF included in its Dealer Portal a "chat" function that merchants could use for "Helping your customers get approved".[61]

65. AFF's internal credit scoring of the consumer determined the approval limits it would place on the consumer's application.[62] The retailer plays no role in the underwriting decision.

66. If the consumer was approved for financing by AFF, the information uploaded to the Dealer Portal would be used by AFF to populate a financing agreement called a "**Security Agreement**," that AFF would send back to the retailer for the consumer to execute.[63] AFF alone provided the form of the Security Agreement.[64] The retailer was required to use the form of the Security Agreement provided by AFF.[65]

67. The terms of the Security Agreement were prepared consistent with the section 1.2 of the RISC Program Agreement.[66] AFF alone prepared the Security Agreement with the exception of the amount to be financed. AFF would first approve the consumer for financing up to a specified limit, and only at a later point would the retailer actually input the amount of the financing that would be entered into the contract.[67]

68. The credit terms on the Security Agreement were always determined by AFF.[68] Patrick Christen testified that he had not seen a contract where the consumer's credit terms

---

[55] Britt 2021 Depo. Tr. at 137:11-16. *See also* Christen Depo. Tr. at 112:14-25; Britt 2021 Depo. Tr. at 120:13-121:5. The expansion of application channels during the Class Period is not material to my ultimate opinions.

[56] Walter Depo. Tr. at 76:10-14; Christen Depo. Tr. PLTF Exh. 032 at 2.

[57] Walter Depo. Tr. at 76:20-77:5.

[58] Walter Depo. Tr. at 76:15-19.

[59] Walter Depo. Tr. at 77:16-22.

[60] Walter Depo. Tr. at 79:9-18.

[61] Christen Depo. Tr. at 113:1-12; Christen Depo. Exhb. PLTF 030 at 3 (2018 version of training document).

[62] Britt 2019 Depo. Tr. at 63:9-17, 64:12-22.

[63] Britt 2019 Depo. Tr. at 41:17-23.

[64] Loredo Depo. Tr. at 53:10-54:1, 56:5-9; Christen Depo. Tr. at 107:20-24; Britt 2021 Depo. Tr. at 29:20-30:5.

[65] Britt 2021 Depo. Tr. at 30:6-13.

[66] Murad Alrawashdeh Response to Plaintiff's Request for Admission, Number 5; Ahmad Alrawashdeh Response to Plaintiff's Request for Admission, Number 5.

[67] Walter Depo. Tr. at 82:11-17, 104:6-24.

[68] Christen Depo. Tr. at 59:4-60:4.

were not determined by AFF.[69] AFF would determine the APR on the contract.[70] AFF would also determine the late payment and NSF fees.[71]

69. AFF also determined the number of payments,[72] the timing and size of the payments on the Security Agreement.[73] The payment frequency was linked to the consumers' pay date.[74] All of this is shown in a "deal preview" prior to the consummation of the purchase.[75]

70. AFF would also fill in all of the information on the contract with addresses for provision of notices, giving its own address.[76] The address on the contract given for revocation of ACH authorization, for opting out of email and SMS/text messages, for bankruptcy notices, notices of disputed debts, for pre-arbitration claim notices, rejection of arbitration, and for obtaining the privacy policy is AFF's address, not the retailer's.[77]

71. This information is all populated by AFF before the consumer signs the contract.[78]

72. The consumer would be presented with the Security Agreement on either his or her own device or on the retailer's device and would be asked to sign electronically. As an AFF training document provides:

> Once the e-Sign documents load on the screen, the consumer must first accept to use the electronic records and signatures provision. Once they click consent, they will be able to proceed to review and sign the agreement documentation.[79]

73. While the training document refers to the consumer's ability to "review" the Security Agreement, the DocuSign system used by AFF for electronic signatures precludes meaningful opportunity for review, however, in the e-Sign system. This is because, as the training document explains, "The electronic agreement will auto-scroll from one signature spot to the next, after selecting the **Start** option. Signature boxes are labeled in yellow."[80]

74. The signature box says "Sign Here," and when the consumer clicks on it, a signature option window will open, further obscuring the text of the contract.[81]

---

[69] *Id.*
[70] Walter Depo. Tr. at 85:19-23.
[71] Walter Depo. Tr. at 99:12-100:9.
[72] Walter Depo. Tr. at 94:19-21.
[73] Walter Depo. Tr. at 96:23-97:1; Christen Depo. Tr. at 120:21-25 ("How to Finalize a Sale Installment" video transcript).
[74] Walter Depo. Tr. at 96:13-15.
[75] Christen Depo. Tr. at 116:9-14.
[76] Walter Depo. Tr. at 101:25-102:24.
[77] AFF-Andrade 000801-804; Walter Depo. Tr. at 101:25-102:24.
[78] Walter Depo. Tr. at 102:25-103:8.
[79] Christen Depo. Tr. Exhb. PLTF 030 at 18 (2018 version of training document).
[80] Christen Depo. Tr. Exhb. PLTF 030 at 19 (emphasis in original). *See also* AFF-Andrade 000274 ("DocuSign will take the user to the signature areas on both the Application and Contract.").
[81] AFF-Andrade 000274.

75. The signatures required are on the third and seventh pages of the contract. The disclosure of the APR and the finance charge and other material terms of the contract are on page one of the contract, however. Because the DocuSign system auto-scrolls to the signature boxes, the consumer is never presented with this critical first page of the contract, but is taken directly to the third page of the contract. Then the consumer is taken to the seventh page of the contract, bypassing the arbitration clause on pages five and six. The auto-scroll feature of the DocuSign system effectively covers up the material terms of the contract such that they are not visible to the consumer unless the consumer takes additional steps to seek them out—and the consumer has no reason to know where these terms might be.

76. AFF would automatically populate the Security Agreement with the retailer's name as consumer's counterparty,[82] but the retailer's role in the financing is limited to collecting credit information from the consumer and inputting the amount to be financed into the Security Agreement.[83] The retailer plays no role whatsoever in the credit granting decision, and never even gets a copy of the executed Security Agreement.[84]

77. When the consumer executes the Security Agreement, the consumer will be emailed a link to the signed document that the consumer can access through DocuSign.[85] The Security Agreement is seven pages, and is paired with a two page payment schedule and a one page Gramm-Leach-Bliley Act privacy notice for a total of 10 pages.[86] The process of contracting through the DocuSign system means that the consumer would never actually see the material financial terms of the contract (APR, finance charge, etc.) or the arbitration clause unless the consumer took additional steps to seek them out.

78. No payments under the Security Agreement are ever made to the retailer. AFF may require that a consumer pay a downpayment as a condition of financing, which is also paid directly to AFF and not the retailer.[87]

79. The retailer would never incur the consumer's credit risk. If the consumer executed the Security Agreement, AFF would deliver a cash payment to the retailer's account within 24 hours of confirming the delivery of the goods to the consumer.[88] This means that the retailer has never assumed credit risk on the consumer, as there is never a moment when the retailer has provided goods or services to the consumer and is owed payment by the consumer. Indeed, in keeping with the idea that the retailer will never assume credit risk on the consumer, the notice of a purported assignment is provided before the consumer has actually agreed to the financing.[89]

---

[82] Walter Depo. Tr. at 84:19-25.

[83] Walter Depo. Tr. at 104:21-24.

[84] Christen Depo. Tr. at 139:15-140:3. The retailer may be able to obtain a copy of the Security Agreement, however.

[85] Britt 2019 Depo. Tr. at 44:7-12, 44:20-23; Loredo Depo. Tr. at 111:8-14.

[86] *See, e.g.,* FAC-0037-0046. *See also* Campos Depo. at 96:15-18.

[87] Walter Depo. Tr. at 176:20-177:6; 178:22-180:9.

[88] Christen Depo. Tr. at 71:22-72:1; Christen Depo. Tr. PLTF Exh. 023 ("a sale is not final until the customer takes possession of their order.").

[89] Christen Depo. Tr. at 121:13-17.

80. The Security Agreement defines "[t]he words **"we," "us,"** and **"our"** to mean the seller identified on the first page of this Agreement, its successors and assigns."[90] Yet the Security Agreement also repeatedly refers to "mailing us a written revocation to American First Finance" or "please contact us at American First Finance" or "delivering to us at American First Finance".[91]

81. Likewise, the Security Agreement provides "Our complete privacy policy statement will be provided to you with this Agreement and is available from American First Finance."[92] The privacy policy statement itself says that the notice is being provided by American First Finance, Inc.[93]

82. The Security Agreement includes standardized "Notice of Assignment" language that states:

> We have assigned this Agreement and any of our rights under it, including without limitation, the right to receive payments, to American First Finance, _____ , the Assignee, phone number _____. That assignment is made under the terms of a separate written agreement.[94]

83. The Security Agreement does not indicate what the "separate written agreement" that effectuates the assignment is. Mr. Christen was not sure what document would have effectuated the assignment, but assumed that it was the RISC Program Agreement.[95] Nothing in the RISC Program Agreement, however, provides for the assignment of any particular RISC. Instead, the RISC constitutes a general term sheet for the assignment of RISCs from the retailer to AFF, but nothing identifies which particular RISCs have been assigned.[96] AFF's Rule 30(b)(6) designee testified that the language in the Security Agreement expressly states that the assignment is made "under the terms of a separate document," so the Security Agreement does not constitute the assignment.[97] He then testified that he is not aware of any point in the process where the merchant makes the assignment to pay AFF other than when the merchant executes the security agreement.[98]

### C. AFF's Involvement with the Financing Exceeds What Is necessary to Effectuate Assignment of a RISC

84. The financing provided through AFF bears indicia of being a loan, rather than a *bona fide* retail installment sale contract because AFF's involvement goes beyond what is necessary to effectuate the assignment of the contract. Additionally, the drafting and

---

[90] *See, e.g.,* AFF-Andrade 009875 (emphasis in original).
[91] *See, e.g.,* AFF-Andrade 009876 (twice), 009877, 009878.
[92] *See, e.g.,* AFF-Andrade 009879.
[93] *See, e.g.,* AFF-Andrade 009883.
[94] *See, e.g.,* AFF-Andrade 009880; AFF-Andrade 000804; Bella's-Andrade 000021.
[95] Christen Depo. Tr. at 138:25-139:14.
[96] Britt 2021 Depo. Tr. at 25:16-31:21.
[97] Britt 2021 Depo. Tr. at 20:10-21:7.
[98] Britt 2021 Depo. Tr. at 35:20-24.

structure of the Security Agreement and the transaction suggest that AFF is actually the direct lender.

85. To purchase a retail installment sale contract–that is receive an assignment of such a contract for value–the assignee would need to be able to value the contract at the time of purchase. That would require being able to underwrite the credit risk on the borrower on an existing contract, but little more. It would not require dictating the form or the terms of the contract, or determining the creditworthiness of the borrower before the borrower could enter into the contract. Instead, the purchaser would have to adjust its pricing based on the form and terms of the contract and the creditworthiness of the borrower. If the purchaser did not find those terms to meet its minimum standards, it would not have to purchase the contract.

86. While the purchaser will always have to find the form, terms, and creditworthiness acceptable relative to its purchase price, to effectuate the purchase of a contract all of that can be determined *ex post*, after the contract exists. In the case of AFF, however, all of these terms were determined *ex ante*, and if AFF's dictates were not met, there would not be a RISC in the first place.

87. Put another way, the retail installment contract would only come into existence if AFF had pre-approved its "purchase." In such an arrangement, the retailer is nothing more than an origination agent for AFF. The retailer assumes no risk on the contract, as the consumer's obligation to pay AFF, rather than the merchant, begins immediately upon signing the Security Agreement, and AFF makes immediate payment in full into the merchant's bank account. At that point, the retailer has assumed no risk other than that of a lost sale.

88. When the total set of facts and circumstances of the financing is considered, AFF's involvement in the financing goes far beyond what is necessary to value the contract.

89. First, AFF advertised its financing services at the retailers' premises,[99] and provided information to consumers about how financing would work through AFF.[100] If AFF were merely a purchaser of RISCs, its identity and even its existence would be irrelevant to borrowers at the time when they were seeking credit. Borrowers would have been seeking credit *from the retailer*, not from a third-party to whom the retailer could, in its sole discretion, assign the RISC. Mere purchasers of retail installment contracts do not advertise to consumers except in the context of captive finance companies affiliated with the manufacturers of the retail goods, which will advertise financing on subvented loans in order to increase demand for their manufacturing affiliate's goods.

90. Second, AFF controlled the form of the Security agreement. It is common for retail installment lenders to insist on particular contract provisions or even a standard form contract–such as the LAW 553 contract form that is widely used by indirect auto lenders

---

[99] *See supra* ¶ 54.
[100] *See supra* ¶ 55.

in California. Nonetheless, it is not necessary that the assignee of a RISC actually prepare and provide the contract, only that the contract meet with its approval.

91. Third, AFF would accept credit application data directly from consumers in some cases, and even when the retailer was involved with the application, its role was limited to data entry.[101] To purchase a RISC, no direct interaction with the consumer is necessary.

92. Fourth, consumers were required to "apply" for credit with AFF, rather than with the retailer,[102] and AFF controlled the terms of the credit application.[103] If the retailer were in fact the original lender, the credit application should have gone to the retailer, which would then relay the information to AFF for AFF to determine whether it would purchase the contract.

93. Fifth, the underwriting was done solely by AFF. Only AFF pulled a credit report on the consumer,[104] and it was AFF's decision alone whether the consumer obtained funding. If AFF would not approve the financing, the consumer would not be given financing by the retailer. The retailer would not engage in any independent evaluation of the consumer's credit risk.

94. Sixth, AFF, rather than the retailer, determined the credit limit and all of the pricing terms for the Security Agreement—the APR, the late fee, and the NSF fee, as well as the number, timing, and amount of payments.[105] The terms of the financing under the Security Agreement were determined by AFF, not the retailer. AFF's involvement with the terms of the Security Agreement went beyond what is necessary to effectuate the purchase of a retail installment contract. It is standard for the purchaser of a retail installment contract, most notably in auto finance, to specify a "buy rate,"—a minimum interest rate for the contract if it is to purchase it, and sometimes to specify a maximum rate and other required terms, but the retailer is still left with discretion to price above those terms. There is a difference between setting forth minimum contract terms for a purchase and dictating the specific contract terms. AFF's process left no discretion for the retailer in the terms of the Security Agreement. The consumer was presented with AFF's terms, not the retailer's.

95. Seventh, AFF prepared the Security Agreement with all of the terms for the specific customer.[106] In other words, the RISC was created and prepared by the putative assignee. This is not necessary simply to effectuate the purchase of a RISC.

96. Eighth, AFF put its own name into the notice provisions of the Security Agreement *before the Security Agreement had even been executed, much less assigned.*[107] This is not necessary simply to effectuate the purchase of a RISC.

---

[101] See *supra* ¶ 58.
[102] See *supra* ¶ 58.
[103] See *supra* ¶ 61.
[104] See *supra* ¶¶ 62-65.
[105] See *supra* ¶¶ 67-70.
[106] See *supra* ¶ 71.
[107] See *supra* ¶ 70.

97. Ninth, AFF has the option to require a consumer pay a down payment to AFF as a condition of financing.[108] This is not necessary simply to effectuate the purchase of a RISC, as there is no credit risk on the down payment.

98. Tenth, AFF would send payment to the merchant promptly upon delivery of the goods to the consumer, such that the retailer would never assume any credit risk.[109] While this factor does not directly go to what is necessary to effectuate the purchase of a loan, when viewed in conjunction with the other facts and circumstances of the transaction, it is highly indicative of the transaction being a direct financing by AFF.

99. Eleventh, the Security Agreement's language use of the terms "we", "us," and "our" to refer to "American First Finance" rather than to the retailer is suggestive that American First Finance believed that it was the original party to the Security Agreements, notwithstanding the definition in the Security Agreements applying those terms solely to the retailers.[110]

100.    Twelfth, the lack of an actual assignment of the RISCs to AFF suggests that the transactions were direct loans, rather than an assignment of a RISC.[111] If the transactions were *bona fide* assignments of RISCs, one would expect to see a transactional document that actually assigns the particular RISCs to AFF. Indeed, the Security Agreement states that the "assignment is made under the terms of a separate written agreement." Yet no such separate agreement appears to exist or could be identified by AFF deponents.

101.    Consistent with this transactional structure, a comparison of the assignment language on AFF's Security Agreement with that used in common RISC forms is instructive. The "Notice of Assignment" language in the Security Agreement is in the past tense ("We have assigned this Agreement...to American First Finance..."). That indicates that the assignment has already been made prior to the consumer entering into the Security Agreement. In other words, the Security Agreement purports to have been assigned before it is even in existence.

102.    This language contrasts with that of the LAW RISC form, the most commonly used RISC form, which provides that "Seller assigns its interest in this contract to..." [112] Similarly, another commonly used RISC form, Wolters Kluwer's form CA-103, provides in the present tense that "This Contract and Security Agreement is assigned to..."[113] The present tense language in these other RISC forms indicates that the RISC is not assigned until or after it has been executed by the consumer, rather than prior to its

---

[108] Walter Depo. Tr. at 176:20-177:6; 178:22-180:9; Christen Depo. Tr. at 94:17-95:4.
[109] *See supra* ¶ 79.
[110] *See supra* ¶¶ 80-81.
[111] *See supra* ¶¶ 82-83.
[112] The Reynolds & Reynolds Company, Law Form No. 553-CA-ARB-eps 7/16 v1.
[113] Wolters Kluwer Financial Services, Retail Installment Contract-CA, CA-103 7/1/2013 (RSSIMVLFAZCA); Wolters Kluwer Financial Services, Retail Installment Contract-CA, CA-103 10/10/15 (RSSIMVLFAZCA).

existence in the case of AFF's contract. Further, neither the LAW RISC or the CA-103 form pre-populates the name and information regarding the assignee.

103.     Given the lack of a post-financing assignment to AFF, the only way that AFF could be the creditor on the financing would be if it were the original creditor itself. That would be consistent with AFF's name and contact information being pre-filled on the Security Agreement. The absence of an actual assignment suggests that the true nature of the transaction is that AFF is the original lender and that AFF is merely trying to cloak the transaction in the guise of an assignment of a RISC.

104.     In sum, AFF determined and controlled all of the material terms of the financing and bore all of the risk on the transaction. None of this is necessary to purchase a RISC. AFF's involvement in the financing went far beyond what is necessary or typical for a RISC purchase.

## II. AFF's Financings Bear Indicia of Unconscionability

### A.  California Standard for Unconscionability

105.     It is my understanding that the standard for unconscionability in California involves a showing of both a procedural and substantive element.[114] The California Supreme Court has explained that:

> [P]rocedural unconscionability requires oppression or surprise. Oppression occurs where a contract involves lack of negotiation and meaningful choice, surprise where the allegedly unconscionable provision is hidden within a prolix printed form. Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided. A contract term is not substantively unconscionable when it merely gives one side a greater benefit; rather, the term must be so one-sided as to shock the conscience.[115]

106.     Critically, in this formulation, surprise does not look to consumers' actual knowledge, but to the actions of the business in obfuscating the terms of the contract.

107.     It is similarly my understanding that under California law, while both procedural and substantive unconscionability must be shown, "they need not be present in the same degree" and are evaluated on a "sliding scale" such that the stronger the showing of procedural unconscionability, the lesser of a showing must be made regarding substantive unconscionability, and vice-versa.[116]

---

[114] *Pinnacle Museum Tower Ass'n v. Pinnacle Market Development (US), LLC*, 55 Cal. 4th 223, 247 (Cal. 2012).

[115] *Id.* (internal quotation marks and citations omitted).

[116] *Armendariz v. Foundation Health PsychCare Services, Inc.*, 24 Cal. 4th 83, 114 (Cal. 2000); *Pinnacle Museum Tower Ass'n v. Pinnacle Market Development (US), LLC*, 55 Cal. 4th 223, 247 (Cal. 2012) (quoting *Armendariz*).

108.     It is also my understanding that California law recognizes that a high price term alone, such as an interest rate, may be sufficient to render a loan unconscionable.[117] While price is likely indicative of substantive unconscionability, it could also reflect procedural unconscionability, and the California Supreme Court did not distinguish as to which element of unconscionability was satisfied by the high interest rates (either 96% or 135% APRs) in the *De La Torre* case.[118]

109.     It is further my understanding that while an arbitration provision is not itself inherently unconscionable,[119] as state law may not discriminate against agreements to arbitrate, the presence of an arbitration clause could, in conjunction with other facts and circumstances, contribute to a finding of unconscionability. Moreover, it is my understanding that even if an arbitration clause is not *per se* unconscionable, its particular features could render a contract unconscionable.

## B.     *Substantive Unconscionability*

110.     AFF's financing bear two indicia of substantive unconscionability. The first is the price term. The AFF financing had an annual percentage rate ("APR")–an annualized measure of the finance charge (roughly interest and certain mandatory fees)–of 120% or more on financing amounts (including finance charges) of up to $5,000 during the Class Period.[120] AFF applies a standard annual percentage rate that is assigned to most merchant programs and most consumers.[121] The standard rate was 120% from 2015-2017; 144.59% from 2017-2020; and is now 170%.[122] In some cases, the rate is as high as 279.23%.[123] As consumer financial products go, particularly for a secured financing with a term of approximately 18 months,[124] these are all shockingly high and harsh annual percentage rates.

111.     There are other consumer financial products, such as payday loans, that frequently have higher APRs, but the APRs on these products are not properly comparable to the APR on the AFF financing. APRs are a very poor measure for comparing the cost of loans of significantly different duration or for comparing very small dollar loans to larger dollar loans. To calculate the ARP for a loan of less than a year, an annualization factor must be applied to the ratio of the finance charge to the amount financed. On a two-week loan the annualization factor is approximately 26, while on a four-week loan it is approximately 13. In contrast, for an 18 month financing like offered by AFF, the annualization factor is 0.67. Thus much of the difference in APRs

---

[117] *De La Torre v. CashCall, Inc.*, 5 Cal. 5th 966, 973 (Cal. 2018).
[118] *Id.* at 974.
[119] *AT&T Mobility LLC v. Concepcion*, 5563 U.S. 333 (2011).
[120] *See, e.g.*, AFF-Andrade 000799; Bella's-Andrade 000016; Muhammad Ashraf Depo. Tr. Exhb. PLTF 0076, FAC-0037; Christen Depo. Tr. Exhb. PLTF 024 at 6-8, 10. Maximum financing amounts appear to have been lower earlier in the Class Period, *see* AFF-Andrade 000257 ($3,000 limit), but the increase is not material to my opinions.
[121] Britt 2021 Depo. Tr. at 110:15-20.
[122] Britt 2021 Depo. Tr. at 112:13-113:8.
[123] Justiss Depo. Tr. at 81:5-16; Exhb. PLTF 90.
[124] *See, e.g.*, FAC-0037; AFF-Andrade 000799.

between a two- or four-week payday loan and AFF's financing is explained by the annualization factor, which has nothing to do with the actual cost of the credit.

112.    Similarly, the small size of payday loans ($200-$400 usually) makes the APR a poor measure of comparison with larger loans like an AFF financing. Irrespective of the size of a loan, there will be a certain amount of fixed or semi-variable costs, such as salaries and overhead expenses, that a lender has to recapture in the finance charge in order to break even. This means that holding all else constant, the finance charge will necessarily be greater relative to the loan amount than for a large dollar loan. Accordingly, the APR, which is an annualized ratio of the finance charge to the loan amount will be higher. To illustrate, if a lender's cost of making a one-year loan includes a fixed charge of $20, that $20 as a finance charge for a $100 loan would result in a 20% APR, while for a $1000 loan would result in a 2% APR. This means that the APR is not a measure of how profitable the loan is for the lender relative to loans of different sizes.

113.    AFF loans are also secured by the goods the borrower purchased from the retailer. All else being equal, secured loans have lower costs of credit than unsecured loans. This is because the pledge of collateral offers the creditor a more certain source of repayment and possibly the ability to engage in self-help repossession and private sale of the collateral to obtain repayment, rather than the slower and more expensive judicial collection procedure necessary for an unsecured loan.

114.    The extremely high cost of the AFF financing relative to other consumer financial products is an indicia of substantive unconscionability.

115.    The second indicia of substantive unconscionability is the arbitration provision. While the mere presence of an arbitration provision itself does not render a contract unconscionable, the presence of the arbitration provision here, including a class action waiver, is an additional factor beyond the shockingly high APR, that is indicative of substantive unconscionability, and is an additional factor beyond the high APR that the California Supreme Court held in *de la Torre v. CashCall* could alone be the basis for a finding of unconscionability.

116.    The specific terms of the arbitration provision in the Security Agreement are also indicative of substantive unconscionability. The arbitration provision is lopsided, giving AFF rights that exceed those of the consumer. Specifically, the arbitration provision provides that it does not apply to any "self-help remedy".[125] Additionally, the Security Agreement provides that the arbitrator's award will be final and binding, but only for claims of under $50,000 (including Claims that may reasonably require injunctive relief costing more than $50,000).[126] For claims involving more than $50,000, any party may appeal the award to a three-arbitrator panel, which will reconsider the entire matter *de novo*.[127]

---

[125] *See, e.g.*, AFF-Andrade 009878.
[126] *See, e.g.*, AFF-Andrade 009879.
[127] *Id.*

117.    These provisions create a lopsided benefit for AFF. The exclusion of self-help remedies from the scope of arbitration means that AFF is free to exercise self-help remedies on its security interest in the goods purchased. The consumer, in contrast, has no self-help remedies because it lacks a security interest in any of AFF's assets, so the exclusion of self-help remedies from the scope of arbitration is a one-sided benefit for AFF, ensuring that AFF can collect from the consumer without obtaining a judgment, but the consumer would have to obtain an arbitral award and then a judgment to attempt to collect on any claim against AFF.

118.    Likewise, claims of $50,000 would only be claims *against* AFF. Given that the AFF financings were for $5,000 or less, it would not be possible for AFF to have a claim against a consumer of over $50,000. AFF, then, has given itself an additional bite at the apple in cases where it might be sued for a substantial amount. There is no parallel benefit for the consumer.

119.    These sort of one-sided terms are indicative of substantive unconscionability, particularly when paired with the high price term.

### C.    Procedural Unconscionability

120.    AFF's financing also bears a number of indicia of procedural unconscionability.

121.    First, the terms of the AFF financing were not negotiated. Instead, the AFF financing of the Class members was through contracts of adhesion—take-it-or-leave-it contracts. Consumers apply for financing and based on their credit characteristics are told what loan terms they qualify for. These terms are not and may not be negotiated by Class members. Based on my knowledge and experience, the lack of negotiation indicates to me that AFF's financings were oppressive.

122.    Second, AFF was lending to consumers with poor credit. Consumers with poor credit have limited credit alternatives. Because they are frequently denied credit, they are usually willing to take the first offer of credit they receive as long as it is below their reservation price, and they do not engage in comparison shopping of different credit offers to seek out the best credit terms. This means that these consumers are effectively price inelastic up to their maximum reserve price (at which point their demand discontinuously disappears). Thus, a recent study by the Consumer Financial Protection Bureau indicates that consumers with poor credit are less likely to shop around for credit terms than other consumers.[128]

123.    It is well established in the economics literature that if consumers do not observe prices but simply choose the first product they hear about, then prices will settle ("equilibriate") at the monopoly level, even in a market with multiple competitors. Each firm will in essence be a monopolist.[129] Indeed, unless consumers believe that the costs

---

[128] CFPB, *Consumer use of payday, auto title, and pawn loans*, Insights from the Making Ends Meet Survey, Research Brief No. 2021-1 (May 2021), at 18-19.

[129] *See, e.g.*, Peter A. Diamond, *A Model of Price Adjustment*, 3 J. ECON. THEORY 156 (1971); Steve Salop & Joseph E. Stiglitz, *The Theory of Sales: A Simple Model of Equilibrium Price Dispersion with Identical Agents*, 72 AM. ECON. REV. 1121 (1982).

savings resulting from a search for better prices will outweigh the search costs, they will not even bother to search.[130] As a result, it will not matter how many competitors exist in the market, as each firm will be a monopoly unto itself once a consumer hears about its product.

124.     In such a market it is critical for a lender to be the first one to make the consumer an offer. AFF's guidance to its retailer associates reflects this, emphasizing the need to "present the application to American First Finance first before presenting to other financing options."[131]

125.     If consumers do not shop around for prices, the result will be the supracompetitive pricing described in the Diamond and Salop & Stiglitz models. The high cost of the AFF financing is itself suggestive that this is how the AFF financing market works. AFF did not have to compete for consumers at point of sale because even if a retailer offered alternative financing options, those alternatives would be presented seriatim, rather than simultaneously to the consumer. If consumers actually shopped around, it would be unlikely that such high interest rates as exist on AFF financings would be unlikely to obtain.

126.     Based on my knowledge and experience, the borrowers' lack of meaningful choice given their economic situation indicates to me that AFF's financings were oppressive.

127.     Third, AFF's transacting process would have resulted in surprise by consumers as to the financial terms of the loan, the presence of the arbitration agreement and class action waiver, and as to the involvement of AFF, rather than the retailer, as the real financer.

128.     Consumers typically apply for credit and enter into the Security Agreement at the end of their shopping experience, when they want to finish the deal and get out of the store. AFF's fast decision making on credit applications—typically 30-40 seconds[132]—reflects consumer exhaustion and impatience at this point in the shopping process.

129.     AFF's transacting process takes advantage of this impatience and exhaustion to materially interfere with consumers' ability to understand the terms and conditions of the Security Agreement. The consumer is never told the terms of the financing when applying for credit. Instead, the consumer applies for credit, and, if approved, is asked to sign the Security Agreement using the DocuSign system.

130.     The DocuSign system does not present the consumer with the entirety of the agreement in a readily readable format. Instead, the consumer is able to view only part of the agreement on either the screen of a personal handheld device or the merchant's computer. Nor is the consumer ever directed to the beginning of the agreement. Instead, the DocuSign system's "autoscroll" feature takes the consumer directly to the

---

[130] Id.
[131] AFF-Andrade 007225; Christen Depo. Tr. Exhb. PLTF 029.
[132] Christen Depo. Tr. at 111:24-112:13.

signature boxes on pages three and seven of the contract, bypassing the price terms on page one and the arbitration clause on pages five and six. Those signature boxes are made more prominent than the rest of the agreement by virtue of being colored in yellow. The design of the DocuSign format encourages consumers to sign without actually reviewing the contract. When the consumer presses on a signature box, it enlarges, further obscuring the contract. The auto-scroll and pop-up signature boxes in DocuSign physically interfere with the consumer's ability to see and read the contract. Likewise, the DocuSign system never provides the consumer with a copy of the actual contract, but only with a link through which the consumer access the contract. This added step adds to the obfuscation of the contract terms.

131.    The point here is not that is impossible for a consumer to learn the terms of the contract or whether any particular consumer was in fact unaware of the terms of the contract, but that AFF set up a system that made it difficult for a lay consumer to learn the terms of the contract, increasing the likelihood that consumers would be surprised by the contract terms, much the same as if key terms were buried in "prolix prose."

132.    Based on my knowledge and experience, AFF's transacting process indicates to me that consumers were subject to surprise by AFF's financings.

133.    It is my opinion that AFF's financings bear substantial indicia of both substantive and procedural unconscionability.

### III. The Rates on AFF's RISCs Exceed the Maximum Permitted Loan Charges for Loans Made by California Finance Lenders

134.    California law restricts what a licensed finance lender may charge on a loan. While the California constitution includes a default usury cap of 10% annually, it permits the state legislature to exempt classes of persons from that cap and to prescribe alternative caps via legislation.[133]  Bona fide RISCs, however, are not subject to usury caps, so if AFF were merely a purchaser of RISCs, it would not be subject to California's usury laws.

135.    Prior to January 1, 2020, no usury cap whatsoever applied to finance lender loans with a principal amount of at least $2,500.  Since January 1, 2020, California has imposed a flat 36% annual rate cap on finance lenders for all loans with a principal amount of at least $2,500, but less than $10,000.[134]  The 36% annual rate cap applies to the entire principal balance.  It is my understanding that even if a loan is not subject to a usury cap, it may still be unconscionable in California, merely on the basis of its interest rate,[135] and the California Financing Law provides that if a loan is unconscionable, the remedial provisions of that Law apply.[136]

---

[133] Cal. Const. art. XV, sec. 1(2).
[134] Cal. Fin. Code § 22304.5(a) (effective Jan. 1, 2020).
[135] *De La Torre v. CashCall, Inc.*, 5 Cal. 5th 966, 973 (Cal. 2018).
[136] Cal. Fin. Code § 22302(b).

136.    Throughout the Class Period, for loans of less than $2,500, California has permitted licensed finance lenders to charge either a flat monthly rate on the unpaid principal balance of the loan[137] or a graduated rate.[138]  The flat rate is 1.6% of the unpaid principal balance of less than $2,500. On an annual basis, this translates to 19.2%.

137.    The graduated rate begins at 2.5% monthly of unpaid principal balances of $225 or less, then decreases to 2% monthly on the excess of the unpaid principal that is $900 or less, then decreases to 1.5% on the further excess of the unpaid principal balance of $1,650 or less, and then decreases to 1% on the additional excess of unpaid principal balances of less than $2,500.[139] The implied annual rates on the graduated schedule range from 12% to 30%.  Table 1, below, summarizes in tabular form using the form of the rate caps prescribed by statute, while Table 2, below, summarizes with a conversion of all rate caps into annualized rates.

**Table 1.  Rate Caps Applicable to California Finance Lenders**

| Balance Range to Which Rate Applies | Flat Rate Option | Graduated Rate Option |
|---|---|---|
| ≤$225 | 1.6% monthly | 2.5% monthly |
| $226 - $900 | | 2.0% monthly |
| $901 - $1,650 | | 1.5% monthly |
| $1,651 - $2,499 | | 1.0% monthly |
| Entire balance, if loan is between $2,500 and $9,999 | 36% annually (for loans made on or after Jan. 1, 2020, otherwise no applicable rate cap.) | |
| Entire balance, if loan is ≥ $10,000 | No applicable rate cap. | |

---

[137] CAL. FIN. CODE § 22304.
[138] CAL. FIN. CODE § 22303.
[139] CAL. FIN. CODE § 22303.

**Table 2.  Annualized Rate Caps Applicable to California Finance Lenders**

| Balance Range to Which Rate Applies | Flat Rate Option | Graduated Rate Option |
|---|---|---|
| ≤$225 | | 30% |
| $226 - $900 | 19.2% | 24% |
| $901 - $1,650 | | 18% |
| $1,651 - $2,499 | | 12% |
| Entire balance, if loan is between $2,500 and $9,999 | 36% (for loans made on or after Jan. 1, 2020, otherwise no applicable rate cap.) | |
| Entire balance, if loan is ≥ $10,000 | No applicable rate cap. | |

138.      The charges permitted under the graduated rate exceed those permitted under the flat rate for all loans with a principal balance of less than $2,312.50. The charges permitted under the flat rate exceed those permitted under the graduated rate for all loans with a principal balance of more than $2,312.50. The graduated rate and flat rate generate the same monthly interest for loans with a principal balance of precisely $2,312.50.

139.      All rates prescribed for California finance lenders are simple interest; compounding is not permitted.[140]

140.      While California expresses its rate caps as simple interest rates, rather than annual percentage rates, it permits finance lenders to contract for and receive finance charges at a single annual percentage rate as long as the total finance charge does not exceed that permitted under the graduated rate calculation.[141] This option appears not to be permitted for loans of $2,500 or more.

141.      In addition to interest charges, for the entirety of the Class Period, a finance lender has been permitted to charge an administrative fee. For loans of less than $2,500, the fee is capped at the lesser of 5% of the principal amount (excluding such fee) or $50.  Prior to January 1, 2020, no cap existed on fees for loans $2,500 or more. Since January 1, 2020, the fee for loans of $2,500 or more has been capped at $75.[142]

142.      The AFF RISCs bear a standard annual percentage rate.[143]  The standard rate was 120% from 2015-2017; 144.59% from 2017-2020; and is now 170%.[144] In some cases, the rate is as high as 279.23%.[145] The AFF RISCs also bear a term of

---

[140] CAL. FIN. CODE § 22309.
[141] CAL. FIN. CODE § 22308.
[142] CAL. FIN. CODE § 22305.
[143] Britt 2021 Depo. Tr. at 110:15-20.
[144] Britt 2021 Depo. Tr. at 112:13-113:8.
[145] Justiss Depo. Tr. at 81:5-16; Exhb. PLTF 90.

approximately 18 months.[146]  This implies annual interest rates of approximately 80% from 2015- 2017, 97% from 2017-2020, and 114% currently.[147]

143.    All of the RISCs at issue in this litigation that were made on January 1, 2020, or later bear interest rates that substantially exceed those permitted by California law for loans made by licensed finance lenders.

144.    All of the RISCs at issue in this litigation that were made prior to January 1, 2020, for less than $2,500 also bear interest rates that substantially exceed those permitted by California law for loans made by licensed finance lenders.

## CONCLUSIONS

145.    Based on the forgoing analysis, it is my opinion that AFF's involvement in the provision of financing to the Class Members went beyond what was necessary to merely purchase RISCs and included features more commonly associated with direct lending.

146.    It is further my opinion that AFF's financings bear many of the indicia of both substantive and procedural unconscionability.

147.    It is further my opinion that the interest rate on all the AFF financings made on or after January 1, 2020, substantially exceed the maximum rate a licensed California finance lender may charge.

148.    It is additionally my opinion that the interest rate on all the AFF financings of less than $2,500 made prior to January 1, 2020, substantially exceed the maximum rate a licensed California finance lender may charge.

149.    I understand that AFF has not yet completed its document production and that there may be unresolved disputes regarding requested documents. I will consider any further document produced after my expert report is served.

150.    I reserve the right to amend and supplement this report and to submit a rebuttal report.

151.    I declare the foregoing to all be correct and true to the best of my knowledge.

EXECUTED on October 29, 2021, in Somerset, Maryland.

---

[146] See, e.g., FAC-0037; AFF-Andrade 000799.
[147] The precise rate will vary depending on the amortization schedule, but the rates will still be nowhere close to those permitted under California law for licensed finance lenders.

## APPENDIX A. CURRICULUM VITAE OF ADAM J. LEVITIN

# ADAM J. LEVITIN

Anne Fleming Research Professor & Professor of Law
Georgetown University Law Center
600 New Jersey Ave., NW
Washington, DC 20001
adam.levitin@law.georgetown.edu
(202) 662-9234 (o)

## ACADEMIC APPOINTMENTS

| | |
|---|---|
| **GEORGETOWN UNIVERSITY LAW CENTER** | 2007-present |
| *Anne Fleming Research Professor (2020-present)* | |
| *Agnes N. Williams Research Professor (2018-2020)* | |
| *Professor of Law (2011-present) (tenured)* | |
| *Associate Professor of Law (2007-2011)* | |
| **HARVARD LAW SCHOOL** | 2012-2013 |
| *Bruce W. Nichols Visiting Professor of Law* | |
| **AMERICAN BANKRUPTCY INSTITUTE** | Fall 2009 |
| *Robert Zinman Scholar in Residence* | |
| **FEDERAL TRADE COMMISSION** | Summer 2008 |
| *Faculty, Division of Financial Practices Academy* | |

## EDUCATION

| | |
|---|---|
| **HARVARD LAW SCHOOL**, J.D., *cum laude* | 2005 |
| **COLUMBIA UNIVERSITY**, M.PHIL. IN HISTORY, 2001, A.M. IN HISTORY | 2000 |
| **HARVARD COLLEGE**, A.B. IN NEAR EASTERN LANGUAGES & CIVILIZATIONS AND HISTORY, | |
| *magna cum laude with highest honors in field* | 1998 |

## OTHER PROFESSIONAL LEGAL EXPERIENCE

| | |
|---|---|
| **DELAWARE ATTORNEY GENERAL'S OFFICE** | 2011-2012 |
| *Volunteer Consulting Attorney* | |
| **CONGRESSIONAL OVERSIGHT PANEL FOR TROUBLED ASSET RELIEF PROGRAM** | 2008-2010 |
| *Special Counsel* | |
| **WEIL, GOTSHAL & MANGES LLP**, New York, New York | 2006-2007 |
| *Associate, Business Finance & Restructuring Department* | |
| **HON. JANE R. ROTH, THIRD CIRCUIT COURT OF APPEALS,** Wilmington, Delaware | 2005-2006 |
| *Judicial Clerk* | |

## HONORARY PROFESSIONAL AFFILIATIONS

- American College of Bankruptcy, Elected Fellow (2021)
- American College of Consumer Financial Services Lawyers, Elected Fellow (2021)
- American Law Institute, Elected Member (2014)

## SCHOLARSHIP AWARDS AND GRANTS

- Axiom Business Book Awards, Gold Medal for Real Estate (2021)
- LawDragon 500 Leading Global Insolvency and Restructuring Lawyers (2020)
- LawDragon 500 Leading U.S. Bankruptcy and Insolvency Lawyers (2020)
- Student Loan Law Initiative Research Grant for Understanding and Encouraging Enrollment in Income Driven Repayment Programs (with John Brooks and Brian Galle) (2020)
- Best Professional Article, American College of Consumer Financial Services Lawyers Annual Writing Competition (2014)
- American Law Institute, Young Scholar's Medal (2013)
- Pew Charitable Trusts, Grant for Strategies for Reviving the Housing Market (2012)
- George Washington University, Center for Law, Economics & Finance, Junior Faculty Scholarship Prize (2011)
- Walton H. Hamilton Prize for Outstanding Scholarship, *Yale Journal on Regulation* (2009)
- Best Professional Article, American College of Consumer Financial Services Lawyers Annual Writing Competition (2009)
- Editors' Prize, *American Bankruptcy Law Journal* (2007)

## LEGAL PUBLICATIONS

### Books

- THE GREAT AMERICAN HOUSING BUBBLE: WHAT WENT WRONG AND HOW WE CAN PROTECT OURSELVES IN THE FUTURE (Harvard University Press 2020) (with Susan Wachter)
  - "an impressive new book," Robert J. Schiller, *N.Y. Times* (July 31, 2020)
  - "an indispensable analysis of the crisis and the far-reaching measures needed to prevent a recurrence." *Kirkus Starred Review*
  - Axiom Business Book Awards, Gold Medal for Real Estate (2021)
- CONSUMER FINANCE: SELECT FEDERAL LAW MATERIALS (CreateSpace, 4th ed. 2021)
- CONSUMER FINANCE: SELECT STATE LAW AND PRIVATE LAW MATERIALS (CreateSpace, 4th ed. 2021)
- CONSUMER FINANCE: MARKETS AND REGULATION (Wolters Kluwer, 2018)
- BUSINESS BANKRUPTCY: FINANCIAL RESTRUCTURING AND MODERN COMMERCIAL MARKETS (Wolters Kluwer 2015; 2d edition 2018)
- CONSUMER BANKING AND PAYMENTS LAW (Nat'l Consumer Law Center, 5th ed., 2013; 2014 supplement) (with Lauren Saunders *et al.*)

**Articles (published or accepted for publication)**

- *Purdue's Poison Pill: The Breakdown of Chapter 11's Checks and Balances*, 100 TEX. L. REV. (forthcoming 2022)

- *Rent-a-Bank: Bank Partnerships and the Evasion of Usury Laws*, 71 DUKE L.J. (forthcoming 2021)

- *The Proceduralist Inversion—A Response to Skeel*, 130 YALE L.J. ONLINE 335 (2020) (with Edward Janger)

- *Redesigning Education Finance: How Student Loans Outgrew the "Debt" Paradigm*, 109 GEO. L.J. 5 (2020) (with John R. Brooks)

- *A Tale of Two Markets: Post-Crisis Regulation and Innovation in the Mortgage and Structured Finance Markets*, 2020 ILL. L. REV. 47 (2020) (with William Bratton)

- *The Fast and the Usurious: Putting the Brakes on Auto Lending Abuses*, 108 GEO. L.J. 1257 (2020)

- *Considering Law and Macroeconomics*, 83 LAW & CONTEMP. PROB. i (2020) (with Anna Gelpern)

- *Mortgage Risk Premiums During the Housing Bubble*, 58 J. R.E. FIN. & ECON. (2019) (with Desen Lin and Susan Wachter) (peer-reviewed journal)

- *Law of the Middle Class: Consumer Finance in the Law School Curriculum*, 31 LOYOLA CONSUMER L. REV. 393 (2019)

- *One Dollar, One Vote: Mark-to-Market Governance in Bankruptcy*, 104 IOWA L. REV. 1857 (2019) (with Edward Janger)

- *Junk Cities: Insolvency Crises in Overlapping Municipalities*, 106 CAL. L. REV. 459 (2019) (with David Schleicher & Aurelia Chaudhury)

- *Badges of Opportunism: Policing Restructuring Support Agreements*, 13 BROOK. J. OF CORP., FIN. & COMM. LAW 169 (2019) (symposium issue) (with Edward Janger)

- *The Faulty Foundation Draft Restatement of Consumer Contracts*, 36 YALE J. ON REG. 447 (2019) (with Nancy Kim *et al.*) (lead author)

- *Bankruptcy's Lorelei: The Dangerous Allure of Financial Institutions Bankruptcy,* 97 N.C. L. REV. 101 (2019)
    – Reprinted in BANKRUPTCY'S UNIVERSAL PRAGMATIST (Christoph G. Paulus & John A.E. Pottow, ed.)

- *The New Bond Workouts*, 167 U. PA. L. REV. 1597 (2018) (with William Bratton)

- *Pandora's Digital Box: The Promise and Perils of Digital Wallets*, 166 U. PA. L. REV. 305 (2018)

- *Safe Banking: Finance and Democracy*, 83 U. CHIC. L. REV. 357 (2016)

- *Prioritization and Mutualization: Clearinghouses and the Redundancy of Financial Contract Safe Harbors in Bankruptcy*, 10 BROOK. J. OF CORP., FIN. & COMM. LAW 129 (2015)

- *Second Liens and the Leverage Option*, 68 VAND. L. REV. 1243 (2015) (with Susan Wachter)

- *Bankruptcy Law and the Cost of Credit: The Impact of Cramdown on Mortgage Interest Rates,* 57:1 J.L. & ECON. 139 (2014) (with Joshua Goodman) (peer-reviewed journal)

- *The Politics of Financial Regulation and the Regulation of Financial Politics,* 127 HARV. L. REV. 1991 (2014)

- *The Paper Chase: Securitization, Foreclosure, and the Uncertainty of Mortgage Title*, 63 DUKE L.J. 637 (2013)
    – Winner, American College of Consumer Financial Services Lawyers Annual Writing Competition

- *A Transactional Genealogy of Scandal from Michael Milken to Enron to Goldman Sachs*, 86 S. CAL. L. REV. 783 (2013) (with William Bratton)
    – Discussed in TIME ("The Accounting Trick Behind Thirty Years of Scandal," Aug. 15, 2012)

−Reprinted in 56 CORP. PRACTICE COMMENTATOR (2014)

- *The Consumer Financial Protection Bureau:  An Introduction*, 32 REV. BANKING & FIN. L. 321 (2013)

- *The Commercial Real Estate Bubble*, 2 HARV. BUS. L. REV. 801 (2013) (with Susan Wachter)

- *The Public Option in Housing Finance*, 46 U.C. DAVIS L. REV. 1111 (2013) (with Susan Wachter)

- *Skin-in-the-Game:  Risk Retention Lessons from Credit Card Securitization*, 81 GEO. WASH. L. REV.  813 (2013)

- *The Tenuous Case for Derivatives Clearinghouses*, 101 GEO. L.J. 445 (2013)

- *Why Housing?* 23 HOUSING POL'Y DEBATE 5 (2013) (with Susan Wachter) (peer reviewed)

- *Bankrupt Politics and the Politics of Bankruptcy*, 97 CORNELL L. REV. 100 (2012)

- *Explaining the Housing Bubble*, 100 GEO. L.J. 1177 (2012) (with Susan Wachter)
    −Discussed in THE ECONOMIST ("Bricks and Slaughter," Mar. 3, 2011)

- *The Dodd-Frank Act and Housing Finance:  Can It Restore Private Risk-Capital to the Securitization Market?* 29 YALE
    J. ON REG. 101 (2012) (symposium volume) (with Andrey D. Pavlov & Susan M. Wachter)

- *Rate Jacking: Risk-Based and Opportunistic Pricing in Credit Cards*, 2011 UTAH L. REV. 339 (2011) (invited theme
    issue on the Credit C.A.R.D. Act)

- *Private Disordering? Payment Card Fraud Liability Rules*, 5 BROOK. J. OF CORP., FIN. & COMM. LAW 1 (2011)
    (symposium issue)

- *Mortgage Servicing*, 28 YALE J. ON REG. 1 (2011) (with Tara Twomey)

- *In Defense of Bailouts*, 99 GEO. L.J. 435 (2011)
    −Winner, 2011 C-LEAF Junior Faculty Scholarship Prize

- *Rewriting Frankenstein Contracts:  The Workout Prohibition in Residential Mortgage Backed Securities*,
82 S. CAL. L. REV. 1075 (2010) (with Anna Gelpern)
    −Accepted for the 2009 Stanford-Yale Junior Faculty Forum

- *Bankruptcy Markets:  Making Sense of Claims Trading*, 4 BROOK. J. OF CORP., FIN. & COMM. LAW 64 (2010)
    (symposium issue)

- *Resolving the Foreclosure Crisis:  Modification of Mortgages in Bankruptcy,* 2009 WISC. L. REV. 565 (2009)
    −Accepted for the American Law and Economics Association Annual Convention
    −Accepted for Third Annual Conference on Empirical Legal Studies
    −Accepted for Harvard-Texas Conference on Commercial Realities

- *Hydraulic Regulation:  Regulating Credit Markets Upstream*, 26 YALE J. ON REG. 143 (2009)
    −Winner, Walton H. Hamilton Prize for Outstanding Scholarship, Yale Journal on Regulation
    −Accepted for University of Connecticut Workshop on Banking and Consumer Financial Services
    Law

- *Priceless?  The Costs of Credit Cards*, 55 UCLA L. REV. 1321 (2008)
    −Winner, American College of Consumer Financial Services Lawyers Annual Writing Competition

- *Priceless?  The Social Costs of Credit Card Merchant Restraints*, 45 HARV. J. ON LEGIS. 1 (2008)

- *Payment Wars:  The Merchant-Bank Struggle for Control of Consumer Payment Systems*, 12 STAN. J. L., BUS. & FIN.
    425 (2007)

- *Finding Nemo:  Rediscovering the Virtues of Negotiability in the Wake of Enron*, 2007 COLUM. BUS. L. REV. 83
    (2007)

- *Toward a Federal Common Law of Bankruptcy:  Judicial Lawmaking in a Statutory Regime*, 80 AM. BANKR. L.J. 1
    (2006) (double-blind peer-reviewed journal, published by National Conference of Bankruptcy Judges)

–winner of American Bankruptcy Law Journal's 2007 Editors' Prize

- *The Limits of <u>Enron</u>: Counterparty Risk in Bankruptcy Claims Trading*, 15 J. BANKR. L. & PRAC. 389 (2006) (peer-reviewed journal)

- *The Merchant-Bank Struggle for Control of Payment Systems*, 17 J. FIN. TRANSFORMATION 73 (2006) (peer-reviewed applied finance journal)

- *The Antitrust Super Bowl: America's Payment Systems, No-Surcharge Rules, and the Hidden Costs of Credit*, 3 BERKELEY BUS. L.J. 265 (2005)

## Book Chapters

- *Rethinking Duties to Serve in Housing Finance*, in HOMEOWNERSHIP BUILT TO LAST, Eric Belsky *et al.*, eds. (Brookings Institution Press 2014) (with Janneke Ratcliffe)

- *Deregulation and the Financial Crisis of 2008*, in REGULATORY BREAKDOWN? THE CRISIS OF CONFIDENCE IN U.S. REGULATION, Cary Coglianese, ed. (University of Pennsylvania Press 2012) (with Susan M. Wachter)

- *Fiscal Federalism and the Limits of Bankruptcy*, in WHEN STATES GO BROKE: ORIGINS, CONTEXT, AND SOLUTIONS FOR THE AMERICAN STATES IN FISCAL CRISIS, Peter Conti-Brown, ed. (Cambridge University Press 2011)

- *Information Asymmetries in the U.S. Mortgage Crisis*, in THE AMERICAN MORTGAGE SYSTEM: RETHINK, RECOVER, REBUILD, Susan M. Wachter & Martin M. Smith, eds. (University of Pennsylvania Press 2011) (with Susan M. Wachter)

- *Modification of Mortgages in Bankruptcy*, LESSONS FROM THE FINANCIAL CRISIS: INSIGHTS AND ANALYSIS FROM TODAY'S LEADING MINDS, Richard W. Kolb, ed. (Wiley 2009)

## Edited Volumes

- 82 LAW & CONTEMP. PROB., *Law and Macroeconomics* (2019) (with Anna Gelpern)

## Shorter Articles, Research Papers, and Commissioned Studies

- *The Spurious Pedigree of the "Valid-When-Made" Doctrine*, DUKE L.J. ONLINE (2021)

- *"No More Bailouts: A Blueprint for a Standing Emergency Economic Resilience and Stabilization Program,"* Great Democracy Initiative whitepaper (July 2020) (with Lindsay Owens and Ganesh Sitaraman)

- *"Abusive Acts and Practices"—Towards a Definition?* Invited Written Presentation for Consumer Financial Protection Bureau Symposium on "Abusive" (June 25, 2019)

- *Independent Review of the Empirical Studies Supporting the Draft Restatement of Consumer Contracts* (Dec. 21, 2017) (lead author)

- *The Economics of Retail Payments Security: Commentary,* in THE PUZZLE OF PAYMENTS SECURITY: FITTING THE PIECES TOGETHER TO PROTECT THE RETAIL PAYMENTS SYSTEM 69 (Fed. Res. Bank of K.C. 2016)

- *Pandora's Digital Box: Competitive and Business Risks of Mobile Wallets*, Merchants Advisory Group White Paper (2016) (commissioned study)

- *A Lawyer and Partner, and Also Bankrupt*, 4 J. OF LAW (4 THE POST) 93 (2014) (reprinted from blog post at www.creditslips.org)

- *An Analysis of the Proposed Interchange Fee Litigation Settlement*, Geo. L. & Econ. Research Paper, No. 12-033, *at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2133361

- *Clearing the Mortgage Market Through Principal Reduction: A Bad Bank for Housing (RTC 2.0)*, Pew Charitable Trusts Strategies to Improve the Housing Market Research Paper (2012), *available at* http://www.pewstates.org/uploadedFiles/PCS_Assets/2012/Clearing_the_Mortgage_Market.pdf (commissioned study).

- *What Next for Housing Finance?* 15 WHARTON REAL ESTATE REV. (2012) (with Susan Wachter)

- *Cross-Routing: PIN and Signature Debit Interchangeability Under the Durbin Amendment*, 2 LYDIAN J.16 (Dec. 2010)

- *Interchange Regulation: Implications for Credit Unions*, Research Brief #224, The Filene Research Institute, November 2010

- *Back to the Future with Chapter 13: A Reply to Professor Scarberry*, 37 PEPPERDINE L. REV. 1261 (2010)

- *Overdraft Regulation: A Silver Lining to the Regulatory Clouds?*, Research Brief #211, The Filene Research Institute, April 2010 (commissioned study)

- *The Credit C.A.R.D. Act: Opportunities and Challenges for Credit Unions*, Research Brief #202, The Filene Research Institute, Dec. 2009 (commissioned study)

- *Critique of Evans and Wright's Study of the Consumer Financial Protection Agency Act*, white paper, Oct. 22, 2009, *available at* http://ssrn.com/abstract=1492471

- *Bad and Good Securitization*, 13 WHARTON REAL ESTATE REV. 23 (2010) (with Andrey Pavlov and Susan Wachter), *available at* http://papers.ssrn.com/abstract=1462895

- *The Consumer Financial Protection Agency*, Policy Analysis, Pew Charitable Trusts Financial Reform Project, Research Brief #2, July 2009
  - The "best one-stop paper for understanding why CFPA needs to pass." Baseline Scenario, *at* http://baselinescenario.com/2009/08/17/a-cfpa-research-brief/

- *The Crisis Without a Face: Emerging Narratives of the Financial Crisis*, 63 U. MIAMI L. REV. 999 (2009) (invited foreword to themed volume)

- *Evaluation of Alternatives for Secondary Mortgage Markets*, Study for the National Association of Realtors' Presidential Advisory Group (2009) (commissioned study)

- *Remote Deposit Capture: A Legal and Transactional Overview*, 126 BANKING L.J. 115 (2009) (peer-edited journal)

- *Helping Homeowners: Modification of Mortgages in Bankruptcy*, 3 HARV. L. & POL'Y REV. (online) (Jan. 19, 2009) (invited contribution), *at* http://www.hlpronline.com/Levitin_HLPR_011909.pdf

- *Reforming Mortgage* Servicing, Research Brief, American Association of Retired Persons, Dec. 2008 (commissioned study)

- *All But Accurate: A Critique of the American Bankers Association Study on Credit Card Regulation*, white paper, December 6, 2007, *at* http://papers.ssrn.com/abstract=900444

- *Gifting Plans and Absolute Priority*, 124 BANKING L.J. 722 (2007) (peer-edited journal)

- *The Problematic Case for Incentive Compensation in Bankruptcy*, 155 UNIV. PA. L. REV. PENNUMBRA 88 (2007)

- *Antitrust Issues in Credit Card Merchant Restraints Rules*, Tobin Project Working Paper, Risk Policy Working Paper, May 6, 2007 (with Elizabeth Warren)

- *Health Care Privacy Issues in Corporate Reorganizations*, Materials Presented Before the American Bankruptcy Institute 2007 New York City Bankruptcy Conference, May 7, 2007 (with Arthur R. Cormier & Andrew M. Troop)

## Encyclopedia Entries

- *Mortgage Market Character and Trends: USA*, in THE HOUSING ENCYCLOPEDIA, Susan Smith, ed.,

(Cambridge University Press 2012) (with Susan Wachter)

- *American Mortgages,* in THE HOUSING ENCYCLOPEDIA, Susan Smith, ed., (Cambridge University Press 2012) (with Susan Wachter)

## LEGISLATIVE TESTIMONY AND BRIEFINGS

- Testimony Before the House Judiciary Committee Subcommittee on Regulatory Reform, Commercial and Antitrust Law, July 28, 2021 (hearing on "Oversight of the Bankruptcy Code, Part 1: Confronting Abuses of the Chapter 11 System").
- Testimony Before the House Committee on Small Business, Sept. 9, 2020 (hearing on "Transparency in Small Business Lending").
- Testimony Before the Senate Committee on Banking, Housing, and Urban Affairs, March 26, 2019 (hearing on Chairman's Housing Reform Outline:  Part I).
- Testimony Submitted to the Senate Judiciary Committee, Nov. 13, 2018 (hearing on the Taxpayer Protection and Responsible Resolution Act of 2018).
- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit, Jan. 25, 2018 (hearing on "Examining Opportunities and Challenges in the Financial Technology ("Fintech") Marketplace").
- Testimony Before the Senate Committee on Banking, Housing, and Urban Affairs, June 8, 2017 ("Fostering Economic Growth: The Role of Financial Institutions in Local Communities").
- Testimony Submitted to the House Financial Services Committee's Subcommittee on Financial Institutions and Consumer Credit, Mar. 21, 2017 (hearing on "Ending the *De Novo* Drought:  Examining the Application Process for *De Novo* Financial Institutions").
- Testimony Before the House Financial Services Committee, July 9, 2016 ("Making a Financial Choice: More Capital or More Government Control?") (hearing on the CHOICE Act).
- Testimony Before the Senate Judiciary Committee, Subcommittee on The Constitution, July 23, 2015 ("The Administrative State v. The Constitution:  Dodd-Frank at Five").
- Testimony Before the House Financial Services Committee, Mar. 15, 2015 ("Preserving Consumer Choice and Financial Independence").
- Testimony Before the House Judiciary Committee, Subcommittee on Regulatory Reform, Commercial and Antitrust Law, July 17, 2014 ("Guilty Until Proven Innocent?  A Study of the Propriety & Legal Authority for the Justice Department's *Operation Choke Point*").
- Testimony Before the House Financial Services Committee, Subcommittee on Capital Markets and Government Sponsored Enterprises, Feb. 26, 2014 ("The Dodd-Frank Act's Impact on Asset-Backed Securities").
- Testimony Before the House Committee on Small Business, Subcommittee on Oversight, Investigations, and Regulation, Dec. 3, 2013 ("Regulatory Landscape:  Burdens on Small Financial Institutions").
- Testimony Before the Senate Banking Committee, Oct. 1, 2013 ("Housing Finance Reform: Fundamentals of a Functioning Private Label Mortgage Backed Securities Market").
- Testimony Before the House Financial Services Committee, July 18, 2013 ("A Legislative Proposal to Protect American Taxpayers and Homeowners by Creating a Sustainable Housing Finance System") (hearing on the PATH Act).
- Testimony Before the House Judiciary Committee, Subcommittee on Intellectual Property, Competition, and the Internet, July 10, 2012 ("The Dodd-Frank Act's Effects on Financial Services Competition").

37

- Testimony Before the House Financial Services Committee, Subcommittee on Capital Markets and Government Sponsored Institutions, June 7, 2012 ("Investor Protection: The Need to Protect Investors from Government").
- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit, May 9, 2012 ("Rising Regulatory Compliance Costs and Their Impact on the Health of Small Financial Institutions").
- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit & Subcommittee on Capital Markets and Government Sponsored Enterprises, Nov. 16, 2011 (Joint Hearing on "H.R. 1697: The Communities First Act").
- Testimony Before the Senate Committee on Banking, Housing, and Urban Affairs, Sept. 13, 2011 ("Housing Finance Reform: Should There Be a Government Guarantee?").
- Testimony Submitted to the House Committee on the Judiciary, Sept. 8, 2011 (H.R. 2533, the "Chapter 11 Bankruptcy Venue Reform Act of 2011").
- Testimony Before the House Committee on Small Business, Subcommittee on Oversight, Investigations & Regulation, July 28, 2011 ("Open for Business: The Impact of the CFPB on Small Business").
- Testimony Before the Senate Committee on Banking, Housing, and Urban Affairs, July 19, 2011 ("Enhanced Consumer Financial Protection After the Financial Crisis").
- Testimony Before the House Government Oversight and Reform Committee, Subcommittee on TARP, Financial Institutions, and Bailouts of Public and Private Institutions, May 24, 2011 ("Who's Watching the Watchmen? Oversight of the Consumer Financial Protection Bureau").
- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit, Apr. 6, 2011 ("Legislative Proposals to Improve the Structure of the Consumer Financial Protection Bureau").
- Testimony Before the House Financial Services Committee, Subcommittee on Housing and Community Opportunity, Nov. 18, 2010 ("Robo-Signing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing").
- Testimony Before the Senate Committee on Banking, Housing, and Urban Affairs, Nov. 16, 2010 ("Problems in Mortgage Servicing from Modifications to Foreclosures").
- Testimony Before the Financial Crisis Inquiry Commission, Oct. 28, 2010, *at* http://fcic.law.stanford.edu/interviews/view/421.
- "Future of Housing Finance," Center for American Progress Mortgage Finance Working Group Presentation to the U.S. Department of Treasury, August 2, 2010.
- Testimony Before the House Judiciary Committee, Subcommittee on Commercial and Administrative Law, December 11, 2009 ("Home Foreclosures: Will Voluntary Mortgage Modification Help Families Save Their Homes? Part II?").
- Testimony Before the Senate Judiciary Committee, Subcommittee on Administrative Oversight and the Courts, July 23, 2009 ("The Worsening Foreclosure Crisis: Is It Time to Reconsider Bankruptcy Reform?).
- Testimony Before the House Judiciary Committee, Subcommittee on Commercial and Administrative Law, April 2, 2009 (re: Consumer Debt — Are Credit Cards Bankrupting Americans?).
- Testimony Before the Senate Judiciary Committee, Subcommittee on Administrative Oversight and the Courts, Mar. 24, 2009 ("Abusive Credit Card Practices and Bankruptcy," re: Consumer Credit Fairness Act, S.257).

- Testimony Before the Senate Committee on Banking, Housing and Urban Affairs, Feb. 12, 2009 (re: Modernizing Consumer Protection in the Financial Regulatory System: Strengthening Credit Card Protections).
- Testimony Before the House Judiciary Committee, Jan. 22, 2009 (re: Helping Families Save Their Homes in Bankruptcy Act, H.R. 220, and the Emergency Homeownership and Equity Protection Act, H.R. 225).
- Testimony Before the Senate Judiciary Committee, Nov. 19, 2008 (re: Helping Families Save Their Homes in Bankruptcy Act, now S.61).
- "Bankruptcy Modification of Mortgages," Democratic Staff Briefing, United States House of Representatives, November 14, 2008.
- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit on March 13, 2008 (re: Credit Cardholders' Bill of Rights).
- Testimony Submitted to the Economic Matters Committee, Maryland State House of Delegates, March 6, 2008.
- "Credit Card Regulation," Democratic Staff Briefing, United States House of Representatives, March 5, 2008.

## REGULATORY AND LEGISLATIVE COMMENTS FILED

- Letter to the Permanent Editorial Board of the Uniform Commercial Code regrading proposed Commentary on Perfection of a Security Interest in Intangible Money and Related Choice-of-Law Rules, Aug. 9, 2021
- Comments to the Office of the Comptroller of the Currency regarding Notice of Proposed Rulemaking regarding "Fair Access to Financial Services," Docket No. OCC- 2020-004, Dec. 18, 2020
- Legal Scholars Letter to Senator Elizabeth Warren Regarding the Consumer Bankruptcy Reform Act of 2020, December 14, 2020 (co-lead drafter)
- Comments to the Office of the Comptroller of the Currency regarding the Charter Application of Figure Bank, N.A., 2020-WE-Charter-317953, Dec. 7, 2020
- Comments to the Consumer Financial Protection Bureau regarding "Qualified Mortgage Definition Under the Truth in Lending Act (Regulation Z): General QM Loan Definition", Docket No. CFPB-2020-0020, Sept. 23, 2020
- Comments to the Office of Comptroller of the Currency regarding Notice of Proposed Rulemaking regarding "National Banks and Federal Savings Associations as Lenders," Docket No. OCC-2020-0026, September 3, 2020
- Comments to the Consumer Financial Protection Bureau regarding Request for Information from Taskforce on Federal Consumer Financial Law, Docket No. CFPB-2020-0013, June 1, 2020
- Comments to the Federal Deposit Insurance Corporation regarding Notice of Proposed Rulemaking regarding "Federal Interest Rate Authority," RIN 3064-AF21, Jan. 5, 2020
- Comments to the Office of Comptroller of the Currency regarding Notice of Proposed Rulemaking regarding "Permissible interest on loans that are sold, assigned, or otherwise transferred," Docket No. OCC-2019-0027, Jan. 5, 2020
- Letter to William K. Harrington, Esq. United States Trustee, Region 2, Regarding Appointment of Examiner in the Chapter 11 Case of Purdue Pharma, Inc., No. 19-23649 (Bankr. S.D.N.Y.), Nov. 5, 2019 (co-author with Jonathan Lipson and Stephen Lubben)
- Comments to the Securities and Exchange Commission on Request for Comments on Asset-Level Disclosure Requirements for Residential Mortgage-Backed Securities, Nov. 23, 2019

- Comments to the Consumer Financial Protection Bureau on proposed rescission of Final Rule regarding Payday, Vehicle Title, and Certain High-Cost Loans, Docket No. CFPB-2019-0006, May 15, 2019
- Letter on behalf of bankruptcy and financial regulation scholars to Senators Warren and Sanders in support of the U.S. Territorial Relief Act of 2019, May 2, 2019 (drafter)
- Joint Letter of Concerned Members of the Members Consultative Group to the American Law Institute Council on Council Draft No. 5 of the Restatement of the Law of Consumer Contracts, Oct. 3, 2018 (lead drafter)
- Letter on behalf of bankruptcy and financial regulation scholars to Senators Warren and Sanders in support of the U.S. Territorial Relief Act of 2018, July 25, 2018 (drafter)
- Comments of Financial Regulation and Consumer Protection Scholars Regarding the Consumer Financial Protection Bureau's Request for Information on Regulatory Guidance, Docket No. CFPB-2018-0013, July 2, 2018 (lead drafter)
- Letter Regarding Independent Review of the Empirical Studies Supporting Council Draft No. 3 of the Restatement of the Law, Consumer Contracts, to the American Law Institute Council, Jan. 12, 2018
- Joint Letter of Empirical Legal Scholars to the American Law Institute Council, concerning the third draft of the Restatement of the Law of Consumer Contracts, Oct. 9, 2017
- Letter to the American Law Institute Council, concerning the third draft of the Restatement of the Law of Consumer Contracts, Oct. 2, 2017
- Legal Scholars Letter to Congressional Banking and Financial Services Committee Leadership Regarding H.R. 10 and the Consumer Financial Protection Bureau, May 12, 2017 (co-lead drafter)
- Joint Letter of Concerned Members of the Members Consultative Group to the Reporters on the second draft of the American Law Institute Restatement of the Law of Consumer Contracts, Oct. 19, 2016 (lead drafter)
- Consumer Finance Scholars Comment Letter to the Consumer Financial Protection Bureau regarding Proposed Rulemaking on Payday, Vehicle Title, and Certain High-Cost Loans, Sept. 13, 2016 (lead drafter)
- Joint Letter of Concerned Members of the Members Consultative Group to the Reporters on the second draft of the American Law Institute Restatement of the Law of Consumer Contracts, Dec. 31, 2015 (lead drafter)
- Corporate Finance Scholars' Letter to Congressional Leadership on Proposed Omnibus Appropriations Bill Rider to Amend the Trust Indenture Act, Dec. 8, 2015 (lead drafter)
- Letter to the Reporters on the second draft of the American Law Institute Restatement of the Law of Consumer Contracts Nov. 15, 2015
- Letter to the Reporters on the first draft of the American Law Institute Restatement of the Law of Consumer Contracts Mar. 27, 2015
- Comments to the Consumer Financial Protection Bureau on Amendments Relating to Small Creditors and Rural or Underserved Areas Under the Truth in Lending Act (Regulation Z), Feb. 27, 2015
- Letter to the Reporters on the first draft of the American Law Institute Restatement of the Law of Consumer Contracts Nov. 12, 2014
- Comments to the Consumer Financial Protection Bureau on Advanced Notice of Proposed Rulemaking regarding Debt Collection, Feb. 28, 2014
- Comments to the Federal Housing Finance Agency on Proposed State-Level Guarantee Fee Increases November 29, 2012
- Comments to the Permanent Editorial Board of the Uniform Commercial Code on the Draft Report on Mortgage Notes, May 27, 2011

- Comments to the Permanent Editorial Board of the UCC on Draft Report on Enforceability of Mortgage Notes, April 2011
- Comments to the Federal Reserve Board on the Durbin Amendment Rulemaking (Reg E), Feb. 21, 2011
- Cited in NACS v. Bd. of Governors of Fed. Reserve Sys., 2013 WL 3943489 (D.D.C. July 31, 2013)
- Comments to the Bankruptcy Rules Committee on Proposed Amendments to Federal Rule of Bankruptcy Procedure 2019, Feb. 15, 2010.
- Comments to the Permanent Editorial Board of the UCC on Proposed (Pre-Release) Draft Report on Enforceability of Mortgage Notes, January 5, 2011

## AMICUS BRIEFS AUTHORED (LEAD AUTHOR OR CO-AUTHOR)

- Amicus Brief (in support of plaintiffs), *California ex rel. Becerra v. FDIC*, No. 20-cv-5860 (N. D. Cal. 2020) (sole author, represented by Eliza Duggan and Ted Mermin)
- Amicus Brief (in support of plaintiffs), *California ex rel. Becerra v. v. Brooks*, No. 20-cv-5200 (N. D. Cal. 2020) (sole author, represented by Eliza Duggan and Ted Mermin)
- Amicus Brief (in opposition to proposed settlements between the United States Department of Justice and the Debtors and between the United States Department of Justice and the Sackler Family), *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y.) (lead co-author; co-counsel with Jonathan Lipson and Daniel Walfish)
- Amicus Brief (in support of respondent), *City of Chicago v. Fulton*, Supreme Court of the United States, No. 19-357 (co-author; represented by David Kuney)
- Amicus Brief (in support of the judgment below), *Seila Law LLC v. Consumer Financial Protection Bureau*, Supreme Court of the United States, No. 19-7 (lead co-author; co-counsel with Deepak Gupta and Patricia McCoy)
- Amicus Brief (in support of neither party), *McShannock v. JP Morgan Chase Bank N.A.*, No. 1:19-15899 (9th Cir. 2019) (sole author)
- Amicus Brief (in support of appellant), *Rent-Rite Super Kegs West, Ltd. v. World Business Lenders, LLC*, No. 1:19-cv-01552 (D. Colo. 2019) (sole author) (discussed favorably in decision reversing and remanding)
- Amicus Brief (in support of plaintiff), *Meade v. Marlette Funding, LLC*, No. 17-cv-30376 (Denver District Court, Colo. 2018) (sole author)
- Amicus Brief (in support of plaintiff), *Meade v. Avant of Colorado, LLC*, No. 17-cv-30377 (Denver District Court, Colo. 2018) (sole author)
- Amicus Brief of Scholars Consumer Finance Regulation in support of Plaintiff, *English v. Trump*, United States Court of Appeals for the District of Columbia, (2018) (co-lead author; represented by Law Offices of Courtney Weiner)
- Amicus Brief of Scholars Consumer Finance Regulation in support of Plaintiff, *Lower East Side People's Federal Credit Union v. Trump*, United States District Court for Southern District of New York, No. 1:17-cv-09536 (S.D.N.Y. 2017) (co-lead author; represented by Law Offices of Courtney Weiner)
- Amicus Brief of Scholars Consumer Finance Regulation in support of Plaintiff, *English v. Trump*, United States District Court for District of Columbia, No. 1:17-cv-02534 (D.D.C. 2017) (co-lead author; represented by Law Offices of Courtney Weiner)

- Amicus Brief of Scholars of Behavioral Science and Economics in support of Respondents, *Masterpiece Cakeshop, Ltd., et al., v. Colorado Civil Rights Commission et al,* Supreme Court of the United States, No. 16-111 (co-author; represented by Allison Ehlert and Adam Hoffman)

- Amicus Brief (in support of appellant), *Expressions Hair Designs v. Schneiderman,* Supreme Court of the United States, No. 15-1391, Nov. 21, 2016 (lead author; co-counsel with Carl Cecere)

- Amicus Brief of Financial Regulation Scholars in support of petitioners at en banc rehearing, *CFPB v. PHH Corp.,* D. C. Circuit en banc, No. 15-1177, Mar. 31, 2016 (co-lead author; co-counsel with Michael Barr and Deepak Gupta)

- Amicus Brief of Scholars of Behavioral Economics (in support of certiorari petition), *Expressions Hair Designs v. Schneiderman,* Supreme Court of the United States, No. 15-1391, June 15, 2016 (lead author; represented by Allison Ehlert and Adam Hoffman)

- Amicus Brief (in support of respondents), *Bank of America v. Caulkett,* United States Supreme Court, 2015 (lead author; co-counsel with Michael Fitzgerald)

- Amicus Brief (supplemental), *Eaton v. Federal National Mortgage Association & Another,* Supreme Judicial Court of Massachusetts, No. 11041, Jan. 27, 2012 (sole author)

- Amicus Brief, *Eaton v. Federal National Mortgage Association & Another,* Supreme Judicial Court of Massachusetts, No. 11041, Sept. 22, 2011 (sole author)

- Amicus Brief, *Residential Funding Co. v. Saurman,* No. 143178, Supreme Court of Michigan, Oct. 21, 2011 (co-author with John Pottow & Rebecca Tushnet)

- Amicus Brief, *Bevilacqua v. Rodriguez,* Supreme Judicial Court of Massachusetts, No. 10880, April 21, 2011 (lead author)

- Amicus Brief on Behalf of the Texas Hotel and Lodging Ass'n, *La Villita Motor Inns, J.V., v. Orix Capital Markets, LLC, et al.,* Supreme Court of Texas, No. 10-1001, Mar. 20, 2011 (lead author)

## **Editorials and Blogging**

- "The Boy Scouts Are Abusing Bankruptcy," BLOOMBERGLAW, Nov. 2021
- "Now is the time for bankruptcy venue reform," THE HILL, August 6, 2021 (with Joan Feeney, Steven Rhodes, and Jay Westbrook)
- "Consumers—not banks—should control access to personal financial data," THE HILL, July 6, 2021
- "Reform Our Bankruptcy Laws Before a Tsunami of Covid Debt Comes Due," CNBC, Jan. 11, 2021
- "Supersize the Supreme Court to Save It," The AMERICAN PROSPECT, October 12, 2020
- "In Case of Economic Emergency:  Break Glass," BOSTON GLOBE, July 5, 2020 (with Lindsay Owens and Ganesh Sitaraman)
- "Mortgage Market Déjà vu," THE AMERICAN PROSPECT, July 1, 2020 (with Susan Wachter)
- "How to Start Closing the Racial Wealth Gap," The AMERICAN PROSPECT, June 17, 2020
- "How to Get Money to Small Businesses, Fast," N.Y. TIMES, Mar. 24, 2020 (with Satyam Khanna)
- "The Americans Joe Biden Left Behind on the Bankruptcy Bill," THE AMERICAN PROSPECT, Jan. 9, 2019
- "Who Needs More Supreme Court Justices?  Democrats and Republicans Do," BLOOMBERGLAW, Apr. 2, 2019
- "Depoliticize the Supreme Court by Adding Two Dozen New Justices," THE HILL, Dec. 7, 2018

- "Treasury's Bankruptcy Plan Would Mean More, Not Fewer, Bailouts," AMERICAN BANKER, Feb. 23, 2018
- "Toys 'R' Us and the Rigged Economy," HUFFINGTON POST, Sept. 26, 2017
- "Fixing the Equifax Problem:  Public Utility Regulation of Credit Reporting," HUFFINGTON POST, Sept. 24, 2017
- "'Madden fix' bills are a recipe for predatory lending," AMERICAN BANKER, Aug. 25, 2017
- "Draining the Financial Swamp," WALL ST. JOURNAL, Mar. 21, 2017
- "What the CFPB 'Commission' Debate Is Really About," AMERICAN BANKER, Dec. 29, 2016
- "Glass-Steagall's Political Firewall," HUFFINGTON POST, Oct. 27, 2015
- "Where's the Proof that Durbin Failed Consumers?" AMERICAN BANKER, Oct. 22, 2015
- "Who's Afraid of a Republican CFPB?" AMERICAN BANKER, Oct. 16, 2015
- "Recalibrate the TIA for Today's Debt Markets," WALL ST. J. BANKRUPTCY BEAT, Sept. 30, 2015
- "The CFPB's Data Collection Should Be Applauded," AMERICAN BANKER, Aug. 17, 2015
- "Discharge Private Student Loans, But Federal Loans Have Safety Net," WALL ST. J. BANKRUPTCY BEAT, May 11, 2015
- "Eliminate Vendor Priority Claims," WALL ST. J. BANKRUPTCY BEAT, Dec. 3, 2014
- "Argentina and Distressed Investors," WALL ST. J. BANKRUPTCY BEAT, July 29, 2014
- "Mandatory Arbitration Offers Bargain-Basement Justice," AMERICAN BANKER, May 13, 2014
- "Outlook for Corporate Restructuring," WALL ST. J. BANKRUPTCY BEAT, Mar. 26, 2014
- "Postal Banking:  Maybe Not So Crazy After All," AMERICAN BANKER, Jan. 31, 2014
- Letter to the Editor, N.Y. TIMES, Nov. 1, 2013
- "Hands Off Detroit's Final Treasures!" SALON, Aug. 20, 2013.
- "Don't Take My Pension:  The Looming Public Worker Nightmare," SALON, Aug. 12, 2013.
- "Make the Banks Pay," SALON, Oct. 27, 2011.
- "Fed's Feeble Swipe Fee Rule Is an Unauthorized Sop to Big Banks," AMERICAN BANKER, July 8, 2011.
- "More Openness on Mortgages," N.Y. TIMES, Mar. 8, 2010.
- Letter to the Editor, WASHINGTON POST, July 6, 2010.
- Letter to the Editor, WASHINGTON TIMES, June 22, 2010.
- "Swipe Fee Reform Benefits Consumers and Businesses Large and Small," HUFFINGTON POST, June 18, 2010.
- "Rein in the Credit Card Games," DETROIT FREE-PRESS, Nov. 28, 2008 (reprinted as "Consumer Pay High Price for Credit Cards," SAN DIEGO UNION-TRIBUNE, Nov. 30, 2008) (reprinted as "Credit cards on Santa's naughty list," ATLANTA JOURNAL CONSTITUTION, Dec. 7, 2008).
- "Bailout Bill Must Include Help for Homeowners," WASHINGTON INDEPENDENT, Sept. 26, 2008.
- "The Card Industry Still Has a Chance to Reform," AMERICAN BANKER, Aug. 8, 2008.
- "The Flaws in the FHA Housing Bill", op-ed, WALL ST. JOURNAL, July 11, 2008.
- Letter to the Editor, WALL ST. JOURNAL, April 3, 2008.
- "Complex Pricing of Credit Cards Should be Simplified," op-ed, CHICAGO TRIBUNE, Dec. 27, 2007, at A21
- "Conglomerate Master" guest blogger on The Conglomerate, 2010-2011
- Guest blogger, PrawfsBlawg, May 2008
- Guest blogger, Warren Reports at TPM Café, Jan. 2007

- Blogger, Credit Slips, www.creditslips.org, Dec. 31, 2007-present

## PRESENTATIONS AND PANELS

### 2021

- "The Legislative Landscape for Consumer Bankruptcy: Chapter 10, Student Loans and Beyond," American Bankruptcy Institute Consumer Practice Extravaganza, Nov. 3, 2021 (presenter)
- "State of the Settlements, Bellwethers, and Settlement Design Innovations," Georgetown University O'Neill Institute for National and Global Health Law and the Pew Charitable Trusts Opioid Summit, Sept. 25, 2021 (panelist)
- "The Financial Inclusion Trilemma," Georgetown Law Faculty Workshop, July 13, 2021 (presenter)
- "Purdue's Poison Pill: The Breakdown of Chapter 11's Checks and Balances," Corporate Restructuring and Insolvency Seminar, June 15, 2021 (presenter)
- "Rethinking Bankruptcy Exceptionalism," Emerging Scholars Conference, University of Chicago, May 25, 2021 (commentator on paper by Jonathan Seymour)
- "Conglomerates, Conflicts of Interest, and Consumer Protection," Arthur Wilmarth Celebration Conference, May 24, 2021 (panelist)
- "Addressing Poverty and Financial Distress in the Jewish Community," Jewish Federation of Greater Washington Board Meeting, Apr. 28, 2021 (panelist)
- "Contractual Inequality," Consumer Law Scholars Conference, UC Berkeley, Mar. 5, 2021 (commentator on paper by Manisha Padi)
- "Cryptocurrency, Blockchain, and Decentralized Finance," National Community Reinvestment Coalition Just Economy 2021 Conference, May 12, 2021 (panelist)
- Bankruptcy 202:  Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, Mar. 16, 2021 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, Mar. 10, 2021 (presenter)
- "Contractual Inequality," Consumer Law Scholars Conference, UC Berkeley, Mar. 5, 2021 (commentator on paper by Manisha Padi)
- "Bankruptcy 101:  Creditors' Rights and Chapter 7," Gerson Lehrman Group webcast, Mar. 3, 2021 (presenter)
- "The Consumer Bankruptcy Reform Act of 2020," Brooklyn Law School, Feb. 4, 2021 (co-presenter)
- "The Great American Housing Bubble," Wharton Club of Boston, Jan. 28, 2021 (presenter)
- "The Coming Consumer Financial Cliff," Hebrew Free Loan Association Board Meeting, Jan. 11, 2021

### 2020

- "Attacking State Usury Law Evasions," National Consumer Law Center Consumer Rights Litigation Conference, Nov. 14, 2020 (panelist)
- Bankruptcy 202:  Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, Oct. 30, 2020 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, Oct. 28, 2020 (presenter)
- "Bankruptcy 101:  Creditors' Rights and Chapter 7," Gerson Lehrman Group webcast, Oct. 26, 2020 (presenter)

- "Loan Sharks or Angel Fish?  The Pros and Cons of Bank Partnerships and Interest Rate Exportation Rights," Columbia Law and Political Economy Society, Oct. 26, 2020 (panelist)
- "The Great American Housing Bubble," Harvard Club of New York, August 12, 2020 (presenter)
- "The New Usury:  The Ability-to-Repay Revolution in Consumer Finance," Georgetown Law Faculty Workshop, June 17, 2020 (presenter)
- Bipartisan briefing on nonbank mortgage lending and servicing, House Financial Services Committee Staff, Apr. 16, 2020 (presenter)
- "The New Usury:  The Ability-to-Repay Revolution in Consumer Finance," Consumer Law Scholars Conference, UC Berkeley, Mar. 6, 2020 (presenter)
- "Bankruptcy: Voidable Actions and Equitable Remedies," Gerson Lehrman Group webcast, Feb. 26, 2020 (presenter)
- Bankruptcy: Chapter 11 Operations and Governance," Gerson Lehrman Group webcast, Feb. 25, 2020 (presenter)
- Bankruptcy: Chapter 11 Plans," Gerson Lehrman Group webcast, Feb. 19, 2020 (presenter)
- Bankruptcy: Creditors' Rights and Chapter 7," Gerson Lehrman Group webcast, Feb. 18, 2020 (presenter)
- "Fintech Innovations?" American Association of Law Schools Annual Meeting, Jan. 5, 2020 (roundtable participant)
- "Reflections On and Lessons From 'Foreclosed,' a New Book by Professor Chris Odinet," American Association of Law Schools Annual Meeting, Jan. 4, 2020 (commentator)

**2019**

- "Debt Restructurings:  Exchange Offers and Consent Solicitations," Gerson Lehrman Group webcast, Oct. 31, 2019 (presenter)
- Bankruptcy 202:  Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, Oct. 24, 2019 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, Oct. 17, 2019 (presenter)
- "Bankruptcy 101:  Creditors' Rights and Chapter 7," Gerson Lehrman Group webcast, Oct. 3, 2019 (presenter)
- "Law and Macroeconomics," Georgetown Law and Macroeconomics Conference, Sept. 27, 2019 (presenter)
- "Opioid Bankruptcies: Further Developments," Capstone LLC, September 17, 2019 (presenter)
- "Credit Derivatives 101," Gerson Lehrman Group webcast, Sept. 11, 2019 (presenter)
- "Securitization 101," Gerson Lehrman Group webcast, Sept. 4, 2019 (presenter)
- "Opioid Bankruptcies," Capstone LLC, August 13, 2019 (presenter)
- "Abusive Acts and Practices," Consumer Financial Protection Bureau Symposium, June 25, 2019 (presenter)
- "Credit Derivatives 101," Gerson Lehrman Group webcast, April 2, 2019 (presenter)
- "Securitization 101," Gerson Lehrman Group webcast, March 26, 2019 (presenter)
- "Bankruptcy 202:  Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, March 12, 2019 (presenter)
- "The Fast and the Usurious:  Putting the Brakes on Auto Lending Abuses," University of Minnesota School of Law Faculty Workshop, Mar. 7, 2019 (presenter)

- "Public-Private Risk-Sharing in Financial Regulation," Boston College, Regulation and Markets Workshop, Feb. 19, 2019 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, March 5, 2019 (presenter)
- "Bankruptcy 102:  Bankruptcy Basics," Gerson Lehrman Group webcast, February 26, 2019 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, February 13, 2019 (presenter)

## 2018

- "Get Rid of Multi-Member Commissions," American Constitution Society Convening on Reimagining the Regulatory State, Dec. 13, 2018 (presenter)
- "Bankruptcy 202:  Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, November 14, 2019 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, November 9, 2018 (presenter)
- "Bankruptcy 102:  Bankruptcy Basics," Gerson Lehrman Group webcast, October 31, 2018 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, October 24, 2018 (presenter)
- "Bankruptcy 202:  Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, July 18, 2019 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, July 16, 2018 (presenter)
- "Bankruptcy 102:  Bankruptcy Basics," Gerson Lehrman Group webcast, July 12, 2018 (presenter)
- "Law, Macroeconomics, and Norms," Georgetown University Law Center Summer Workshop, July 10, 2018 (presenter with Anna Gelpern)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, July 9, 2018 (presenter)
- "A Public Option for Bank Accounts (or Central Banking for All)", Vanderbilt Law Roundtable on Financial Transformation, June 1, 2018 (commentator)
- "Mortgage Risk Premia During the Housing Bubble," American Finance Association 2018 Annual Meeting, Washington D.C., June 1, 2018
- "Bankruptcy 202:  Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, March 26, 2019 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, March 19, 2018 (presenter)
- "Bankruptcy 102:  Bankruptcy Basics," Gerson Lehrman Group webcast, March 12, 2018 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, March 5, 2018 (presenter)
- "The Fast and the Usurious:  Putting the Brakes on Auto Lending Abuses," Agnes N. Williams Research Chair Inaugural Lecture, Georgetown University Law Center, Feb. 21, 2018
- "Bankruptcy's Lorelei:  The Dangerous Allure of Financial Institutions Bankruptcy," Jay Westbrook Celebration Symposium, University of Texas School of Law, Feb. 3, 2017 (presenter)

## 2017

- "The New Restructuring?  Coercion and Opportunism in Debt Workouts," University of Pennsylvania Law Review Symposium, Oct. 20, 2017 (presenter)
- "Bankruptcy 202:  Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, November 1, 2017 (presenter)

- "Bankruptcy 201: Chapter 11 Restructuring," Gerson Lehrman Group webcast, October 25, 2017 (presenter)
- "Bankruptcy 102: Bankruptcy Basics," Gerson Lehrman Group webcast, October 18, 2017 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, October 11, 2017 (presenter)
- "Bankruptcy 201: Chapter 11 Restructuring," Gerson Lehrman Group webcast, June 15, 2017 (presenter)
- "Bankruptcy 102: Bankruptcy Basics," Gerson Lehrman Group webcast, June 8, 2017 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, June 1, 2017 (presenter)
- "Bankruptcy 202: Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, February 7, 2017 (presenter)
- "Bankruptcy 201: Chapter 11 Restructuring," Gerson Lehrman Group webcast, January 31, 2017 (presenter)
- "Bankruptcy 102: Bankruptcy Basics," Gerson Lehrman Group webcast, January 24, 2017 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, January 17, 2017 (presenter)

**2016**

- "The New Restructuring? Coercion and Opportunism in Debt Workouts," University of Pennsylvania Institute of Law and Economics Fall Corporate Roundtable, December 9, 2016 (co-presenter)
- "FinTech Charters," U.S. PIRG/National Council of LaRaza FinTech/Big Data Conference, December 6, 2016
- Roundtable on Housing Finance Reform, Bipartisan Policy Center, December 5, 2016 (participant)
- "The New Restructuring? Coercion and Opportunism in Debt Workouts," Georgetown University Law Center Faculty Workshop, Nov. 8, 2016 (presenter)
- "Bankruptcy 201: Chapter 11 Restructuring," Gerson Lehrman Group webcast, October 20, 2016 (presenter)
- "Bankruptcy 102: Bankruptcy Basics," Gerson Lehrman Group webcast, October 13, 2016 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, October 6, 2016 (presenter)
- "Pandora's Digital Box," Merchant Advisory Group Webinar, July 27, 2016 (presenter)
- "Bankruptcy 201: Chapter 11 Restructuring," Gerson Lehrman Group webcast, June 16, 2016 (presenter)
- "Bankruptcy 102: Bankruptcy Basics," Gerson Lehrman Group webcast, Jun 9, 2016 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, June 2, 2016 (presenter)
- "One Dollar, One Vote," Wharton School, University of Pennsylvania, April 21, 2016
- "Minority Creditors' Rights under the Trust Indenture Act and Syndicated Loan Agreements", Financial Lawyers Conference, Ojai, California (lead conference moderator), April 1-3, 2016
- "Gifting Revisited", Financial Lawyers Conference, Ojai, California (lead conference moderator), April 1-3, 2016
- "Multi-Debtor Issues in Chapter 11", Financial Lawyers Conference, Ojai, California (lead conference moderator), April 1-3, 2016
- "Empty and Indirect Creditor Issues in Restructuring", Financial Lawyers Conference, Ojai, California (lead conference moderator), April 1-3, 2016
- "Developments in Fraudulent Transfer Law", Financial Lawyers Conference, Ojai, California (lead conference moderator), April 1-3, 2016

- "State and Federal Law of Corporate Governance", Financial Lawyers Conference, Ojai, California (lead conference moderator), April 1-3, 2016
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, Feb. 18, 2016 (presenter)
- "Bankruptcy 101:  Introduction to Creditors' Rights and Bankruptcy," Gerson Lehrman Group webcast, Feb. 11, 2016 (presenter)


## 2015

- "Introduction to Creditors' Rights and Bankruptcy," Gerson Lehrman Group webcast, Aug. 17, 2015 (presenter)
- "The Puzzle of Payments Security:  Fitting the Pieces Together to Protect the Retail Payments System," Federal Reserve Bank of Kansas City, June 25-26, 2015 (presenter)
- "Foreclosure Activity:  Legal Framework and the Impact on Borrowers and Lenders," Urban Institute, June 9, 2015 (respondent)
- "Introduction to Creditors' Rights and Bankruptcy," Gerson Lehrman Group webcast, June 2, 2015 (presenter)
- "Mortgage Servicing:  Contracts, Technology and Incentives," Consumer Financial Protection Bureau, Enforcement Division, Washington DC, April 21, 2015 (presenter)
- "Politics of the Bailouts," Financial Crisis Seminar, University of California, Irvine, Mar. 11, 2015 (presenter)
- "Clearinghouses and the Bankruptcy Treatment of Financial Contracts," Brooklyn Law School, Symposium on the Treatment of Financial Contracts in Bankruptcy and Bank Resolution, Feb. 27, 2015 (presenter)
- "Second-Liens and the Leverage Option," Georgetown University Law Center Faculty Workshop, Jan. 29, 2015 (presenter)


## 2014

- "Safe Banking," Duke University School of Law Faculty Workshop, Dec. 11, 2014 (presenter)
- ABI-Brooklyn Law School Junior Scholars Bankruptcy Workshop, Nov. 21-22, 2014 (commentator)
- "Safe Banking," University of Virginia Law School Law & Economics Workshop, Nov. 13, 2014 (presenter)
- "Safe Banking," University of Maryland School of Law Faculty Workshop, Oct. 23, 2014 (presenter)
- "Introduction to Creditors' Rights and Bankruptcy," Gerson Lehrman Group webcast, Oct. 16, 2014 (presenter)
- "Safe Banking," Georgetown University Law Center Faculty Workshop, Sept. 23, 2014 (presenter)
- "Introduction to Creditors' Rights and Bankruptcy," Anchorage Capital, New York, Sept. 18, 2014 (presenter)
- "Introduction to Creditors' Rights and Bankruptcy," Gerson Lehrman Group webcast, July 29, 2014 (presenter)
- "Financial Services and the Post Office," Pew Charitable Trusts, Washington, D.C., July 16, 2014 (panelist)
- "The $10 Trillion Dollar Question:  Reforming Housing Finance Markets," American Law Institute Young Scholar's Medalist Conference, Washington, DC, June 10, 2014 (convener)

- "Why Teach Consumer Finance", American Association of Law Schools Mid-Year Meeting, Washington DC, June 9, 2014, panel on "Modern Financial Regulatory Approaches"
- "Perspectives on the CFPB," Financial Services Roundtable's 4th Annual Consumer Program, May 14, 2014, Washington, DC (panelist)
- "Short-Term Debt Markets," Institute for Law and Economics Corporate Roundtable, University of Pennsylvania Law School, May 2, 2014 (panelist)
- "What Should/Shouldn't Be in the Fine Print?", Making The Fine Print Fair, April 4, 2014, Washington, DC (moderator)
- "Behavioral Economics:  The End of the First Wave," Georgetown University Faculty Retreat, Feb. 19, 2014 (presenter)

## 2013

- "Mortgage Servicing", Consumer Financial Protection Bureau Legal Division Speaker Series, Dec. 11, 2013
- "The Politics of Financial Regulation and the Regulation of Financial Politics," Georgetown University Law Center Faculty Workshop, Nov. 12, 2013
- "The Politics of Financial Regulation and the Regulation of Financial Politics," Fordham University Law School Faculty Workshop, Nov. 7, 2013
- "The Disclosure Paradox," Americans for Financial Reform Conference on Transparency in Financial Regulation, Washington DC, Oct. 11, 2013.
- "Financing Housing:  GSE Reform and Sensible Mortgage Lending, CQ Roll Call Forum in partnership with the National Association of Home Builders, Washington, DC, Sept. 17, 2013 (panelist)
- CFPB Conference on Mobile Payments and Financial Inclusion, Sept. 12, 2013 (panelist)
- "Legal Leverage," Law and Society Association Annual Meeting, June 1, 2013
- "Legal Leverage," American Law Institute Annual Meeting, May 21, 2013
- "Bankruptcy Law and the Cost of Credit: The Impact of Cramdown on Mortgage Interest Rates," Harvard Law School Law and Economics Workshop, April 9, 2013
- "Duties to Serve after the Fall," Harvard Joint Center for Housing Studies, April 2, 2013

## 2012

- "The Paper Chase:  Securitization, Foreclosures, and the Uncertainty of Mortgage Title," Harvard Law Faculty Workshop, Nov. 12, 2012
- "Community Responses to the Foreclosure Crisis," Harvard Law School, Nov. 9, 2012 (panelist)
- Cornell Junior Scholars Financial Regulation Workshop, Sept. 29, 2012 (commentator)
- "American Financial Regulation," Cornell Law School Faculty Workshop, Sept. 28, 2012
- "A Transactional Genealogy of Scandal," Georgetown University Law Center Faculty Workshop, July 19, 2012
- "RTC 2.0," Pew Housing Conference, Washington, DC, June 20, 2012
- "Opportunities and Challenges for Businesses and Consumers."  FTC Mobile Payments Workshop, Washington, DC, April 26, 2012
- "A Theory of American Financial Regulation," University of Minnesota School of Law, Minneapolis, MN, April 23, 2012

- "A Theory of American Financial Regulation," Georgetown University Law Center Faculty Workshop, April 19, 2012
- Consumer and Investor Protection, George Washington University Law School C-LEAF Conference, Mar. 2, 2012 (panelist)
- "Mortgage Notes and the Uniform Commercial Code," American Ass'n of Law Schools Annual Convention, Washington, DC, Jan. 5, 2012 (panelist)

## 2011

- "The Consumer Financial Protection Bureau," World Bank, Washington, DC, Nov. 17, 2011 (panelist)
- "Mortgage Servicing Litigation," AmeriCatalyst Conference, Austin Texas, Nov. 2011
- "Modification of Mortgages in Bankruptcy," John Marshall School of Law, Chicago, IL, Oct. 20, 2011
- "Financial institutions in the new regulatory environment: Opportunities, constraints and global challenges," Georgetown McDonough School of Business, Washington, DC, Sept. 22, 2011 (panelist)
- "The Public Option in Housing Finance," Univ. Pennsylvania Law School Conference on Regulatory Breakdown, Sept. 2011
- "Mortgage Servicing," National Association of Business Economists webinar, July 7, 2011
- "Servicing Litigation," AmeriCatalyst webinar, June 23, 2011
- "State Bankruptcy," Stanford Law School, Palo Alto, CA, May 13, 2011
- "In Defense of Bailouts," C-LEAF Junior Scholars Workshop, April 1, 2011
- Durbin Amendment, PYMNTS Conference, Washington, DC, Mar. 29, 2011 (panel)
- "State Bankruptcy," American College of Bankruptcy, Washington, DC, March 19, 2011
- "Behavioral Economics and the Consumer Financial Protection Bureau," GMU National Attorneys General Education Program, Arlington, VA, March 11, 2011
- "The Dodd-Frank Act and the Financial Crisis Inquiry Commission Report," GMU National Attorneys General Education Program, Arlington, VA, March 10, 2011
- The Big-Bankruptcy Empirical Research Agenda, Conference, UCLA Law School, Los Angeles, California, February, 11 2011 (presenter)
- Treatment of Derivatives and Other Financial Contracts in Insolvency, World Bank Insolvency and Debtor/Creditor Regime Task Force Meeting, January 11, 2011 (presenter)
- Asset Sales in Bankruptcy, American Association of Law Schools Annual Convention, San Francisco, California, January 7, 2011 (moderator)
- Credit Cards and College Students, American Association of Law Schools Annual Convention, San Francisco, California, January 7, 2011 (panelist)
- "Explaining the Housing Bubble," American Association of Law Schools Annual Convention, San Francisco, California, January 6, 2011

## 2010

- "Explaining the Housing Bubble," Tel Aviv University Law School, Law and Economics Workshop, Tel Aviv, Israel, Nov. 29, 2010
- "Modification of Mortgages in Bankruptcy," American University Washington College of Law, Washington, D.C., Nov. 11, 2010
- "The Uncertain Value Proposition in Mobile Commerce," Mobile Commerce Conference, University of Washington Law School, Seattle, October 29, 2010

- "Robosigning, Putbacks, and Failed Loan Modification Programs," Federal Reserve System & Federal Deposit Insurance Corporation Conference on Mortgages and the Future of Housing Finance, Arlington, VA, Oct. 25, 2010
- "Why We Need Bankruptcy More Than Ever," American College of Bankruptcy, Washington, D.C., Oct. 22, 2010 (moderator)
- "Explaining the Housing Bubble," Georgetown University Law School Legal Scholarship Workshop, Washington, D.C., Oct. 20, 2010
- "In Defense of Bailouts," University of Pennsylvania School of Law, Philadelphia, Pennsylvania, Oct. 18, 2010
- "What Have They Done?" American Enterprise Institute, Washington, D.C. Oct. 14, 2010 (panelist)
- AmeriCatalyst, Inside Out: Rebuilding the U.S. Housing Finance System, Austin, Texas, Sept. 14, 2010 (moderator)
- AmeriCatalyst, Inside Out: Rebuilding the U.S. Housing Finance System, Austin, Texas, Sept. 13, 2010 (panelist)
- "Financial Data Privacy in the United States," U.S. State Department Foreign Press Center, Washington, D.C., June 21, 2010
- "Information Failures in the U.S. Mortgage Crisis," Tobin Project Workshop, Washington, D.C., June 8, 2010
- "Information Failures in the U.S. Mortgage Crisis," Federal Reserve Bank of Philadelphia, May 14, 2010
- "Too Big to Fail," American Bankruptcy Institute Great Debates, ABI Annual Convention, Washington, D.C., April 30, 2010
- "In Defense of Bailouts," Georgetown University Law Center Faculty Workshop, Washington, D.C., April 14, 2010
- Practicing Law Institute, Consumer Financial Services Institute, Chicago, Apr. 8, 2010 (panelist)
- "Private Disordering? Payment Card Fraud Liability Rules," Symposium on Data Security and Data Privacy in the Payment System, Brooklyn Law School, Mar. 19, 2010
- The New Regulatory Landscape, Filene Research Institute, National Credit Union Executive Conference, Feb. 23, 2010 (keynote)
- "Private Label Securitization," University of Pennsylvania Wharton School, Philadelphia, Pennsylvania, Feb. 22, 2010
- Practicing Law Institute, Consumer Financial Services Institute, New York, Feb. 18, 2010 (panelist)

**2009**

- The Consumer Financial Protection Agency, Consumer Federation of America Financial Services Conference, Washington, D.C., Dec. 3, 2009 (panelist)
- "Conceptual Challenges in Access to Credit versus Regulation" Conference on Consumer Finance Post-Apartheid: The South African Experience, University of Connecticut School of Law, Nov. 21 (moderator)
- "The Disclosure Paradox," University of Connecticut School of Law, Nov. 21, 2009
- The Consumer Financial Protection Agency, American Enterprise Institute, Washington, D.C., Nov. 18, 2009 (panelist)
- "Mortgage Workouts," University of Pennsylvania Law School, Philadelphia, Pennsylvania, Nov. 17, 2009

- "Too Big to Fail," American Bankruptcy Institution Legislative Symposium, Washington, D.C., Nov. 17, 2009 (panelist)
- "Role of Central Banks in Payment System Regulation," Federal Reserve Bank of Kansas City, November, 2009
- Workshop on Behavioral and Institutional Research and Financial Services Regulatory Reform, Penn Law School, Philadelphia, Pennsylvania, Nov. 6, 2009 (moderator)
- "The Consumer Financial Protection Agency," Women in Housing Finance, Washington, D.C., Oct. 29, 2009 (panelist)
- The Consumer Financial Protection Agency, Symposium: Regulatory Reform at the Crossroads: What Is the Right Response to the Financial Crisis?, George Washington University Law School, Washington, D.C., October 23, 2009 (panelist)
- "Consumer Credit Reform Legislation," American Bankruptcy Institute Midwest Consumer Bankruptcy Conference, Chicago, Illinois (October 2009) (keynote address)
- "DIP Financing," American Bankruptcy Institute-University of Missouri Kansas City Bankruptcy Conference, Kansas City, Missouri (October 2009) (panelist)
- "Making Home Affordable?," American Bankruptcy Institute-University of Missouri Kansas City Bankruptcy Conference, Kansas City, Missouri (October 2009) (keynote address)
- "Current Issues in Chapter 11," American Bankruptcy Institute Northeast Bankruptcy Conference, Bretton Woods, New Hampshire (July 2009) (panelist)
- "Consumer Protection in Financial Transactions," ABA Section on Antitrust, Consumer Protection Conference, Georgetown University Law Center (June 2009) (panelist)
- "Frankenstein Contracts," Stanford-Yale Junior Faculty Forum, Palo Alto, California (May 30, 2009)
- "Who Pays for Payments," Federal Reserve Bank of Chicago, May 15, 2009
- "The Financial Crisis and Administrative Law," Georgetown University Law Center White Tablecloth Faculty Luncheon, May 2009
- "The Financial Crisis," Georgetown University Law Center Board of Visitors Annual Meeting, Santa Fe, NM, April 4, 2009
- "Bankruptcy Claims Trading," Symposium, Brooklyn Law School & Brooklyn Journal of Corporate, Financial and Commercial Law (February 27, 2009)
- "Modification of Mortgages in Bankruptcy," International Monetary Fund, (January 23, 2009)
- "Real Estate Transactions in Troubled Times," Joint Extended Program of the AALS Section on Real Estate Transactions and the AALS Section on Creditors' and Debtors' Rights, American Association of Law Schools Annual Convention (January 10, 2009)
- "Hydraulic Regulation," AALS Section on Financial Institutions and Consumer Financial Services. American Association of Law Schools Annual Convention (January 9, 2009)

**2008**

- "Mortgage Loss Mitigation," Pennsylvania Bar Institution Real Estate Institute, Philadelphia, PA, (Dec. 5, 2008) (panelist)
- "The Impact of the Subprime Meltdown," Commercial Law League of America and National Conference of Bankruptcy Judges (Nov. 11, 2008) (panelist)
- "Foreclosure Externalities," Conference on "The Public Aspects of Private Property," Georgetown University Law Center (Nov. 7-8, 2008)
- "United States Banking Regulation," Presentation to Great Wall Asset Management Corporation (Chinese government agency responsible for non-performing bank assets), Georgetown University, Oct. 30, 2008)

- "Equal Rights Under Law," Response to Professor Li Xia Feng, Georgetown University-Chinese Central Party School Conference, Washington, D.C., (Oct. 21, 2008)
- "Wall Street to Main Street: Bail Out and Restructuring," ABA 2008 Administrative Law Conference, Washington, D.C. (Oct. 17, 2008) (panelist)
- "The Subprime Mortgage Crisis: A Systemic View," National Conference of Bankruptcy Judges Annual Convention (September 25, 2008) (panelist)
- "Lehman Brothers' Bankruptcy," Student Bar Association, Georgetown University Law Center (Sept. 17, 2008)
- "Hydraulic Regulation: Regulating Credit Markets Upstream," Georgetown University Law Center Faculty Workshop (Sept. 16, 2008)
- Panel on "Mounting Household Debt, Lending Practices, and Legislative and Regulatory Responses," Federal Reserve Bank of Cleveland 2008 Community Development Policy Summit (June 11, 2008)
- "Hydraulic Regulation: Regulating Markets Upstream" University of Connecticut School of Law Junior Workshop on Banking and Consumer Financial Services Law (May 28, 2008)
- Panel on "Credit Card Regulation" Conference on Consumer Credit Protection Sponsored by the Federalist Society, the Financial Services Roundtable, and the Consumer Bankers Association, National Press Club, Washington, D.C., (May 20, 2008)
- "Mortgage Market Sensitivity to Bankruptcy Modification," American Law and Economics Association Annual Convention, (May 16, 2008)
- Panel on "Emerging Privacy Issues between the US and the EU - Bridging the Transatlantic Gap," Conference at Georgetown University Law Center (April 28, 2008)
- Panel on "Bankruptcy Law in Indonesia" at *Indonesia: Current Legal Reform*, Conference sponsored by the United States-Indonesia Society, International Law Institute, and the Millennium Challenge Corporation (a United States government corporation) (April 22, 2008)
- Panel on "Subprime Mortgage Lending," Paul Robeson Conference, Columbia Law School (April 18, 2008)
- "Mortgage Market Sensitivity to Bankruptcy Modification," University of Virginia School of Law Faculty Workshop (April 11, 2008)
- "Mortgage Market Sensitivity to Bankruptcy Modification," Board of Governors of the Federal Reserve, Research and Statistics Workshop (March 25, 2008)
- "Mortgage Market Sensitivity to Bankruptcy Modification," Georgetown University Faculty Workshop (March 18, 2008)
- "Mortgage Market Sensitivity to Bankruptcy Modification," Harvard-University of Texas Conference on Commercial Realities (Feb. 29, 2008)

**2007 and prior**
- Commentator, Conglomerate Third Annual Junior Scholars' Workshop (June 24, 2007)
- "Priceless? The Costs of Credit Card Merchant Restraints," Cornell Law School (Dec. 18, 2006)
- "Priceless? The Costs of Credit Card Merchant Restraints," Georgetown University Law Center (Dec. 4, 2006)
- "Priceless? The Costs of Credit Card Merchant Restraints," The Ohio State University Moritz College of Law (Nov. 28, 2006)
- "Priceless? The Costs of Credit Card Merchant Restraints," Cardozo Law School (Nov. 21, 2006)
- "Priceless? The Costs of Credit Card Merchant Restraints," Washington University in St. Louis Law School (Nov. 20, 2006)

- "Priceless?  The Costs of Credit Card Merchant Restraints," Northwestern University Law School (Nov. 14, 2006)
- "Priceless?  The Costs of Credit Card Merchant Restraints," American University Washington College of Law (Nov. 9, 2006)
- "Priceless?  The Costs of Credit Card Merchant Restraints," Brooklyn Law School (Nov. 1, 2006)
- "Priceless?  The Costs of Credit Card Merchant Restraints," Emory Law School (Oct. 18, 2006)
- "Finding <u>Nemo</u>:  Rediscovering the Virtues of Negotiability in the Wake of <u>Enron</u>," New York Law School (Sept. 8, 2006)
- "Finding <u>Nemo</u>:  Rediscovering the Virtues of Negotiability in the Wake of <u>Enron</u>," Conglomerate Second Annual Junior Scholars' Workshop (July 10, 2006), *at* http://www.theconglomerate.org/junior_scholars_workshop/index.html


## COURSES TAUGHT

**Bankruptcy:**  2008(s); 2008(sum); 2008(f); 2009 (sum); 2010(s); 2022(s)

**Contracts:**  2009(f); 2011(f); 2012(f-Harvard Law School)

**Commercial Finance/Secured Credit:**  2009(s); 2013(f)

**Consumer Finance:**  2011(s); 2012(s); 2013(s-Harvard Law School); 2014(s), 2017(s); 2018(s); 2019(s), 2021(s)

**Financial Restructuring:**  2011(s); 2012(s); 2013(s-Harvard Law School); 2014(s); 2016(s), 2016(f); 2017(f); 2019(s), 2020(s), 2020(f), 2021(f)

**Law of Money Seminar:** 2016(s), 2021(s)

**Payment Systems and Financial Transactions:**  2008(sum—FTC); 2008(f)

**Regulation of Financial Institutions:**  2018(f)

**Sales and Leases:** 2017(s); 2018(s)

**Structured Finance (Securitization & Derivatives):**  2010(s)


## SCHOOL SERVICE

- Academic Standards Committee (2021(f))
- Appointments Committee (2018-19; 2013-14; 2011-12, chair; 2009-10)
- Faculty Workshop Committee (2016(s), chair; 2017(f), chair)
- Fellows and Teaching Careers Committee (2019-20)
- Finance Committee (2010-11)
- Financial Aid Committee (2013-2014)
- Rank and Tenure Committee (2020-21)
- Tax Appointments Committee (2013-14; chair, 2010-11)
- Technology Committee (2016-17)
- Legal Profession Committee (2008-2009; 2007-2008)

## PROFESSIONAL SERVICE AND ACTIVITIES

- DC Bar Pro Bono Center, Bankruptcy Clinic trainer (2021)
- Jewish Federation of Greater Washington Anti-Poverty Initiative (2021)
- Biden for President, Policy Volunteer Coordinator—Consumer Protection and Consumer Credit (2020)
- Warren for President, Policy Volunteer Coordinator—Financial Regulation, Consumer Protection, and Bankruptcy (2019-2020)
- Federal Reserve Bank of Philadelphia, Supervisory Research Forum (2019-2020)
- Supreme Court Fellows Program, Academic Advisory Board (2018-19)
- Member, Mortgage Servicing Collaborative (convened by the Urban Institute) (2018)
- Federal Reserve Secure Payments Task Force (2015)
- Federal Reserve Faster Payments Task Force (2015)
- Consumer Financial Protection Bureau, statutory Consumer Advisory Board (2012-2015)
- Member, American Law Institute Advisory Group on UCC and Holder-in-Due-Course Policy.
- Member, American Law Institute Member's Consultative Group, Restatement on Law of Consumer Contracts
- Urban Institute, Housing Finance Policy Center, Academic Research Council
- Center for American Progress, Mortgage Finance Working Group
- Reporter, Advisory Committee on Multiple Debtor Cases, American Bankruptcy Institute Commission to Study the Reform of Chapter 11
- World Bank Insolvency and Debtor/Creditor Regime Task Force
- Fellow, Center for Law, Economics and Finance (C-LEAF) at George Washington University Law School
- Editorial Board, AMERICAN BANKRUPTCY INSTITUTE LAW REVIEW
- Manuscript reviewer for AMERICAN BANKRUPTCY LAW JOURNAL; Cambridge University Press; CITYSCAPE; Conference on Empirical Legal Studies; COLUMBIA LAW REVIEW; Cornell University Press; GEORGETOWN LAW JOURNAL; HOUSING POLICY DEBATE; JOURNAL OF EMPIRICAL LEGAL STUDIES; LAW & SOCIETY REVIEW; Netherlands Organization for Scientific Research; Oxford University Press; STANFORD LAW REVIEW, University of Chicago Press; YALE LAW JOURNAL; Yale University Press
- Area Organizer for Bankruptcy, American Law and Economics Association (2009)
- Executive Committee Member, AALS Section on Fin. Institutions & Consumer Fin. Services (2009)

## COURT ADMISSIONS

- Supreme Court of the United States (2015) (Bar # 294231)
- United States Court of Appeals for the Third Circuit (2006)
- United States District Court for the Southern District of New York (2006)
- United States District Court for the Eastern District of New York (2006)
- New York State Courts (2006)

**APPENDIX B. DOCUMENTS RELIED UPON IN FORMULATING THE REPORT**

**Litigation Documents**
- Second Amended Complaint
- Answer to Second Amended Complaint
- Defendant American First Finance, Inc.'s. Answers to Plaintiff's Interrogatories
- Defendant American First Finance, Inc.'s. Answers to Plaintiff's Interrogatories, Set Two
- Defendant American First Finance, Inc.'s. Supplemental Answer to Plaintiff's Interrogatory No. 5 to American First Finance, Inc., Set One
- Defendant American First Finance, Inc.'s. Supplemental Answer to Plaintiff's Interrogatory No. 8 to American First Finance, Inc., Set Two
- Defendant American First Finance, Inc.'s. Supplemental Answer to Plaintiff's Interrogatories Nos. 16-24 to American First Finance, Inc., Set Two
- Defendant American First Finance, Inc.'s. Answers to Plaintiff's Interrogatories, Set Three
- Responses of Defendant Ahmad Alrawashdeh to Plaintiff's Request for Admission
- Responses of Defendant Murad Alrawashdeh to Plaintiff's Request for Admission

**Discovery Production**
- AFF-Andrade 000257
- AFF-Andrade 000274
- AFF-Andrade 00355-56
- AFF-Andrade 000799
- AFF-Andrade 000801-80
- AFF-Andrade 000964
- AFF-Andrade 001189
- AFF-Andrade 001236-39
- AFF-Andrade 001245
- AFF-Andrade 001317
- AFF-Andrade 001329
- AFF-Andrade 001337
- AFF-Andrade 001346

- AFF-Andrade 001889
- AFF-Andrade 001917
- AFF-Andrade 002029
- AFF-Andrade 002076
- AFF-Andrade 002085
- AFF-Andrade 002284
- AFF-Andrade 002293
- AFF-Andrade 005116
- AFF-Andrade 005170
- AFF-Andrade 005198
- AFF-Andrade 005772
- AFF-Andrade 005790
- AFF-Andrade 005808
- AFF-Andrade 006955
- AFF-Andrade 006964
- AFF-Andrade 007216-46
- AFF-Andrade 008692
- AFF-Andrade 009875-79
- AFF-Andrade 009880
- AFF-Andrade 009883
- AFF-Andrade 011090
- AFF-Andrade 011101
- AFF-Andrade 012410
- AFF-Andrade 013762-69.
- Bella's-Andrade 000016
- Bella's-Andrade 000021
- FAC-0037

**Deposition Transcripts (with exhibits)**

- Maria Andrade Depo. Tr.
- Muhammad Ashraf Depo. Tr.

- John Reginald Britt Depo. Tr. (2019)
- John Reginald Britt Depo. Tr. (2021)
- Ricardo Campos Depo. Tr.
- Patrick Christen Depo. Tr.
- Mark Fenton (rough) Depo. Tr.
- Meredith Garland Depo. Tr.
- Andy Gonzalez Depo. Tr.
- Pamela Justiss Depo. Tr.
- Teresa Loredo Depo. Tr.
- Annette Walter Depo. Tr. (Vols. 1 and 2)

**California State Law Provisions**

- California Constitution, article XV
- Cal. Civ. Code §§ 1801-1812.20 (Unruh Act)
- Cal. Fin. Code §§ 22000-22407 (California Financing Law)

**Judicial and Administrative Decisions**

- *AT&T Mobility LLC v. Concepcion*, 5563 U.S. 333 (2011)
- *Armendariz v. Foundation Health PsychCare Services, Inc.*, 24 Cal. 4th 83 (Cal. 2000)
- *Boerner v. Colwell Co.*, 21 Cal. 3d 37 (Cal. 1978)
- *De La Torre v. CashCall, Inc.*, 5 Cal. 5th 966 (Cal. 2018)
- *In the Matter of the Commissioner of Business Oversight v. Sezzle, Inc.*, 2019 WL 8194406 (Cal. Dept. Corp. Dec. 30, 2019)
- *Pinnacle Museum Tower Ass'n v. Pinnacle Market Development (US), LLC*, 55 Cal. 4th 223 (Cal. 2012)
- *W. Pico Furniture Co. v. Pac. Fin. Loans*, 2 Cal. 3d 594, 603 (1970)

**Other Sources**

- American First Finance Inc. Statement of Designation by Foreign Corporation filed 02/06/2018 with the California Secretary of State
- Cal. Dept. of Bus. Oversight, Opinion Letter re: Deferred Payment Products, File No. OP 7667 (Dec. 20, 2019)