# EXHIBIT 9

*Confidential*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA ANDRADE, on behalf of herself and those similarly situated;<br><br>　　　　　　　　　Plaintiff,<br><br>　v.<br><br>AMERICAN FIRST FINANCE, INC., a corporation; AHMAD FAYEZ AL RAWASHDEH, an individual and dba ELEGANT FURNITURE; MURAD FAYEZ AL RAWASHDEH, an individual and dba ELEGANT FURNITURE;<br><br>　　　　　　　　　Defendants. | Case No. 18-cv-6743-SK<br><br><br><br><br><br>**REBUTTAL EXPERT REPORT OF MARK GUSTAFSON** |

**FEBRUARY 14, 2022**

*Confidential*

34. Ms. Andrade's RISC had an APR of 120%; the scheduled payments comprised $2,567.05 relative to an amount financed of $1,201.62, meaning that scheduled payments exceeded the amount financed (origination amount) by approximately 114%.[34] Mr. Britt, AFF's chief technology officer, testified that Ms. Andrade's rate of 120% was the default rate for contracts originated at the time (in 2015).[35]

35. In contrast, my analysis finds that the total amount paid to AFF for at-issue contracts that were originated in 2015 exceeded the origination amounts by only 35.4%. For at-issue contracts originated from the beginning of the proposed class period through the end of 2019, I find that the total amount paid to AFF exceeded the origination amounts by only 37.0%. **See Exhibit 3.**

36. To evaluate the extent to which my findings might be due to contracts that were paid off during the abatement period, **Exhibit 3** also presents results excluding at-issue contracts that were paid off in 101 days or fewer. For example, I find that, for contracts originated through the end of 2019, the total amounts paid to AFF exceeded the origination amounts by 53.4%. This finding suggests that contracts paid off during the abatement period are not the sole reason why the total amounts paid across the portfolio of at-issue contracts was lower than what would be expected if all contracts were paid over the scheduled repayment period at their contracted APRs.

### C. Many Proposed Class Members Were Repeat Customers, Which May Reflect That They Had Satisfactory Prior Experiences with AFF's Services and Were Aware of and Agreeable to the Terms of AFF's Services

37. Mr. McFarlane's restitution methodologies assume that all Proposed Class Members who made payments to AFF were harmed (Method 1) or that those who paid AFF more than a

---

[34] Exhibit B to Complaint, p. 1.

[35] Deposition of John Reginald Britt, September 10, 2021 ("Britt 2021 Deposition"), 112:13-113:8.

*Confidential*

56. The Proposed Class Members are typically higher credit risks than typical U.S. consumers.[58]

57. Mr. McFarlane testified that a company offering an installment payment option assumes a risk of nonpayment or delayed payment and it is reasonable for the company to be compensated for that risk.[59] Mr. McFarlane has not provided any method of evaluating what compensation to AFF would be reasonable for assuming those risks.

58. To evaluate if Mr. McFarlane's illustrative benchmark interest rate of 10% is realistic, I reviewed the U.S. Consumer Financial Protection Bureau (CFPB)'s Consumer Credit Card Market Reports, which provide data on the cost of credit cards for consumers with varying credit scores. I find that Mr. McFarlane's interest rate is unrealistically low given the risk profiles of AFF's customers.

59. The CFPB's Total Cost of Credit (TCC) measure for credit cards "captures the totality of payments by consumers to issuers as an annualized percentage of cycle-ending balances on their

---

[58] The Complaint alleges that "AFF targets its products to consumers with poor or little to no credit. AFF promises almost instant credit approvals with little to no credit history." Complaint, ¶¶ 32-33.

Mr. Fenton, who worked as an "outside business development rep[resentative]" for AFF, testified that "There's just no reason for somebody who has a credit score above 650 to enter into a retail installment agreement with American First because the terms aren't as favorable as they would get from another source." Deposition of Mark Fenton, October 21, 2021, 16:2-7, 55:6-10.

The home page of AFF's retail installment product page (https://americanfirstfinance.com/retail-installment) states:
> What does "No Credit Required" and "FICO® not required for approval" mean?
>
> When applying with the retail merchant for a retail installment contract, it is likely that your credit history or FICO Score will be pulled. However, it is possible to not have a credit history or FICO Score and still receive an approval.

[59] McFarlane Deposition, ¶ 34:7-20.

*Confidential*

# Appendix C
# Excerpts from Consumer Financial Protection Bureau
# Consumer Credit Card Market Reports

## 2021 CFPB Credit Card Report

TABLE 1: CREDIT SCORE RANGE SHARES AS OF Q4 2019 (CCP)

| Credit score tiers | U.S. adult population | U.S. scored population | U.S. scored credit cardholding population |
|---|---|---|---|
| Superprime (scores of 720 or greater) | 41% | 54% | 64% |
| Prime (scores from 660 to 719) | 12% | 16% | 16% |
| Near-prime (scores from 620 to 659) | 6% | 8% | 8% |
| Subprime (scores from 580 to 619) | 5% | 7% | 6% |
| Deep subprime (scores of 579 or less) | 12% | 16% | 7% |
| Thin or stale score file | 12% | -% | -% |
| Credit invisible[37] | 11% | -% | -% |



Figure 1: TOTAL COST OF CREDIT, REVOLVING ACCOUNTS, GENERAL PURPOSE (Y-14+)



Figure 2: TOTAL COST OF CREDIT, REVOLVING ACCOUNTS, PRIVATE LABEL (Y-14+)

*Confidential*

# Appendix C
# Excerpts from Consumer Financial Protection Bureau
# Consumer Credit Card Market Reports

## 2017 CFPB Credit Card Report



FIGURE 3: TOTAL COST OF CREDIT, 2016 (SHADED AREA REPRESENTS FEES, SOLID AREA REPRESENTS INTEREST CHARGES) (Y-14)



FIGURE 4: TOTAL COST OF CREDIT, REVOLVING ACCOUNTS, 2016 (SHADED AREA REPRESENTS FEES, SOLID AREA REPRESENTS INTEREST CHARGES) (Y-14)