UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARIA ANDRADE,

    Plaintiff,

    v.

AMERICAN FIRST FINANCE, INC., et al.,

    Defendants.

Case No. 18-cv-06743-SK

**ORDER ON EQUITABLE RELIEF**

Now that the jury has returned the verdict, Plaintiff Maria Andrade's claim under California Business and Professions Code § 17200 *et seq.* for equitable relief is ripe for the Court to address. The Court makes the following Findings of Fact and Conclusions of Law. This Order also incorporates the Findings of Fact and Conclusions of Law from the Order dated April 20, 2023. (Dkt. No. 449.)

**Findings of Fact**

Elegant Furniture is the fictitious business name of Murad Fayez Al Rawashdeh. (Trial Exhibit 120.) Murad Fayez Al Rawashdeh was doing business as Elegant Furniture in 2015. (*Id.*) For purposes of this Order, all references will be to "Elegant Furniture."

Defendant American First Finance, Inc. ("Defendant") is a subsidiary of a large corporation that is traded on the public markets. (Trial Exhibit 30; Trial Transcript ("TT") Vol. 4 at 492:24-493:5). Defendant entered into a contract titled "Retail Installment Sales Contract Program Agreement (the "Merchant Agreement") with Elegant Furniture, dated January 30, 2015. (Trial Exhibit 53.) The Merchant Agreement specifically listed Murad Al Rawashdeh as a "propership" [sic] and listed him as an "owner" of Elegant Furniture. (*Id.*)

Defendant also created a "dealer portal" through which Elegant Furniture was able to directly access Defendant's computer system prior to either party offering to purchase or sell any retail installment contracts among each other. (Trial Exhibits 53, 64.)

1    Defendant drafted all terms of the Security Agreement, including the blank spaces that were filled in either prior to or at the time of the transaction; Elegant Furniture did not fill out or draft any provisions in Defendant's form agreement. (TT Vol. 4 at 487; Trial Exhibit 140 (Transcript of Annette Walter Deposition ("Walter Tr.") at 80:08-103:08.)[1]

Defendant inserted the provision for the interest rate of 120% into the Security Agreement, and Defendant calculated the amount and schedule of monthly payments. (TT Vol. 4 at 460; Trial Exhibit 137 (Transcript of John Reginald Britt Deposition ("Britt Tr.")) at 110:10-113:11; TT Vol. 4 at 487; Trial Exhibit 140 (Walter Tr.) at 91:10-97:15.)

Defendant placed its own name in the Security Agreement in the sections regarding privacy, arbitration and notice, rather than the name of the purported retail merchant, Elegant Furniture. (TT Vol. 4 at 487; Trial Exhibit 140 (Walter Tr.) at 101:17-102:24.)

Defendant's form Security Agreement indicated that it had already been assigned at the time it was drafted by Defendant and before it was signed by either Elegant Furniture or Plaintiff. (Trial Exhibit 37; TT Vol. 4 at 460; Trial Exhibit 137 (Britt Tr.) at 20:14-23:03.)

Defendant created and fully controlled a system in which Elegant Furniture was advertised on Defendant's website, and Defendant's financing could be accessed through a banner that could be placed on Elegant Furniture's website that would connect consumers directly to Defendant without ever going to the merchant. (TT Vol. 4 at 460; Trial Exhibit 137 (Britt Tr.) at 118:11-121:05.) Defendant also created a "Text to Apply" system allowing consumers to reach Defendant directly without going through a merchant first. (TT Vol. 4 at 460; Trial Exhibit 137 (Britt Tr.) at 118:11-121:05.)

Because the Security Agreements were prepopulated by Defendant with its own contact and notice information, Elegant Furniture could only "sell" these Agreements to Defendant and no other person or entity.

Plaintiff is Maria Andrade, formerly known as Maria Rivera ("Plaintiff"). (TT, Vol. 1 at

---

[1] This deposition testimony was presented at trial, as were the depositions of Ricardo Campos, Mark Gustafson, John Reginald Britt, Pamela Justiss, Thomas Nusspickel, and Meredith Garland. The written transcripts are Trial Exhibits 136-142.

136:16-20; Vol. 2 at 160:1-11.) She grew up in a family of farm workers, and as a child, she helped her family members in the fields. (TT, Vol 2 at 160:25-161:5; 162:8-17.) She graduated from high school and had a job as a caregiver in an assisted living facility in 2015 and at the time of trial. (TT, Vol. 2 at 162:5-6; 162:19-163:2.)

In 2015, she moved from her home in Concord, California, which she shared with her husband and son, to Fresno, California, to live with and care for her elderly mother in her mother's house in Fresno, without her husband and son. (TT, Vol. 2 at 168:9-15; 170:10-18.) She worked for the same company but in another location, and she was depressed and anxious at starting at essentially a new job and taking care of her elderly mother. (TT, Vol. 2 at 168:20-169:8.)

Plaintiff went to Elegant Furniture in Fresno, California on December 9, 2015, to purchase furniture. (Dkt. No. 363 (Joint Pretrial Conf. Statement of Undisputed Facts).)

On December 9, 2015l, Mike Trujillo was a salesman working for Elegant Furniture. (TT, Vol. 2 at 175:2-177:16; Trial Exhibit 16).

Plaintiff purchased $1,201.62 worth of furniture from Elegant Furniture but did not pay the full amount that day. (TT, Vol. 2 at 187:18-189:23.)

Plaintiff knew and told Trujillo that she wanted "financing," and she wanted to pay approximately $100 per month. (TT, Vol. 2 at 305:2-306:11.) Plaintiff and Trujillo sat across from each other at a desk while Trujillo typed information that he gathered from Plaintiff. (TT, Vol. 2 at 178:12-183:20; 306:24-312:16.) Trujillo did not show Plaintiff the information he typed into a computer during the transaction, and Plaintiff could not see the screen. (TT, Vol. 2 at 311:2-312:16.) Trujillo slid the mouse for the computer to Plaintiff to click and told her that the reason was to confirm the accuracy of the information she had provided orally to him. (TT, Vol. 2 at 182:9-184:16; 314:15-316:10.) Plaintiff believed that the one click she made on the computer mouse was to confirm the accuracy of the information she had provided orally and did not believe that, by clicking the mouse, she was electronically signing a document. (TT, Vol. 2 at 179:14-184:16).

Trujillo, acting on behalf of Elegant Furniture, used Defendant's Credit Application form (Trial Exhibit 15) to collect and transmit personal information for Plaintiff to Defendant in

3

accordance with Defendant's requirements and entered the data in Defendant's dealer portal.

Trujillo, acting on behalf of Elegant Furniture, created a document, the "Credit Application." (Trial Exhibit 15.) The Credit Application lists Trujillo's email address, rather than Plaintiff's email address, in the area for "Applicant Information," even though Plaintiff had an email address at the time. (Trial Exhibit 15; TT, Vol. 2 at 207:15-208:5.) The purpose of entering an email address on the Credit Application was so that Defendant could send a copy of the completed Security Agreement to the email address listed there. (Trial Exhibit 64 at AFF-Andrade 000325).

Plaintiff did not see the Security Agreement on December 9, 2015. (TT, Vol. 2 at 206:15-25.) Plaintiff did not see or receive the Security Agreement in hard copy or electronic format until approximately 10 months after December 9, 2015. (TT, Vol. 2 at 206:15-25.)

Elegant Furniture and its salesman Trujillo were operating under the control of Defendant (TT Vol. 4 at 487; Trial Exhibit 139 (Deposition of Ricardo Campos ("Campos Tr.") at 42:11 to 42:18), and they completed the transaction with the Plaintiff through Defendant's dealer portal (Trial Exhibit 14, p.7), using forms drafted completely by Defendant and which Defendant required that Elegant Furniture use without alteration. (Trial Exhibits 53, §§ 2.5, 5.5; TT Vol. 4 at 487; Trial Exhibit 140 (Walter Tr.) at 80:08-103:08.)

Defendant created a Security Agreement with information obtained from Plaintiff (through Trujillo, acting on behalf of Elegant Furniture) and Defendant transmitted that document through the dealer portal to Trujillo, acting on behalf of Elegant Furniture, and Trujillo, acting on behalf of Elegant Furniture, completed the document without obtaining any signatures from Plaintiff. (TT, Vol. 2 at 178:12-184:23; Trial Exhibit 15).

Pursuant to the Security Agreement, the annual percentage rate for financing the purchase of the furniture was 120%, which resulted in a scheduled finance charge of $1,365.43 and monthly payments scheduled to total $2,567.05. (TT, Vol. 2 at 201:9-12; TT, Vol. 5 at 644:13-17; Trial Exhibit 37 at 1.)

Plaintiff did not draft or negotiate the terms of the Security Agreement. (TT, Vol. 2 at 201:9-204:17.)

1          Plaintiff was not told about the 120% rate of interest. (TT, Vol. at 201:9-204:17.)

2          The only document Plaintiff received from Trujillo on December 9, 2015 was an "Invoice" that listed "Elegant Furniture" at the top of the document. (Trial Exhibit 16; TT, Vol. 2 at 190:21-191:5; 214:10-13.) The Invoice did not contain any information about an interest rate and did not identify Defendant. (Trial Exhibit 16.) The Invoice listed the price of the furniture Plaintiff purchased and information about delivery. (*Id*.) The Invoice listed Plaintiff's correct telephone number and her address at her mother's house. (*Id*.)

Plaintiff is unsophisticated in financial transactions and not experienced in the use of computers, other than a simple tablet that she used at work. (TT, Vol. 2 at 165:25-168:7.) Plaintiff was unfamiliar with the DocuSign software program used to populate her electronic signature in the Security Agreement. (TT, Vol. 2 at 165:1-166:10, 209:7-210:15).

The highest interest rate charged for subprime credit cards (unsecured) during the time of Plaintiff's transaction was approximately 40%. (TT Vol. 4 at 568; Trial Exhibit 136 (Transcript of Mark Gustafson Deposition) at 94:20-95:09; Trial Exhibit 108). Defendant's rate of 120% is three times higher than the highest rate for a subprime borrower – the riskiest category of borrower – for unsecured transactions.

Plaintiff did not have any reasonable alternatives to Defendant's Security Agreement because she was purchasing the necessities of life, a bed set and related items, to use while caring for her elderly mother. (TT, Vol. 2 at 174:11, 264:1-265:6). Although she had enough cash to pay for the bed and related items, her circumstances had significantly changed, and her financial obligations were uncertain, so she wanted to preserve her cash resources for emergencies. (TT, Vol. 2 at 174:11, 264:1-265:6).

The realities of poverty require that individuals conserve cash for emergencies and that was true for Plaintiff who had little access to credit, with a single credit card with a limit of only $300. (TT, Vol. 2 at 165:1-6, 264:1-12). Plaintiff was a financially unsophisticated person at a vulnerable point in her life when she was attempting to help her elderly mother in a difficult environment.

The payment schedule in the Security Agreement provides that $143.41 was due each

1    month for the first 17 months of the contract.  (*See* Trial Exhibit 37, payment table located on p. 1;

2    *see also* TT, Volume 2 at p. 331:7-15.)

3          The final payment due under the Security Agreement, in the amount of $129.08, was

4    scheduled for June 1, 2017. (*See* Trial Exhibit 37, payment table located on p. 1; *see also* Trial

5    Transcript, Volume 2 at pp. 331:23-332:3.)

6          The first time funds were withdrawn was on January 6, 2016, when the sum of $143.41

7    was withdrawn from Plaintiff's checking account at Wells Fargo Bank.  (TT, Vol. 2 at 331:7-21;

8    368:17-23; Trial Exhibit No. 37 at 1; Trial Exhibit 134 at page 14, stamped as "AND-0008.")

9          In a separate transaction, Plaintiff entered into a secured retail installment contract with

10   Paul Blanco Good Car Company on January 8, 2016 – one month and nine days after the date of

11   the Security Agreement.  (Trial Exhibit 28).  That contract contained an interest rate of 14.49%,

12   clearly listed on the contract.  (Trial Exhibit 28.)  Plaintiff signed the contract with Paul Blanco

13   Good Car Company in hard copy and received a copy of the contract at the time she signed it.

14   (TT, Vol. 2 at 216:19-219:17.)

15         The sum of $143.41 was again withdrawn from Plaintiff's bank account on February 1,

16   2016, March 1, 2016, April 4, 2016, May 3, 2016, June 1, 2016, July 1, 2016, August 1, 2016,

17   September 1, 2016, and October 3, 2016.  Plaintiff's checking account statements reflected that the

18   money was withdrawn by Defendant (specifically, American First Finance).  (*See* Trial Exhibit

19   134, page 14, stamped as "AND-0008.")

20         Plaintiff did not check her checking account statements and relied upon her daughter to

21   make sure that there were no unauthorized withdrawals because Plaintiff was overwhelmed with

22   her job and caretaking duties.  (TT, Vol. 2 at 191:19-193:5; 356:17-359:11.)  Plaintiff learned that

23   $143 was withdrawn from her account in either January or February 2016, when her daughter

24   notified her, and Plaintiff thought that she could pay off her loan faster because more than $100

25   was being withdrawn from her account each month.  (TT, Vol. 2 at 192:16-193:17.)  Thus, she

26   thought that, as a result of paying $143 per month, for a total price of $1,201.62, her loan

27   payments would end after approximately nine months (because $1,201.62 divided by $143 is 8.3).

28   (TT, Vol. 2 at 193:8-17.)

Plaintiff believed that her loan would be paid in full by September 2016. When Plaintiff saw that $143 was withdrawn from her account, even after she believed that she had paid in full, she contacted Defendant in September 2016. In October 2016, Plaintiff received a hard copy of the Security Agreement, and that was the first time she saw the Security Agreement. (TT, Vol. 2 at 200:16-203:6). She also received a copy of the Credit Application for the first time. (TT, Vol. 2 at 206:15-207:9.) She did not sign or authorize the Credit Application, which was signed electronically. (TT, Vol. 2 at 208:11-209:3; Trial Exhibit 15.)

After Plaintiff received a copy of the Security Agreement, she contacted Defendant via telephone to complain about the fact that she had never signed the Security Agreement. (TT, Vol. 2 at 204:9-21.) Defendant informed her to report the matter to the police, but Plaintiff did not do so. (TT, Vol. 2 at 204:9-205:19.) Defendant took no steps to investigate internally and continued to collect on the loan. (TT, Vol. 2 at 204:22-205:19; Vol. 5 at 670:16-23.)

The sum of $143.41 was drawn from Plaintiff's checking account at Wells Fargo Bank on November 1, 2016, December 1, 2016, January 1, 2017, and February 1, 2017. (*See* Trial Exhibit 44.)

On January 20, 2017, Plaintiff's lawyer wrote a letter to Defendant to rescind the Security Agreement. (Trial Exhibit 18; TT, Vol. 2 at 229:6-230:14.) Defendant did not respond to the letter. (TT, Vol. 2 at 229:6-230:14.)

Plaintiff took efforts to end the payments. (Trial Exhibit 18; TT, Vol. 2 at 232:6-239:14.) The last payment of $143.41 was made by Plaintiff to Defendant on March 17, 2017. (*See* Trial Exhibit 44.)

There were three monthly payments remaining when Plaintiff stopped paying. The final scheduled payment due under the terms of the Security Agreement provided for one payment of $129.08 in June 2017. (TT, Volume 2 at pp. 331:23-332:3; Trial Exhibit 37 at p. 1 [Payment Table].)

Defendant withdrew monthly payments of $143.41 from Plaintiff's bank account every month from January 1, 2016 through February 1, 2017. (Trial Exhibit 44). Because Plaintiff instructed her bank to stop any further withdrawals by Defendant, on March 17, 2017, Defendant

1    initiated an unauthorized ACH withdrawal and charged Plaintiff a $10 Late Fee for a total amount

2    paid of $2,161.15.  (TT, Vol 2 at 234:7-235:1; Trial Exhibit 44).   Thereafter, Plaintiff closed her

3    bank account to stop further withdrawals.  (TT, Vol 2 at 2-10).

4          Under the Security Agreement, Plaintiff's payments were due on the first day of each

5    month in the amount of $143.41.  (Trial Exhibit 37).  Plaintiff's last payment was taken in March

6    2017.  (Trial Exhibit 44).  Therefore, Plaintiff made no further payments, and on May 1, 2017, she

7    was 30 days delinquent, which thereafter increased through the various stages of 60 days, 90 days,

8    charge off and then into collections.

9          Defendant's Director of Operations testified that Defendant "accurately" reported adverse

10   information to TransUnion every 30 days, that after 90 days accounts were charged off. (TT Vol.

11   4 at 487; Trial Exhibit 139 (Campos Tr.) at 107:23-109:09.)  After accounts were charged off, they

12   were submitted to collections, either directly or through a third-party collections company.  (TT

13   Vol. 4 at 487; Trial Exhibit 139 (Campos Tr.) at 104:24-106:19.)

14         After Plaintiff's payments to Defendant were stopped, she received calls directly from

15   Defendant to collect on the debt and her employer received at least one collection call.  (TT, Vol.

16   2 at 238:4-239:22).  Plaintiff was extremely distressed by the Defendant's collection efforts.  (TT,

17   Vol. 2 at 238:4-239:22).

18         In April 2023, the parties tried Plaintiff's claims under California Civil Code §1782, the

19   Consumer Legal Remedies Act ("CLRA") under California law, California Business and

20   Professions Code §17200 ("UCL"), and California Civil Code § 51 ("Unruh Act") in a combined

21   jury and court trial.

22         The Court held that the Security Agreement is unconscionable and instructed the jury on

23   that issue.  (Dkt. No. 449.)  As noted in the Order dated April 20, 2023 (Dkt. No. 449), the

24   Security Agreement is both procedurally and substantively unconscionable.

25         The jury ruled against Plaintiff on the issue of whether she provided notice of her claims

26   under the CLRA in compliance with California Civil Code §1782, and, based on that finding, did

27   not determine whether any of the elements of the CLRA claim had been established.  The claim

28   under the UCL does not have a similar notice requirement.

**Conclusions of Law**

As noted above, the Court adopts the findings of fact and conclusions of law from the Order dated April 20, 2, 23 (Dkt. No. 449) that the Security Agreement is both procedurally and substantively unconscionable.

As relevant here, the UCL prohibits any unlawful, unfair, or fraudulent business act or practice. Cal. Bus. & Prof. Code § 17200.  A business practice may be "unfair" and therefore illegal under the UCL, "even if not specifically proscribed by some other law." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co*., 20 Cal. 4th 163, 180 (1999).

The "unfair" prong under the UCL is "intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable 'new schemes which the fertility of man's invention would contrive.'" *Cel-Tech Commc'ns*, 20 Cal. 4th at 180 (quoting *Am. Philatelic Soc. v. Claibourne*, 3 Cal. 2d 689, 698 (1935)); *see also People ex rel. Mosk v. Nat'l Research Co. of Cal*., 201 Cal. App. 2d 765, 772 (1962) (the UCL covers unfair practices that "may run the gamut of human ingenuity and chicanery"); *Epic Games, Inc. v. Apple, Inc*., 67 F.4th 946, 1000 (9th Cir. 2023) (same).

"[T]o support a finding of unfairness to consumers, a court uses the balancing test, which 'weigh[s] the utility of the defendant's conduct against the gravity of the harm to the alleged victim.'" *Progressive W. Ins. Co. v. Super. Ct.*, 135 Cal. App. 4th 263, 285 (2005) (citation omitted); *see also Epic Games*, 67 F.4th 946 at 1000.

As discussed below, the Court finds that Defendant engaged in three separate unfair business practices.

**A.     Collecting an Unconscionable Loan Alone Constitutes an Unfair Business Practice.**

The act of collecting on an unconscionable retail installment sales contract, even if Defendant acquired it from the seller, is an unfair business practice.  This finding is not dependent upon a finding that the seller was acting as Defendant's agent.  This finding also assumes that Defendant did not have a role in setting the unconscionable rate or in approving the extension of credit to the seller.  This finding also assumes that Plaintiff actually entered into the Security Agreement, which she did not.  The mere act of collecting a debt at this unconscionable rate is an

unfair business practice.

The harm of the action – collecting amounts under a retail sales installment contract at the rate of 120%, outweighs the utility of the transaction – allowing consumers who otherwise might not be able to purchase furniture. Although allowing purchases for furniture to consumers who might not otherwise be able to afford it is helpful, saddling consumers with debt at this high a rate is crippling for those very consumers. Here, Plaintiff was able to purchase furniture, but the rate she paid was extremely high in comparison to the price of her furniture and her income.

**B.    Defendant's Actions in the Process of Creating the System Constitutes Unfair Business Practice.**

Defendant's creation of a system in which it assisted sellers to market and enter into a Security Agreement for an unconscionable rate of interest was an unfair business practice. Defendant had a larger role in the process than simply acquiring and then collecting the payments under the Security Agreement at an unconscionable rate of interest; Defendant created the entire system. Defendant set the unconscionable rate of 120%, prepared the Security Agreement, coordinated and communicated with Trujillo to assess Plaintiff's credit while she was in the process of purchasing furniture, and contracted with Elegant Furniture to acquire the Security Agreement before Plaintiff even entered into the Security Agreement. These additional facts show that Defendant was engaged in the unfair business practice of creating a system in which sellers offered a contract for sale of a product at an unconscionable rate of interest to consumers. This finding is not dependent on a finding that the merchant and/or salesperson was acting as a formal agent of Defendant, as the unfairness of Defendant's actions is based on the specific facts described above, whether or not they create a relationship of agency with the merchant and/or salesperson.

There appears to be some utility to the sellers to provide a system for financing purchasers of furniture, but again, the cost to the consumer of being saddled with a rate of 120% is crippling. Thus, the utility does not outweigh the harm.

**C.    Defendant's Failure to Investigate Constitutes an Unfair Business Practice.**

Defendant's failure to investigate when Plaintiff reported that she did not sign the Security

10

Agreement was also an unfair practice. Plaintiff did not sign or see the Security Agreement, and when she notified Defendant that she had not entered into the Security Agreement, Defendant took no action to confirm that she had not entered into it other than to advise her to file a police report. Instead, Defendant continued to withdraw payments, later tried to collect the payments when blocked by Plaintiff, and reported Plaintiff to TransUnion for owing a debt to Defendant. The harm to Plaintiff – a bad credit rating – was far higher than the utility to Defendant of not investigating Plaintiff's claim, when Defendant was so enmeshed with the system in which Elegant Furniture sold furniture to Plaintiff. Defendant took no action – when a simple review of the Security Agreement, telephone call with Elegant Furniture, and collecting information from Plaintiff – would have demonstrated that Plaintiff did not sign the Security Agreement.

**Remedies**

1. Business & Professions Code §17203 provides that, "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."

2. Defendant acquired from Plaintiff by means of the unfair competition described above the amount of $2,161.15.

3. Factors that weigh in favor of requiring Defendant to return the entire sum include (1) the fact that the 120% rate of interest permeates the entire contract and has been determined to be at a high degree of unconscionability; (2) the fact that Plaintiff was not told that she was entering into the Security Agreement and would not have done so if the terms had been presented to her; (3) the fact that Defendant has a contract with the owner of Elegant Furniture which may have allowed Defendant to reverse the transaction when it first learned that Plaintiff had not signed the Security Agreement; (4) the gravity of harm to Plaintiff, a person living on a limited salary, trying to take care of her family and protect her credit rating, all of which was made

11

1   extremely difficult or impossible by Defendant's conduct; (5) the high degree of distress that
2   Defendant's conduct caused Plaintiff; and (6) the fact that Defendant's unfair conduct continued
3   long after it was informed of relevant, material facts indicating that its basis for continuing to
4   enforce the Security Agreement against Plaintiff was not valid.

5       4.    The Court further finds that in order to deter Defendant from engaging in illegal
6   and unfair conduct, it is necessary to award to Plaintiff in restitution the full amount of money that
7   Defendant took from her as a result of the transaction. *Cortez v. Purolator Air Filtration Products
8   Co.*, 23 Cal. 4th 163, 176 (2000); *People ex rel. Kennedy v. Beaumont Investment, Ltd.* 111 Cal.
9   App.4th 102, 135 (2003) (full refund); *People ex rel. Harris v. Aguayo,* 11 Cal. App. 5th 1150,
10  1169 (2017) (same).

11      5.    The Court thus finds that restitution to Plaintiff is appropriate under Business &
12  Professions Code §17203 and awards Plaintiff a total amount of $2,161.15 in restitution.

13      6.    Pursuant to Bus. & Prof. Code §17203, Defendant is enjoined from any further
14  attempts either directly or through any other entities from collecting or attempting to collect from
15  Plaintiff any further funds in any way related to this account.

16      7.    Pursuant to Bus. & Prof. Code §17203, Defendant is ordered to provide a
17  corrective notice to every credit reporting agency to whom Defendant provided adverse
18  information to Plaintiff that was in any way related to this account.

19      8.    In diversity cases, state law governs an award of pre-judgment interest. *Unies v.
20  Kroll & Linstrom,* 957 F.2d 707, 714 (9th Cir.1992).

21      9.    "Although a court may not award prejudgment interest under Civil Code section
22  3287, subdivision (a), to a restitutionary award under the UCL, the court nevertheless has
23  discretion in equity to award prejudgment interest on a UCL award as a component of restitution."
24  *Espejo v. The Copley Press, Inc.*, 13 Cal. App. 5th 329, 375 (2017).

25      10.    "The policy underlying an award of prejudgment interest is to make the injured
26  party whole for the accrual of wealth that could have been produced during the period of loss." *Id*.

27      11.    The Court finds that prejudgment interest is not necessary to make Plaintiff whole
28  in light of her restitution award and therefore declines to award her prejudgment interest.

1      12.     Based on the restitution awarded to Plaintiff, Plaintiff no longer owes any debt to
2  Defendant.  Therefore, Defendant would have no basis to sell any debt for collections or attempt to
3  seek possession of Plaintiff's furniture.

4      **IT IS SO ORDERED**.

5  Dated: June 28, 2023    
                             SALLIE KIM
6                            United States Magistrate Judge

13